IN THE DISTRICT COURT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| WINSTON TYLER HENCELY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | CIVIL ACTION FILE |
| v. | * | |
| | * | NO. _____ |
| FLUOR CORPORATION, INC.; | * | |
| FLUOR ENTERPRISES, INC.; | * | |
| FLUOR INTERCONTINENTAL, | * | |
| INC.; FLUOR GOVERNMENT | * | |
| GROUP INTERNATIONAL, INC., | * | |
| | * | |
| Defendants. | * | |

## **COMPLAINT FOR DAMAGES**

Winston Tyler Hencely ("Hencely") files this his Complaint for Damages

against Fluor Corporation, Inc.,  Fluor Enterprises, Inc., Fluor Intercontinental,

Inc., and Fluor Government Group International, Inc. (collectively, "Fluor").

Plaintiff shows the Court the following:

## I.    INTRODUCTION

1.

Plaintiff Winston Hencely is a United States Army soldier, designated a

"Specialist" (E-4).  Hencely is from Effingham County, Georgia, near Savannah.

He enlisted in the U.S. Army on November 27, 2013.

1

2.

At the time of the incident referenced in this Complaint, November 12, 2016, Hencely was stationed at Bagram Airfield in Afghanistan.

3.

Defendant Fluor is a "private military contractor." It signed a contract with the U.S. Department of Defense ("DOD") to provide certain specified services and base support at military installations in Afghanistan, including Bagram Airfield (the "Base").

4.

Fluor's contract with the DOD imposed very specific duties and responsibilities upon Fluor. Included among those duties was management of the Base's "Non-Tactical Vehicle Yard" and all personnel working there.

5.

By contract with the DOD Fluor accepted legal responsibility for all actions of all of Fluor's employees, subcontractors, and subcontractor's employees at Bagram Airfield (Fluor's "LOGCAP personnel").[1]

---

[1] The term "LOGCAP personnel" refers to all Fluor's employees, subcontractors, and subcontractor employees on Bagram Airfield. As the prime contractor with the U.S. government, "Fluor is responsible for all of its employees, subcontractors, and subcontractor employee actions." Army Report at 10.

6.

Fluor is liable for any and all negligence committed by its LOGCAP personnel, including the negligence of any other personnel at the Base under Fluor's direct or indirect supervision.

7.

On Saturday morning of November 12, 2016 more than 200 personnel residing at the Base were gathering for a Veterans Day 5k race set to begin at 6:15 a.m.

8.

Also on the Base was a Fluor employee named Ahmad Nayeb.

9.

Nayeb worked at Fluor's HAZMAT work center within Fluor's Non-Tactical Vehicle Yard at the Base.

10.

Fluor knew that Nayeb was a former member of the Taliban.

11.

Fluor knew that Nayeb was not supposed to be on the Base on the morning of November 12, 2016.

12.

Fluor was required by its contract to ensure that Afghan nationals like Nayeb, and including Nayeb, were physically escorted off the Base by Fluor's LOGCAP personnel.[2]  Nayeb was supposed to have been escorted off the Base by bus without fail at 4:45 a.m. that morning.

13.

Fluor knew Nayeb was not escorted off the Base.

14.

Fluor knew almost an hour before the attack Nayeb did not check in to be escorted off the Base.

15.

Fluor did nothing as a result of Nayeb's failure to check in to be escorted off the Base.

---

[2] *See* Ex. 1, Army Report at 13-14: "Various Fluor Non-Tactical Vehicle Yard employees – U.S. Civilians, Other Country Nationals, and Local Nationals – served as escorts for Local Nationals who worked in the Non-Tactical Vehicle Yard.  These *Fluor escorts* were responsible for supervising the transport of Local Nationals from the Entry Control Point *to* the Non-Tactical Vehicle Yard, *and from* the Non-Tactical Vehicle Yard back to the Entry Control Point, at shift change." (citations omitted) (emphasis added).

16.

Fluor was obligated by its contract to provide Fluor escorts to remain in close proximity to and maintain constant sight of the individuals they were escorting.

17.

Fluor failed in its duty, but warned no one of its failure.

18.

Nayeb was a suicide bomber.

19.

Nayeb had constructed an explosive vest bomb at Fluor's facility on the Base—a facility Fluor had the contractual and legal duty to supervise and manage.

20.

Nayeb used materials owned by Fluor and tools owned by Fluor to construct the explosive vest bomb at Fluor's own facility on Base.

21.

Instead of being escorted off the Base by bus, Nayeb walked, totally unsupervised by Fluor, toward the assembly point for the Veterans Day 5k race.

22.

Three hundred meters from the assembly point, U.S. Army Specialist Winston Hencely noticed Nayeb and thought he looked suspicious and out of place.  Hencely was then 20 years old.

23.

When his questions were ignored, Hencely grabbed Nayeb's shoulder and felt the bulky explosive vest bomb under Nayeb's robe.  Nayeb, the suicide bomber, exploded the vest.

24.

Six were killed in the attack: three U.S. soldiers, two Fluor employees, and the bomber.  Seventeen were injured, including Hencely and fifteen other U.S. soldiers.

25.

Hencely's vigilance saved the lives of, and prevented grievous injuries to, many more who were assembling for the Veterans Day 5k race.  Hencely's intervention stopped the bomber from reaching the densely-packed starting point.

26.

The Taliban subsequently boasted it was responsible for the bombing at Bagram Airfield.  The Taliban stated that "[t]he planning of attack took 4 months[.]"  Ex. 2, *Over 67 US invaders killed and wounded amid Bagram*

*martyrdom attack*, Islamic Emirate of Afghanistan (Nov. 12,

2016),http://alemerah-english.com/?p=7065 (last visited Dec. 5, 2018).

27.

The U.S. Army's Investigation found credible the Taliban's assertion that

the bombing had been planned for four months.

28.

Hencely was grievously injured. The projectiles in the bomb fractured

Hencely's skull and tore through the tissue of his brain. Shrapnel went in the front

of Hencely's forehead; eight bone fragments were lodged in Hencely's frontal

lobe. The head injury was so severe that a large section of Hencely's skull was

removed and left open for more than six months. Shrapnel remains in Hencely's

occipital lobes. The projectiles in the bomb also penetrated Hencely's chest,

resulting in a massive hemothorax and pneumothorax. Hencely's lungs filled with

fluid and blood and his chest was split open between the ribs for a pulmonary

tractotomy.

29.

The projectiles that penetrated Hencely's brain and chest were the property

of Fluor—pieces of nuts and bolts the bomber obtained from Fluor.

30.

Hencely suffers from numbness and inability to fully use his left arm and hand, left leg, and left side of his face and mouth.  He suffers from abnormal EEGs and has suffered seizures.  He has neuropathic pain, cognitive disorder, chronic post-traumatic stress disorder, and anxiety due to traumatic brain injury.  Hencely is subject to developing several afflictions associated with traumatic brain injury, including progressive brain atrophy and increased vulnerability to neurodegenerative disorders including chronic traumatic encephalopathy and other diseases such as Alzheimer's disease, Parkinson's disease, and Amyotrophic lateral sclerosis (ALS, a/k/a Lou Gehrig's disease).

31.

Hencely's short-term memory loss will never improve.  He likely will never be able to cook for himself because he would forget that he put food on the stove. He likely will never be able to live alone and may require full-time live-in care for the rest of his life.

32.

Hencely is permanently disabled.  He is now 22 years old.

33.

The Army conducted an AR 15-6[3] Investigation of the bombing (the "Army Investigation").  The factual findings and conclusions of the Army Investigation were reported in an Army Report dated December 31, 2016, issued by a Major General of the U.S. Army.  The Army Report is attached hereto as Exhibit 1[4].

34.

The Army Investigation established that Fluor was negligent in four separate ways, each of which violated Fluor's contractual obligations to the U.S. government:

a)  Fluor negligently failed to supervise Nayeb at the HAZMAT work center;

b)  Fluor negligently entrusted Nayeb with tools he used to construct the vest bomb;

c)  Fluor negligently supervised Nayeb's escort on and off the Base; and

d)  Fluor negligently retained Nayeb after known poor job performance.

---

[3] Army Regulation 15-6 sets forth the procedures investigating officers must follow when conducting formal and informal investigations.

[4] Page numbers cited in the Army Report are the numbers printed on the Army Report page, which do not necessarily coincide with the pdf page numbers due to multiple page redactions.

35.

The Army Investigation established that Fluor was responsible for the bomber Nayeb and for his actions.

36.

The Army Investigation established, among other things, that:

a) The bomber worked alone and unsupervised during the night shift at the HAZMAT work center where his job was to dispose of automotive materials such as motor oil.

b) Three different Fluor supervisors could have and should have supervised the bomber's work at the HAZMAT work center.

c) Each of the three Fluor supervisors told Army investigators he did not supervise the bomber at the HAZMAT work center.

d) Each of the three Fluor supervisors either denied responsibility or blamed one another for leaving the bomber completely unsupervised while he worked alone at his worksite constructing the vest bomb.

e) The Army Investigation concluded "[t]his ambiguity on supervisory responsibility demonstrates an unreasonable complacency by Fluor to ensure Local National employees were properly supervised at all times, as required by their contract and non-contractual, generally recognized supervisor responsibility."  Army Report at 12.

f)  The bomber's job at the HAZMAT work center did not require tools at all; yet Fluor allowed the bomber to frequently check out unnecessary and suspicious tools from the Fluor tool room.

g)  The bomber used Fluor's tools to construct the bomb at his worksite.

h)  Among the tools the bomber got from Fluor was a "multimeter," which is a tool used to measure electrical voltage, current, and resistance, useful to build a bomb.

i)  The bomber used Fluor materials from the Non-Tactical Vehicle Yard as the components and projectiles of the vest bomb.

j)  There was no reason for the bomber to have access to the Fluor materials and to the Fluor tools he used to construct the vest bomb; none of those were required for him to do his job at the HAZMAT work center.

k)  The Army Investigation concluded the "lack of reasonable supervision facilitated Nayeb's ability to freely acquire most of the components necessary for the construction of the suicide vest and the freedom of movement to complete its construction."  Army Report at 12.

l)  The Bagram Airfield Badging and Screening Policy required Fluor escorts to "remain in close proximity and remain in constant view of the individuals they are escorting."  Army Report at 14.

m) In practice, Fluor ignored the Bagram escort policies.

11

n) Fluor did nothing when the bomber did not show up for escort off the Base the morning of the attack.

o) "Fluor's systematic lack of reasonable supervision enabled Nayeb to go undetected from 0445 until 0538 on 12 November 2016, which coincides with the average walking time of 53 minutes from the Non-Tactical Vehicle Yard to the blast site."  Army Report at 15.

p) The bomber's work performance warranted disciplinary action or termination well before the bombing occurred.

1) Fluor had caught the bomber sleeping in a sleeping bag at his worksite.

2) Fluor had caught the bomber reading the Quran when he should have been working.

3) Fluor knew the bomber was often inexplicably absent from his worksite.

q) Fluor's "failure to enforce a work-related standard of performance and the unjustified retention of Nayeb amounts to a lack of reasonable supervision[.]"  Army Report at 12.

37.

The entirety of the Army Report is admissible in evidence for all purposes under Federal Rule of Evidence 803(8).

## II.    JURISDICTION, PARTIES, AND VENUE

38.

The Court has jurisdiction over this lawsuit under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

39.

Hencely is a citizen of the United States of America and a resident of the State of Georgia.

40.

Defendant Fluor Corporation, Inc. ("FC") is a domestic for-profit engineering and construction corporation that provides services around the world, including services to the United States government in the Islamic Republic of Afghanistan and other places.  Although at times FC presents itself as a holding company that does business through subsidiaries, in reality it operates as a single business enterprise.

a)    Fluor presents itself as a single business enterprise:

"Fluor is Fluor wherever it goes.  The company imparts its core values in its professional and inter-cultural interactions abroad.  People who provide services for Fluor outside the U.S.—local workforces in every type of society—are kept safe on the job and given opportunities to advance.  They also adhere to Fluor's core values once they enter the company's capacious tent."

*See* Ex. 3, A Passion to Build: The Story of Fluor Corporation's First 100 Years 105 (2012).

b)      FC states that it has "more than 60,000 employees."  *See* Ex. 4, Fluor Corporate Profile at pdf page 2.

c)      That number—"60,000"—includes all employees of all subsidiaries.

d)      When in another case filed in California Fluor Intercontinental sought transfer to South Carolina, Fluor Intercontinental designated FC employees as its 'representatives' and claimed the actions of those 'representatives' were the actions of Fluor Intercontinental.[5]

e)      FC has acknowledged that it is the proper defendant in cases against Fluor subsidiaries in Afghanistan.  FC defends without objection overtime pay cases brought by employees of its subsidiaries operating in Afghanistan. [6]

f)      FC and its subsidiaries are properly regarded as a single enterprise because Fluor's conduct shows "an amalgamation of corporate

---

[5] *See* Ex. 5, 4/29/2013 Appellant's Brief, *Int'l Sec. & Def. Mgmt., LLC v. Fluor Intercontinental, Inc.*, No. B243384, 2013 WL 2148005 (Cal. App. 2 Dist.); *Int'l Sec. & Def. Mgmt., LLC v. Fluor Intercontinental, Inc.*, No. B243384, 2013 WL 4761107, at *2 (Cal. Ct. App. Sept. 5, 2013).

[6] *See, e.g.,* Ex. 6, Fluor's 8/02/2016 Motion to Dismiss, *Allen v. Fluor Corp.*, No. 3:16-cv-01219-D (N.D. Tex.) (FC never argued it was an improper party to the case despite the fact that "[t]he entity that actually employed Plaintiffs was Fluor Federal Global Projects, Inc.").

interests, entities, and activities so as to blur the legal distinction

between the corporations and their activities." *Pertuis v. Front Roe*

*Restaurants, Inc.*, 423 S.C. 640, 651 (2018), *reh'g denied* (Aug. 16,

2018).[7]

41.

Fluor has thousands of employees in Afghanistan, including at Bagram

Airfield.[8]

---

[7] For example, Fluor claims it has an "unincorporated umbrella group" that Fluor calls "Fluor Government Group" and that Fluor claims "handles all of Fluor Corporation's business with the United States government."  4/29/2013 Fluor's Brief, *Int'l Sec. & Def. Mgmt., LLC v. Fluor Intercontinental, Inc.*, No. B243384, 2013 WL 2148005 at *4 (Cal. App. 2 Dist.) (footnote omitted). But Fluor also has a subsidiary corporation going by the name "Fluor Government Group International, Inc."  In that same brief, Fluor represented to the California court that it was merely a "holding company" with "no independent business operations."  *Id.* at n. 2.  That is belied both by other public representations Fluor has made—and by the statements of Fluor's own employees. *See, e.g.,* Ex.7, LinkedIn page for Steven M. Anderson: "Afghanistan Country Manager - Fluor Corporation April 2016 - March 2018."

[8] *See* Ex. 7, LinkedIn page for Steven M. Anderson: "Afghanistan Country Manager - Fluor Corporation April 2016 - March 2018 • 2 years – Afghanistan - Project Manager for LOGCAP contract for Fluor in Afghanistan; 6300 employees, 8 different locations."  *See* Ex. 8, LinkedIn page for Erick Henderson, "HR [Human Resources] Senior Generalist at Fluor . . . in Afghanistan," whose job was to "[p]rovide Human Resource support to 5,070 Fluor employees throughout Afghanistan" and to "support the transition of 1,360 Ecolog personnel to Fluor" (Ecolog was a Fluor subcontractor accused in 2014 of charging illegal recruitment fees to applicants in order for them to secure jobs in Afghanistan.).

42.

FC is subject to the jurisdiction of this Court because FC regularly conducts business in South Carolina, contracts to supply services in South Carolina, possesses real property in Greenville, South Carolina, and performed significant parts of the contracts at issue in this case in South Carolina.

43.

Venue is proper as to FC under 28 U.S.C. § 1391 and assignable to the Greenville Division under Local Civil Rule 3.01 DSC.

44.

FC acted at all times relevant to this action individually and through its agents and employees, who are subsumed within the terms "FC" and "Fluor."

45.

Defendant Fluor Enterprises, Inc. ("FE") is a domestic for-profit corporation that provides services to the United States government in the Islamic Republic of Afghanistan and other places.

46.

FE is a subsidiary of FC and has its principal place of business in Greenville, South Carolina.

47.

FE is subject to the jurisdiction of this Court because FE's principal place of business is in Greenville, South Carolina, and FE regularly conducts business in South Carolina, contracts to supply services in South Carolina, possesses real property in Greenville, South Carolina, resides in Greenville, South Carolina, and performed significant parts of the contracts at issue in this case in Greenville, South Carolina.

48.

Venue is proper as to FE under 28 U.S.C. § 1391 and assignable to the Greenville Division under Local Civil Rule 3.01 DSC.

49.

FE itself enters into contracts stating FE has the legal ability to contractually bind all related Fluor entities, *including parents and subsidiaries.*

50.

To evade responsibility in litigation FE has variously represented to courts that its "principal place of business" was in California (representation in 2005), and in Texas (representation in 2007), and in South Carolina (representation in 2010), and then back to Texas (representation in 2017).[9]

---

[9] *As to California*, see 6/21/2005 Notice of Removal filed in a Florida case, *Odum v. Allis-Chalmers*, Case No. 3:05-cv-273-MCR/MD, 2005 WL 5998924 (N.D. Fla.) ("Defendant Fluor [Enterprises] is not a citizen of the State of Florida since it is incorporated under the laws of California and its principal place of business is in California."). As to Texas, see 1/17/2007 Notice of Removal filed in a Louisiana

51.

FE acted at all times relevant to this action individually and through its agents and employees, who are subsumed within the terms "FE" and "Fluor."

52.

Defendant Fluor Intercontinental, Inc. ("FI") is a domestic for-profit corporation that provides services to the United States government in the Islamic Republic of Afghanistan and other places.

53.

FI is a subsidiary of FE and has its principal place of business in Greenville, South Carolina.

54.

FI is party to the contracts at issue in this case with the United States government.

---

case, *Victoriana v. Fluor Constructors Int'l, Inc.*, Case No. 07-0335, 2007 WL 4541771 (E.D. La.) ("Defendant, Fluor Enterprises, Inc., was incorporated in the state of California, and has its principal place of business in the state of Texas."). *As to  South Carolina*, see Ex. 9,  1/5/2010 Notice of Removal filed in a Massachusetts case, *Paul Mueller Co. v. Fluor Enterprises, Inc.*, Case No. 4:10-cv-40002, 2010 WL 2150812 (D. Mass.) ("Defendant Fluor is a corporation organized under the laws of California with its principal place of business in Greenville, South Carolina.").  *As to Texas again*, see Ex. 10, 9/13/2017 Complaint filed in a Virginia case, *Fluor Enterprises, Inc. v. Mitsubishi Hitachi Power System Americas, Inc.*, Case No. 3:17-cv-00622 (E.D. Va.) ("Fluor Enterprises, Inc. ("Fluor") is a California corporation with its principal place of business in Irving, Texas").

55.

FI uses its relationships to other Fluor entities and 'representatives' to blur the legal distinctions between Fluor entities.

56.

FI is subject to the jurisdiction of this Court because FI's principal place of business is in Greenville, South Carolina; FI regularly conducts business in South Carolina; contracts to supply services in South Carolina; possesses real property in Greenville, South Carolina; administered and performed significant parts of the contracts at issue in this case in Greenville, South Carolina; resides in Greenville, South Carolina; and because FI's 'employees' and 'representatives' committed the acts and omissions giving rise to this Complaint.

57.

Venue is proper as to FI under 28 U.S.C. § 1391 and assignable to the Greenville Division under Local Civil Rule 3.01 DSC.

58.

FI acted at all times relevant to this action individually and through its agents and employees, who are subsumed within the terms "FI" and "Fluor."

59.

Defendant Fluor Government Group International, Inc. ("FGG") is a domestic

for-profit corporation that provides services to the United States government in the

Islamic Republic of Afghanistan and other places.

60.

FGG is a subsidiary of FE and has its principal place of business in Greenville,

South Carolina.

61.

FGG uses its relationships to other Fluor entities and its 'representatives' and

'employees' to blur the legal distinctions between Fluor entities.

62.

Though FI is the party to the contracts at issue in this case, FGG is the

'employer' of some of the personnel or 'representatives' carrying out Fluor's

contractual obligations in the Islamic Republic of Afghanistan.

63.

FGG is subject to the jurisdiction of this Court because FGG has its

principal place of business in Greenville, South Carolina; regularly conducts

business in South Carolina; contracts to supply services in South Carolina;

possesses real property in Greenville, South Carolina; performed significant parts

of the contracts at issue in this case in Greenville, South Carolina; resides in

Greenville, South Carolina; and because FGG's employees committed the acts and omissions giving rise to this Complaint.

64.

Venue is proper as to FGG under 28 U.S.C. § 1391 and assignable to the Greenville Division under Local Civil Rule 3.01 DSC.

65.

FGG acted at all times relevant to this action individually and through its agents and employees, who are subsumed within the terms "FGG" and "Fluor."

## III.    BACKGROUND FACTS

### A.    The Bombing

66.

On November 12, 2016, around 4:45 a.m, at the end of his shift at the HAZMAT work center, the bomber Nayeb began walking, totally unsupervised by Fluor, to the starting point of the Veterans Day 5K run to detonate his vest bomb, a walk that took nearly an hour.

67.

By 5:38 a.m., more than 200 personnel residing at Bagram Airfield were converging on the starting point of the run.

68.

The Base Commander, Lieutenant General John C. Thomson, was en route to the starting point to make the opening remarks.

69.

The 5K was scheduled to begin at 6:15 a.m.  The densely-packed starting point was less than three hundred meters from the blast site.

70.

Hencely prevented the bomber from reaching the starting point of the race.

71.

Hencely questioned the bomber about his purpose and destination.

72.

The bomber ignored Hencely's questions.

73.

Hencely grabbed the bomber.

74.

The bomber detonated the vest bomb beside Hencely.

**B.    LOGCAP IV**

75.

Fluor voluntarily participates in a government contracting program known as the Logistics Civil Augmentation Program (LOGCAP).[10]

76.

LOGCAP was created in 1985 by Army Regulation 700–137 that anticipated the use of civilian contractors in wartime situations.

77.

The object of LOGCAP is to retain civilian contractors to handle logistical support tasks in conflict areas.

78.

In April 2008, the DOD awarded the fourth generation of support contracts, known as LOGCAP IV, to three contractors, including Fluor.

79.

Fluor was awarded contract number W52P1J-07-D-0008.

80.

The LOGCAP IV contracts are indefinite quantity/indefinite delivery contracts.

---

[10] "The LOGCAP program is built on the premise that unless war is formally declared by the Congress, contractor performance (with rare exceptions which cannot be the basis for planning) must be voluntary."  Army Reg. 700–137, 2–4 "Risk" (a).

81.

In exchange for billions of dollars, Fluor agreed to abide by the terms of LOGCAP IV (including the Statements of Work, Performance Work Statements, Task Orders, and Letters of Technical Direction issued under LOGCAP IV) and the Bagram Airfield Base Policies (collectively referred to as the "LOGCAP Materials").

82.

The LOGCAP Materials constitute the contracts with the U.S. government, and set forth the parameters within which Fluor was required to perform.

83.

In July 2009, Fluor was awarded Task Order 005, a cost-plus-award-fee contract.

84.

Fluor estimated Task Order 005 was potentially worth more than $7 billion over five years.  Ex. 11, 7/8/2009 Fluor Press Release, U.S. Army Awards Fluor LOGCAP IV Task Order for Afghanistan (July 8, 2009).

85.

Task Order 005 was "the fourth and most significant task order to date in terms of scope granted to Fluor under the LOGCAP IV program."  7/8/2009 Fluor Press Release.

86.

Task Order 005 encompassed services and base life support for the eastern and northern sections of the Islamic Republic of Afghanistan.

87.

Task Order 005 included in Fluor's scope of work the Non-Tactical Vehicle Yard where the bomber worked.

88.

As the prime contractor under the LOGCAP Materials, Fluor controlled and was responsible for the Non-Tactical Vehicle Yard and the personnel working there.

89.

As the prime contractor with oversight of the Non-Tactical Vehicle Yard, Fluor was responsible for the actions of its LOGCAP personnel at the Non-Tactical Vehicle Yard.

90.

Fluor's April 1, 2013 Performance Work Statement, paragraph 01.07a, states "[Fluor] is responsible for ensuring all personnel supporting [LOGCAP IV 005] comply with the standards of conduct, and all terms/conditions set forth in [the] PWS[11] and the Basic Contract.  [Fluor] shall provide the necessary supervision for

---

[11] Performance work statement.

personnel required to perform this contract." Army Report at 10 (alterations in original).

91.

Fluor's April 1, 2013 Performance Work Statement, paragraph 01.07b, states "[Fluor] shall hire HN[12] personnel and Subcontractors to the maximum extent possible in performance of this contract when such recruitment practices meet legal requirements. [Fluor] is responsible for oversight of such personnel or Subcontractors to ensure compliance with all terms of the Basic Contract and this PWS." Army Report at 10 (alteration in original).

### C.    Fluor was Totally Responsible for the Bomber.

92.

The bomber was a local national, a citizen of the Islamic Republic of Afghanistan.

93.

Fluor hired the bomber through a labor broker, Alliance Project Services, Inc. ("APS").[13] APS has an office in Leesburg, Virginia, but has only three

---

[12] Host nation.

[13] *See* Army Report at 10: "Nayeb was hired by Alliance Project Services, Inc. a subcontractor of Fluor (Exhibits 5D, 5F, 5C). Alliance Project Services, Inc. is a U.S. veteran owned business in Alexandria, Virginia, which specializes in hiring host nation personnel in a labor broker capacity. . . . As the prime contractor with

26

employees listed on its website, one of whom works remotely from his home in Miami Florida.[14]

94.

APS, the labor broker who found the bomber for Fluor, administered payroll, time, and attendance for the bomber but the bomber's work activities were supervised by Fluor.[15]

95.

Fluor's own "Afghanistan Country Manager" was in charge of all operations pursuant to Fluor's LOGCAP contract with the DOD.[16]

---

the U.S. Government, and as the contractor with oversight of the Bagram Airfield Non-Tactical Vehicle Yard, Fluor is responsible for all of its employees, subcontractors, and subcontractor employee actions."

[14] *See* Ex. 12, Alliance Project Services website. The listed employees are Tod Nickles, President and CEO, Simon Forrester-Wood, VP of Logistics, Eric Hoeny, VP of Supply Chain.  Forrester-Wood is APS's registered agent in Florida; his listed address as such is a condominium in Miami.  Those same employees are also listed as employees of another corporation, "Alliance Professional Services International, Inc.," which is also apparently a labor broker for outfits like Fluor.

[15] *See* Army Report at 10: "Although Alliance Project Services, Inc. was responsible for administration of Nayeb (payroll, time and attendance, etc.), Nayeb's work performance was supervised by Fluor while he was employed at the Bagram Airfield Non-Tactical Vehicle Yard."  *See also* Ex. 7, LinkedIn page for Steven M. Anderson.

[16] *See* Ex. 7, LinkedIn page for Steven M. Anderson: "Afghanistan Country Manager - Fluor Corporation April 2016 - March 2018 • 2 years – Afghanistan - Project Manager for LOGCAP contract for Fluor in Afghanistan; 6300 employees, 8 different locations.  Executing all significant logistics operations in support of military operations, to include food, fuel, water, waste management, transportation, air operations, laundry, vector control and MWR support."

96.

Fluor claims that its foreign workers are its own employees. Fluor has stated that its work in foreign countries "requires a virtual city of personnel, many of whom are local people Fluor trains to serve as craft employees." A Passion to Build at 9.

97.

In order to meet its contractual obligations, Fluor had the right and ability to control the bomber as Fluor's employee.

98.

Fluor did in fact control the bomber as an employee.

99.

Fluor furnished the equipment and tools the bomber used to construct the vest bomb.

100.

Fluor set the bomber's work hours.

101.

Fluor set the duties of the bomber's job.

102.

Fluor dictated the terms of the bomber's job.

103.

Fluor had the right and ability to fire the bomber.

104.

Fluor controlled the method of payment to the bomber.

105.

Fluor was contractually obligated to supervise and control the Non-Tactical Vehicle Yard.

106.

The bomber's work performance was supposed to be supervised by Fluor while he was employed at the Non-Tactical Vehicle Yard.

**D.    Fluor's Negligent Supervision of the Bomber**

107.

Under the LOGCAP Materials, Fluor agreed that Fluor "shall provide the necessary supervision for personnel required to perform this contract."  Army Report at 10.

108.

Under the LOGCAP Materials, Fluor was "responsible for oversight of [local nationals and subcontractor personnel] to ensure compliance with all terms of the [LOGCAP Materials]."  Army Report at 10.

109.

The Army Investigation concluded "Fluor did not reasonably supervise Nayeb at the work facility[.]"  Army Report at 10.

110.

Fluor did not reasonably supervise the bomber at the Non-Tactical Vehicle Yard because no Fluor supervisor actually supervised Nayeb at his worksite and because no Fluor supervisor was ever told by Fluor that he had a responsibility to supervise the HAZMAT work center, where Nayeb worked alone, constructing the bomb.

111.

At the time of the bombing, the Non-Tactical Vehicle Yard was divided into three separate work centers:

(a) the Light Non-Tactical Vehicle work center;

(b) the Heavy Non-Tactical Vehicle work center; and

(c) the HAZMAT work center.

## 112.

The HAZMAT work center was a row of adjacent containers with two poorly-lit work areas that could not be monitored from either the Heavy or Light work centers, each about 75 feet away. The HAZMAT work center was even further away from the Non-Tactical Vehicle Yard office.

## 113.

From August 6, 2016 until November 12, 2016, the bomber worked the night shift (6:00 p.m. to 6:00 a.m.) at the HAZMAT work center.

## 114.

While on the night shift, including the shift ending on November 12, 2016, the bomber worked alone at the HAZMAT work center.

## 115.

While on the night shift, including the shift ending on November 12, 2016, the bomber worked unsupervised at the HAZMAT work center.

## 116.

The bomber was often absent from the HAZMAT work center during his work hours; he had wandered away. Army Report at 12.

## 117.

A Fluor employee who worked in the Light Non-Tactical Vehicle Yard told Army investigators "it was normal for [Nayeb] not to be in the work area." Army Report at 12 (alteration in original).

### 118.

Allowing the bomber to wander away, wholly unsupervised, from his designated work area was negligent supervision.

### 119.

Three Fluor employees were supposed to supervise LOGCAP personnel, including the bomber, at the Non-Tactical Vehicle Yard:

a) the Heavy Non-Tactical Vehicle Lead Senior Mechanic;

b) the Light Non-Tactical Vehicle Lead Senior Mechanic; and

c) the Non-Tactical Vehicle Yard General Foreman.

### 120.

Each of the three Non-Tactical Vehicle Yard supervisors denied supervising the bomber at the HAZMAT work center.

### 121.

Fluor's Heavy Non-Tactical Vehicle Lead Senior Mechanic for the night shift on November 12, 2016 denied responsibility for supervising the bomber at the HAZMAT work center and blamed "the light vehicle maintenance bay employees

[who] were responsible for ensuring [the bomber] was supervised and employed."
Army Report at 11.

122.

Fluor's Light Non-Tactical Vehicle Lead Senior Mechanic for the night shift
on November 12, 2016 denied responsibility for supervising the bomber at the
HAZMAT work center and stated he was "only accountable for local national
employees when they worked for him in the light vehicle bay" Army Report at 11–
12.

123.

Rexhep Rexhepi, Fluor's own Logistics Supervisor with responsibilities
over[17] the Non-Tactical Vehicle Yard on November 12, 2016, denied responsibility
for supervising the bomber at the HAZMAT work center.  Army Report at 12.

124.

Rexhepi blamed both the Heavy Non-Tactical Vehicle Lead Senior
Mechanic and the Light Non-Tactical Vehicle Lead Senior Mechanic for failing to
supervise the bomber.

125.

---

[17] *See* Ex. 13, LinkedIn page for Rexhep Rexhepi: "MHE SME Logistics
Supervisor **FLUOR** – Present – Country MHE-SME Supervisor – Fluor
Government Group – September 2011 – Present . . . Bagram Air Field,
Afghanistan"

The truth is that no one supervised the bomber when the bomber worked at the HAZMAT work center.

126.

The truth is that no one supervised the bomber at the HAZMAT work center during his shift that ended on November 12, 2016.

127.

Fluor's negligent supervision of the bomber enabled the bomber's attack against the Army and caused Hencely's injuries.

E.    **Fluor's Negligent Entrustment of Tools and Bomb-Building Materials to the Bomber**

128.

Only Fluor LOGCAP personnel were authorized to check out tools from Fluor's tool room at the Non-Tactical Vehicle Yard.

129.

Fluor gave Army investigators contradictory statements in response to questions regarding how and why the bomber was able to check out tools at all, including tools totally unnecessary for and unrelated to his work at the HAZMAT work center.

130.

Fluor employees from the Non-Tactical Vehicle Yard told Army investigators "only certain individuals could check out specific tools within the Non-Tactical Vehicle Yard."  Army Report at 13.

131.

Other Fluor employees told Army investigators "any employee was able to check out any tool, regardless of where that employee worked."  Army Report at 13.

132.

Both the statements in the two preceding paragraphs cannot be true; one or the other is false.  The fact that Fluor employees would not know which is true and which is false is proof of sloppy procedures contrary to Fluor's contracts and the mandates of Base security.

133.

A Fluor employee told Army investigators "only the person who needed the tool could sign the tool in or out from the tool room."  Army Report at 13.

134.

A Fluor employee told Army investigators "HAZMAT workers do not require any tools in the performance of their job."  Army Report at 13.

135.

A Fluor employee told Army investigators the bomber "did not require the use of any special tools to complete his HAZMAT job."  Army Report at 13.

### 136.

A Fluor employee told Army investigators he "did not think it was normal for the HAZMAT worker to sign out tools."  Army Report at 13.

### 137.

A Fluor employee told Army investigators "HAZMAT workers would only check out tools if one of the maintenance guys requested help."  Army Report at 13.

### 138.

A Fluor employee told Army investigators HAZMAT workers would tell the Fluor employee the name of the mechanic that needed the tool when checking out tools from the tool room.  Army Report at 13.

### 139.

The bomber did not tell Fluor employees the name of a mechanic that needed a tool when the bomber checked out tools from the tool room.

### 140.

The bomber did not require any tools from the Fluor tool room to perform his job at the HAZMAT work center.

141.

Fluor's tool room logs show that between August 10, 2016 and November 10, 2016, the bomber checked out tools not associated with his duties at the HAZMAT work center. Army Report at 12.

142.

Fluor's tool room logs show the bomber checked out a ***multimeter*** nine times between August 10, 2016 and November 10, 2016 for up to six hours at a time. Army Report at 12.

143.

A multimeter is a tool used to measure electrical voltage, current, and resistance.

144.

Nothing about the bomber's job required that he use a multimeter.

145.

A multimeter is used to build a bomb.

146.

Fluor negligently failed to apprehend the obvious significance of a known former member of the Taliban (whom Fluor knew was unsupervised and was

repeatedly wandering away from his job site) checking out a device useful to build a bomb from Fluor's tool room.

147.

Twice, Fluor's tool room supervisor asked the bomber why he needed a multimeter during work.

a)    The bomber once replied he needed a multimeter to fix a radio.

b)    The bomber once replied he needed a multimeter to fix hair clippers.

148.

Neither of the bomber's stated reasons for checking out the multimeter were related to his job at the HAZMAT work center.

149.

Fluor did nothing to determine whether the bomber's two stated reasons for checking out a multimeter were true.

150.

Fluor did nothing in response to a known former member of the Taliban checking a tool out of the Fluor tool room which the bomber indisputably and admittedly did not need to perform his job duties but which could be used to build a bomb.

151.

Fluor's failure to reasonably supervise the use of tools by its LOGCAP personnel, including the bomber, allowed the bomber to construct the vest bomb while working for Fluor at Fluor's HAZMAT work center.

152.

The Army Investigation concluded the "evidence supports complacency and a lack of reasonable supervision by Fluor supervisors over Nayeb and other Local Nationals at the Non-Tactical Vehicle Yard work facility that enabled Nayeb's nefarious plan."  Army Report at 13.

153.

The bomber's vest bomb was assembled on Bagram Airfield by the bomber at his Fluor-controlled workplace inside the Non-Tactical Vehicle Yard and was not preassembled prior to entering Bagram Airfield.

154.

Army investigators suspect the bomber smuggled "small quantities of homemade explosives onto Bagram Airfield over approximately four months." Army Report at 49.

155.

The string used to assemble the bomber's vest bomb was a forensic match to string found at the bomber's worksite.

156.

Fluor owned the string the bomber used to assemble the vest bomb.

157.

Fluor owned the components used as projectiles in the vest bomb.

158.

The bomber got the projectiles used in the vest bomb from Fluor.

159.

Army investigators found components (nuts and bolts) similar to the
components the bomber used as projectiles in the vest bomb at the bomber's
worksite.

160.

Those nuts and bolts were not necessary for any job duties the bomber had at
the HAZMAT work center.

161.

Such nuts and bolts are commonly used as projectiles in self-made bombs.

162.

As a result of Fluor's complete failure to supervise and monitor the bomber,
Fluor failed to detect his suspicious use of tools and nuts and bolts unnecessary to
his job duties at the HAZMAT work center.

163.

The switch used to trigger the vest bomb was similar to switches that were readily available and unaccounted for in a trash container at the bomber's worksite.

164.

Fluor owned the switch used to trigger the vest bomb.

165.

Fluor's negligent entrustment of tools and bomb-building materials to the bomber enabled the bomber's attack against the Army and directly caused Hencely's injuries.

**F.    Fluor's Negligent Supervision in Failing to Escort the Bomber Off the Base.**

166.

Fluor's local national employees required a Bagram Airfield access badge to enter the Base.

167.

Verifiable employment on Bagram Airfield was a pre-condition for a local national to receive a Bagram Airfield access badge.

168.

Under the LOGCAP Materials, Fluor was responsible for providing the "transportation and supervision" for its local national employees, including the bomber.  Army Report at 13.

169.

Fluor's transportation and supervision responsibilities included the transportation and supervision of its local national employees, including the bomber, from the Entry Control Point to the Non-Tactical Vehicle Yard at the beginning of each shift and from the Non-Tactical Vehicle Yard to the Entry Control Point at the end of each shift.

170.

Fluor was required to provide employees to serve as escorts for local nationals who worked in the Non-Tactical Vehicle Yard, including the bomber.

171.

Fluor admitted it was obligated to supervise the Non-Tactical Vehicle Yard in accordance with the base access control policy, but Fluor failed to do so.   For example, Fluor did not escort the bomber off the Base on November 12, 2016.

172.

Fluor also did not supervise the Non-Tactical Vehicle Yard "in accordance with the base access control policy" because Fluor's escort practices violated the

policy that required escorts to "remain in close proximity and remain in constant view of the individuals they are escorting." Army Report at 14.

173.

Fluor's escorts did not remain in close proximity or remain in constant view of the individuals they were escorting, including the bomber.

174.

Instead, Fluor used a sign in/sign out sheet filled out by the night shift Local Team Lead.

175.

The Local Team Lead did not visually ensure that every local national employee got on the bus to leave the Base, as was required.

176.

Instead, the Local Team Lead merely observed which employees had signed the sheet claiming to have boarded the bus to leave the Base.

177.

Fluor employees thus relied on the local nationals themselves, including the bomber, to ensure that local nationals were accounted for and on the bus at the end of each shift. That compromised and violated the entire purpose of the mandatory security procedures.

43

178.

Fluor changed its Non-Tactical Vehicle Yard escorts every week.

179.

As a result, Fluor escorts did not know the names of the Fluor local national employees they were supposed to be escorting.

180.

Fluor's negligent escort practices were ripe for abuse.

181.

On November 11, 2016, the bomber told another local national Fluor employee he would miss the bus on November 12, 2016 because of a HAZMAT class requirement.  Army Report at 14.

182.

Fluor did nothing to attempt to ascertain the truth of that statement, or to supervise or monitor the whereabouts of the bomber thereafter.

183.

In fact, the bomber did not have a HAZMAT class requirement to attend on November 12, 2016.

184.

The bomber had taken the class only a month before on October 2, 2016 and did not require the class for another year.

185.

On November 12, 2016, the bomber did not show up to be escorted off the Base.

186.

Fluor did nothing in response to the bomber's failure to appear for escort off the Base on the morning of the bombing.

187.

Fluor did nothing prior to the detonation of the vest bomb to alert the Army or Base officials to the bomber's absence from the escort bus on November 12, 2016.

188.

The Army Investigation concluded "[t]he preponderance of evidence shows a lack of reasonable supervision by Fluor while escorting Local Nationals to and from the Non-Tactical Vehicle Yard."  Army Report at 15.

189.

Fluor's negligent supervision of the bomber's escort off the Base enabled the bomber's attack against the Army and caused Hencely's injuries.

### G. Fluor's Negligent Retention of the Bomber

190.

Retaining an Afghan national—a known former member of the Taliban— who was known to wander away from his designated work area contrary to contractually-required security imperatives, was negligent retention.

191.

The Light Non-Tactical Vehicle Lead Senior Mechanic had caught the bomber sleeping in the HAZMAT work center area in a sleeping bag.

192.

The Light Non-Tactical Vehicle Lead Senior Mechanic had caught the bomber reading the Quran during work hours.

193.

The LOGCAP IV Afghanistan HCN[18] Labor Support Statement of Work provides that sleeping while at work or unsatisfactory job performance are "cause for disciplinary action up to and including termination."  Army Report at 12.

194.

Fluor knew of the bomber's poor job performance at the HAZMAT work center.

---

[18] Host country national.

195.

Fluor never took any disciplinary action against the bomber.

196.

The Army Investigation concluded the evidence of the bomber's poor work performance constituted "evidence to support failings by Fluor in the continued employment of Nayeb." Army Report at 15.

197.

The Army Investigation concluded the "failure to enforce a work-related standard of performance and the unjustified retention of Nayeb amounts to a lack of reasonable supervision on behalf of Fluor." Army Report at 12.

198.

Fluor's retention of the bomber—a known former Taliban member—after his poor performance, was unreasonably dangerous.

199.

Fluor's negligent retention of the bomber enabled the bomber's attack against the Army and caused Hencely's injuries.

## H.    Fluor's Breach of Contract

200.

Under the LOGCAP Materials, Fluor was "responsible for ensuring all personnel supporting [LOGCAP IV 005] comply with the standards of conduct, and all terms/conditions set forth in [the Performance Work Statement] and the Basic Contract."  Army Report at 10.

201.

Fluor did not ensure the bomber complied with the standards of conduct or the terms and conditions of the LOGCAP Materials.

202.

The bomber did not comply with the standards of conduct or the terms and conditions of the LOGCAP Materials.

203.

The bomber's construction of the vest bomb at Fluor's HAZMAT work center did not comply with the standards of conduct or the terms and conditions set forth in the LOGCAP Materials.

204.

The bomber's attack against the Army on November 12, 2016 did not comply with the standards of conduct or the terms and conditions set forth in the LOGCAP Materials.

205.

Allowing the bomber to wander away, wholly unsupervised, from his designated work area was a breach of contract.

206.

Fluor employees admitted no one supervised the bomber at the HAZMAT work center.  Army Report at 12–13.  That was a breach of contract.

207.

Fluor did not meet its contractual obligations to reasonably supervise the bomber when Fluor allowed the bomber to check out tools from the tool room, including tools unnecessary to the bomber's job, that the bomber used to construct the vest bomb.

208.

Fluor did not meet its contractual obligations to reasonably supervise the bomber when Fluor allowed the bomber to use Fluor property as components in the vest bomb.

209.

Fluor did not meet its contractual obligations when it violated the base access control policy by failing to escort the bomber off the Base on November 12, 2016 and by failing to have Fluor escorts remain in close proximity to and in constant view of the bomber when escorting the bomber.

210.

Fluor's breach of these and other contractual obligations enabled the bomber's attack against the Army and caused Hencely's injuries.

**I.    The Significance of Fluor's Neglect**

211.

The entire reason Fluor was contractually obligated to continually monitor Afghan nationals like Nayeb while they were on Base and ensure they were

escorted on to the Base to their work site and then off the Base—in sight of a Fluor escort at all times—was because security was an imperative concern.

212.

Fluor well knew that in Afghanistan, and on American military bases in particular, suicide bombers were a constant and dire threat.

213.

There were at least 1,137 total suicide attacks in Afghanistan from 2006 to October 31, 2016. These suicide attacks killed 5,359 people. Ex. 14, University of Chicago Project on Security and Terrorism, Suicide Attack Database, results of Afghanistan search from 2006–2016, *available at* http://cpostdata.uchicago.edu/search_new.php ("Suicide Attack Database"). Afghanistan is approximately the size of Texas. In that same time period there was *one* (1) suicide attack in the State of Texas. Ex. 15 Suicide Attack Database, results of United States search from 2006–2016.

214.

Of the 1,137 total suicide attacks, the Taliban is known to have executed 745, or 65.52% of all suicide attacks in Afghanistan from 2006 to October 31, 2016. Suicide Attack Database.

215.

Of the 1,137 total suicide attacks, 381, or 33.51%, were committed by unknown groups.  Suicide Attack Database.  Many of the suicide attacks committed by unknown groups were likely committed by the Taliban as well.

216.

From 2006 to October 31, 2016, the Taliban executed an average of 67.72 suicide attacks per year.  Suicide Attack Database.

217.

In 2014, the Taliban executed 78 suicide attacks in Afghanistan.  Suicide Attack Database.

218.

In 2015, the Taliban executed 57 suicide attacks in Afghanistan.  Suicide Attack Database.

219.

Because of increasing violence in the country, the reintegration program[19] under which the bomber had been hired as a former Taliban member was shut

---

[19] The "reintegration" program was part of the "Afghanistan Peace and Reintegration Program" adopted pursuant to the FY2010 National Defense Authorization Act. Army Report at 9.  The United States participated and funded the program until it was shut down in on March 31, 2016.  SIGAR Quarterly Report, October 2016 at 161.

down in March 2016—eight months *before* the deadly attack on November 12, 2016.

220.

The reintegration program was shut down because "armed violence and insecurity in [Afghanistan] . . . largely increased" during the program and there was a lack of evidence that "reintegrees sustainably reintegrated back into community life and transformed into productive members of society." SIGAR Quarterly Report, October 2016 at 161.[20]

221.

Fluor knew that the reintegration program had been shut down and Fluor knew the reason it had failed was precisely because former Taliban members like Nayeb posed a significant risk of *not* reintegrating, but of remaining loyal members of, and insurgents for, the Taliban.

222.

Fluor did nothing to change its conduct and ensure Base security by complying with its contractual obligations, despite knowledge of the continuing proliferation of suicide attacks, despite knowledge the reintegration program under

---

[20] The acronym "SIGAR" stands for "Special Inspector General for Afghanistan Reconstruction. That person, appointed by the President of the United States, provides independent and objective reports quarterly to the United States Congress on congressionally-mandated topics. SIGAR Quarterly Report, October 2016.

which Nayeb had been hired had been shut down, and despite continuing

knowledge that Nayeb was a former member of the Taliban.

223.

It was foreseeable that the Taliban would execute and attempt to execute a

large number of suicide attacks each year in Afghanistan.

224.

It was foreseeable that a former member of the Taliban would in fact remain

loyal to the Taliban.

225.

It was foreseeable that a former member of the Taliban would execute a

suicide attack against the Army if given the opportunity.  The bomber's poor

performance at work and his documented use of suspicious and unnecessary tools

only made the attack more foreseeable.

226.

Fluor's negligent supervision, negligent entrustment, and negligent retention

of the bomber made the attack on November 12, 2016 possible.

## IV.    JUSTICIABILITY AND IMMUNITY

### 227.

Fluor has argued in past cases that its activities at Bagram Airfield present nonjusticiable "*political questions*"; and/or that tort claims against Fluor for activities at Bagram Airfield are preempted by the "*combatant activities exception*" to the federal government's waiver of immunity in the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(j); and/or that Fluor is entitled to *"derivative sovereign immunity"* based on the "discretionary function exception" to the FTCA, 28 U.S.C. § 2680(a).

### 228.

Those arguments do not apply to private military contractors such as Fluor in circumstances such as these, where the bomber, Fluor's employee, ***attacked*** the U. S. Army on November 12, 2016.  *See, e.g.*, *Norat v. Fluor Intercontinental, Inc.*, No. 6:14-CV-04902-BHH, 2018 WL 1382666, at *2 (D.S.C. Mar. 19, 2018).

### A.    Hencely's Actions

### 229.

Hencely's actions related to the bomber on November 12, 2016 were reasonable.

230.

Hencely's actions related to the bomber on November 12, 2016 were prudent.

231.

Hencely's actions related to the bomber on November 12, 2016 were brave.

232.

Hencely's actions related to the bomber on November 12, 2016 were heroic.

**B.     Political Question Doctrine**

233.

The Army did not have complete, direct, *or* actual control over the supervision of the bomber.

234.

The Army did not have complete, direct, *or* actual control over Fluor when Fluor's employee, the bomber, ***attacked the Army*** on November 12, 2016.

235.

The Army did not have complete, direct, *or* actual control over Fluor's employee, the bomber, when he constructed the vest bomb at the worksite that Fluor controlled, using Fluor tools and materials, during the work hours of his Fluor job.

236.

Fluor itself had complete, direct, *and* actual control over the bomber.[21]

237.

The LOGCAP Materials unequivocally state

(a) "*[Fluor] is responsible for oversight of such personnel or Subcontractors to ensure compliance with all terms of the Basic Contract and this PWS.*" Army Report at 10 (alteration in original) (emphasis added).

"[Fluor] is responsible for ensuring all personnel supporting [LOGCAP IV 005] comply with the standards of conduct, and all terms/conditions set forth in [the Performance Work Statement] and the Basic Contract." Army Report at 10.

238.

Fluor should have had complete, direct, *and* actual control over the bomber at all times the bomber was on Base.

239.

Fluor was obligated as a matter of contract to have complete, direct, *and* actual control over the bomber at all times the bomber was on Base.

---

[21] *See, e.g., Al Shimari v. CACI Premier Tech., Inc*., 840 F.3d 147, 155, 158 (4th Cir. 2016) (distinguishing between formal and actual control) (quoting *Taylor v. Kellogg Brown & Root Servs.ices, Inc*., 658 F.3d 402 (4th Cir. 2011)).

240.

Fluor's obligation to provide Base security meant Fluor should have had complete, direct, *and* actual control over the bomber at all times the bomber was on Base.

241.

Fluor itself had complete, direct, *and* actual control over the Non-Tactical Vehicle Yard.

242.

Fluor itself had complete, direct, *and* actual control over Fluor's HAZMAT work center.

243.

The Army did not have complete, direct, *or* actual control over Fluor's Non-Tactical Vehicle Yard or Fluor's HAZMAT work center.

244.

The Army did not "direct" Fluor to

(a) So fail to supervise the bomber that he was able to construct the bomb vest while on the job for Fluor, at Fluor's facility, using Fluor's tools and materials;

(b) So fail to supervise the bomber that he worked alone at Fluor's facility and wandered about the Base unsupervised;

(c) So fail to supervise the bomber that he used Fluor's tools, including a

multimeter for which he had no need except to build a bomb, to construct

a bomb intended to kill American servicemen and women;

(d) So fail to supervise the bomber that he was not escorted off the base

when Fluor's contractual obligations and duty to preserve Base security

both required that he be escorted off the base;

(e) Completely fail to ensure that Fluor's escorts remained "in close

proximity and remain in constant view" of the bomber, as required by

Fluor's contractual obligations and security duties;

(f) So fail to supervise the bomber that he was able to attack the U. S. Army

on November 12, 2016.

245.

Fluor's actual ability to disregard and violate Army policies and the

LOGCAP Materials is itself evidence that the military did not exert complete,

direct, *or* actual control over Fluor.

246.

A decision on the merits of Hencely's claims does not require the Court to

"question sensitive judgments made by the military" because to the extent the

Army made any decisions that *should have* guided Fluor's conduct, Fluor violated, ignored, and disobeyed those decisions.[22]

### 247.

No military decisions supposedly governing Fluor's conduct required that Fluor commit the actions and derelictions of duty referenced herein.

### 248.

Fluor's conduct was not governed by military decisions when Fluor violated specific decisions, policies, and provisions of the LOGCAP Materials and Base policies.

### 249.

Fluor's actual ability to disregard Fluor's obligations under the LOGCAP Materials is itself evidence that military decisions did not govern Fluor's conduct.

## C.     The Combatant Activities Exception Does Not Apply

### 250.

When private military contractors like Fluor work pursuant to a "statement of work," as Fluor was doing, the Army has expressly disclaimed the type of

---

[22] *See, e.g., Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 155 (4th Cir. 2016) (quoting *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402 (4th Cir. 2011)).

control required to invoke the combatant activities exception under *Boyle v. United Techs. Corp*., 487 U.S. 500, 500 (1988).

251.

Fluor's supervision of the *Non-Tactical* Vehicle Yard was not a combat activity.

252.

Fluor's supervision of the HAZMAT center, the disposal of motor oil from servicing non-tactical vehicles, was not a combat activity.

253.

Fluor was not integrated into the military's chain of command such that the military retained command authority over Fluor's supervision of the Non-Tactical Vehicle Yard and Fluor's LOGCAP personnel, including the bomber.

254.

Fluor's actual ability to violate the terms of the LOGCAP Materials show Fluor was not integrated into the military's chain of command such that the military retained command authority over Fluor's supervision of the Non-Tactical Vehicle Yard and Fluor's LOGCAP personnel, including the bomber.

255.

Fluor's negligence was the result of discretionary decisions by Fluor alone.

**D.    Derivative Sovereign Immunity**

256.

A private military contractor cannot seek derivative sovereign immunity

unless the "government authorized the contractor's action." *In re KBR, Inc., Burn*

*Pit Litig.*, 744 F.3d 326, 342 (4th Cir. 2014).

257.

The government, in this instance the U. S. Army, did not "authorize" the

Fluor actions at issue in this case.

258.

The Army did not "authorize" Fluor's actions and Fluor was not "carrying

out [the Army's] will" when Fluor:

(a) So failed to supervise the bomber that he was able to construct

the bomb vest while on the job for Fluor, at Fluor's facility,

using Fluor's tools and materials;

(b) So failed to supervise the bomber that he worked alone at

Fluor's facility and wandered about the Base unsupervised;

(c) So failed to supervise the bomber that he used Fluor's tools,

including a multimeter for which he had no need except to

build a bomb, to construct a bomb intended to kill American servicemen and women;

(d) So failed to supervise the bomber that he was not escorted off the base when Fluor's contractual obligations and duty to preserve Base security both required that he be escorted off the base;

(e) Completely failed to ensure that Fluor's escorts remained "in close proximity and remain in constant view" of the bomber, as required by Fluor's contractual obligations and security duties;

(f) So failed to supervise the bomber that he was able to attack the U. S. Army on November 12, 2016.

259.

Because Fluor's acts and omissions in this case transgressed the will of the Army at every turn and because the Army did not authorize Fluor's negligence or the bomber's attack on U.S. soldiers, Fluor is not entitled to derivative sovereign immunity in this case.

## V.    SOUTH CAROLINA LAW APPLIES

260.

South Carolina has an overwhelming interest in regulating the conduct of its corporate citizens, in this case, Fluor.

261.

The laws of the Islamic Republic of Afghanistan cannot apply in this case because they violate the public policy of the state of South Carolina and of the United States.

262.

The laws of the Islamic Republic of Afghanistan do not recognize the freedom of religion that is a bedrock principle in all courts of the United States.

263.

Article 1 of the Civil Code of the Republic of Afghanistan states "In cases no provision of law exists, courts shall decide in accordance with general principles of Hanafi Jurisprudence of Islamic Sharia in order to secure justice in the best possible way."  Ex. 16, Civil Code of the Republic of Afghanistan at pdf page 2.  This means if there were not a specific code provision answering a legal question in this case, the Court would be required to look to the general principles

of Sharia law.  If *that* did not answer the question, Article 2 directs the Court to turn to the "common custom" of the Islamic Republic of Afghanistan.

264.

Turning to the "general principles of Hanafi Jurisprudence of Islamic Sharia" for every unanswered point of law violates the fundamental right to freedom of religion in the United States and violates the public policy of the United States and every state in the nation.

## VI.    CLAIMS

### Amalgamation of Interests

265.

Plaintiff incorporates herein the preceding paragraphs 1 through 264.

266.

Fluor constitutes a single business enterprise under South Carolina law.

267.

Fluor is "an amalgamation of corporate interests, entities, and activities so as to blur the legal distinction between the corporations and their activities."  *Pertuis v. Front Roe Restaurants, Inc.*, 423 S.C. 640, 651 (2018), *reh'g denied* (Aug. 16, 2018).

268.

Fluor uses its subsidiaries and its subsidiaries' subsidiaries to play shell games regarding venue, jurisdiction, employment, and liability in courts around the country.  Fluor's intentional and public blurring of all Fluor entities into one, Fluor's manipulation of the corporate form, and Fluor's manipulation of the status of its 'employees' and 'representatives,' constitutes bad faith, abuse, fraud, wrongdoing, and injustice.

269.

As a result, each Fluor Defendant in this case is liable for the conduct and obligations of every other Fluor Defendant in this case.

## Count 1

## Negligent Supervision

270.

Plaintiff incorporates herein the preceding paragraphs 1 through 269.

271.

The bomber intentionally constructed the vest bomb and intentionally attacked U.S. soldiers, including Hencely, when he detonated the vest bomb.

272.

The bomber was on premises in the possession of Fluor at the Non-Tactical Vehicle Yard.

273.

The bomber was only able to enter Bagram Airfield because he was a Fluor employee.

274.

The bomber used Fluor's property to construct the vest bomb.

275.

The bomber used Fluor's property as components and projectiles of the vest bomb.

276.

Fluor knew or had reason to know it had the ability to control the bomber. Fluor acknowledged its ability to control the bomber when it entered into the LOGCAP Materials and agreed to control the bomber's conduct and ensure the bomber complied with the LOGCAP Materials and Base policies.

277.

Fluor knew or had reason to know of the necessity of and opportunity to control the bomber, whom Fluor knew to be a former member of the Taliban. Fluor acknowledged the necessity of and opportunity to control the bomber when it contractually obligated itself to control the bomber's conduct in the LOGCAP Materials.

278.

Fluor understood the importance and necessity of controlling the bomber as part of its work in Afghanistan under LOGCAP IV.  Fluor acknowledged that in Afghanistan "there can be no mission failure."  A Passion to Build at 178.

279.

Fluor did not exercise reasonable care to control the bomber.

280.

Fluor's negligent supervision of the bomber proximately caused Hencely's injuries.

281.

But for Fluor's negligent supervision, Hencely would not have been injured.

**Count 2.**

**Negligent Entrustment**

282.

Plaintiff incorporates herein the preceding paragraphs 1 through 281.

283.

Negligent entrustment includes "entrusting [an] employee with a tool that created an unreasonable risk of harm to the public."  *James v. Kelly Trucking Co*., 377 S.C. 628, 631 (2008).

284.

Fluor knew the bomber did not require tools from the tool room to perform his job at the HAZMAT work center.

285.

Fluor knew the bomber did not require a multimeter to perform his job at the HAZMAT work center.

286.

Fluor knew there was no legitimate reason for the bomber to check out a multimeter nine times for up to six hours at a time in the three months before the attack.

287.

Fluor knew hiring a former member of the Taliban carried a greater risk of harm precisely because of the increased risk that a former Taliban member would attack the Army.  This heightened risk required heightened supervision.

288.

Fluor knew its government projects had "strict compliance regulations" and required even greater supervision and oversight than its other engineering and construction work.  A Passion to Build at 131.

289.

The president of Fluor Government Group said, "While Fluor's commercial projects have challenging requirements, government projects are distinguished by their strict compliance regulations.  We must understand the rules and deliver projects in such a way that they can withstand federal and public scrutiny long after the work is complete.  [Fluor's Government Group employees are] the custodians of the American people's tax dollars, and therefore correctly held to a high level of oversight."  A Passion to Build at 131.

290.

Entrusting the bomber with tools from the tool room created an unreasonable risk of harm that the tools would be used in an attack.

291.

Entrusting the bomber with a multimeter created an unreasonable risk of harm that the multimeter would be used in an attack.

292.

Fluor's negligent entrustment of tools to the bomber proximately caused Hencely's injuries.

293.

But for Fluor's negligent entrustment of tools to the bomber, Hencely would not have been injured.

## Count 3.

## Negligent Retention

### 294.

Plaintiff incorporates herein the preceding paragraphs 1 through 293.

### 295.

Fluor knew the bomber was a former member of the Taliban.

### 296.

Fluor knew the bomber slept on the job.

### 297.

Fluor knew the bomber read the Quran on the job.

### 298.

Fluor knew the bomber frequently wandered away from his designated job site at the HAZMAT work center, totally without any supervision by Fluor.

### 299.

Fluor knew the bomber checked out tools he did not need, including the multimeter, from the Fluor tool room.

### 300.

Fluor knew the bomber was not present to be escorted off the Base on the morning of November 12, 2016.

71

301.

In the setting of a military base in the Islamic Republic of Afghanistan, Fluor's negligent retention of a former member of the Taliban was unreasonably dangerous to others, including Hencely.

302.

Fluor's negligent retention of the bomber proximately caused Hencely's injuries.

303.

But for Fluor's negligent retention of the bomber, Hencely would not have been injured.

**Count 4.**

**Vicarious Liability**

304.

Plaintiff incorporates herein the preceding paragraphs 1 through 303.

305.

The failures of supervision, entrustment, and retention alleged in this Complaint proximately caused Hencely's injuries.

306.

But for the failures of supervision, entrustment, and retention alleged in this Complaint, Hencely would not have been injured.

307.

Regardless of whether Nayeb or other LOGCAP personnel were direct employees of Fluor or were direct employees of a Fluor subcontractor, Fluor assumed a nondelegable duty to supervise the bomber.

308.

Fluor contractually obligated itself to ensure "all personnel supporting [LOGCAP IV 005] comply with the standards of conduct, and all terms/conditions set forth in [the] PWS and the Basic Contract. [Fluor] shall provide the necessary supervision for personnel required to perform this contract." Army Report at 10 (alterations in original).

309.

Fluor contractually obligated itself to supervise its employees, local nationals, and its subcontractors' personnel "to ensure compliance with all terms of the [LOGCAP Materials]." Army Report at 10.

310.

Even if Fluor's subcontractors' direct employees were immediately responsible for the failures of supervision, entrustment, and retention alleged in this Complaint, Fluor is vicariously liable for Hencely's injuries, "regardless of any fault on the part of [Fluor]." *Simmons v. Tuomey Reg'l Med. Ctr.*, 330 S.C. 115, 123 (Ct. App. 1998), *aff'd as modified*, 341 S.C. 32 (2000).

## Count 5.

## Negligent Control

### 311.

Plaintiff incorporates herein the preceding paragraphs 1 through 310.

### 312.

Regardless of whether Nayeb or other supervisory personnel were direct employees of Fluor or were direct employees of Fluor subcontractors, Fluor supervised the Non-Tactical Vehicle Yard and all its subcontractors' employees on the Base.

### 313.

Fluor failed in its duty to prevent its employees or its subcontractors' employees from doing their jobs in a way that was unreasonably dangerous to others, including Hencely.

### 314.

Fluor knew or should have known its employees or subcontractors' employees failed to supervise the bomber, negligently entrusted the bomber with tools and materials, negligently failed to escort the bomber off the Base, and negligently retained the bomber after poor work performance.

315.

Fluor knew or should have known about the dangerous conditions created by its employees or subcontractors' employees.

316.

Fluor failed to exercise reasonable care to remedy the dangerous conditions created by its employees or subcontractors' employees.

317.

Fluor had the opportunity to prevent the widespread and dangerous lack of supervision, entrustment, escort, and retention by exercising the power of control Fluor was obligated to retain—and did retain—as stated in the LOGCAP Materials.

318.

Fluor's negligent control of its employees or subcontractors' employees proximately caused Hencely's injuries.

319.

But for Fluor's negligent control of its employees or subcontractors' employees, Hencely would not have been injured.

## Count 6.

## Breach of Contract

### 320.

Plaintiff incorporates herein the preceding paragraphs 1 through 319.

### 321.

Fluor entered into contracts, including the LOGCAP Materials, with the U.S. government.

### 322.

Fluor had a duty under the contracts to supervise Fluor employees and the employees of Fluor subcontractors.

### 323.

Fluor had a duty to ensure that all personnel supporting Fluor's work under the LOGCAP Materials complied with the standards of conduct and all the terms and conditions of the contracts.

### 324.

The LOGCAP Materials were intended to directly benefit U.S. soldiers at Bagram Airfield, including Hencely.

325.

U.S. soldiers, including Hencely, were the intended third party beneficiaries of these contracts.

326.

Fluor intended the LOGCAP Materials to benefit individual U.S. soldiers. Fluor's executive director of sales and account manager for LOGCAP IV stated what makes LOGCAP IV unique "is our critical responsibility to the individual soldier. With this project you feel the dependency of the soldier and it makes it more personal." A Passion to Build at 178.

327.

Fluor breached the contracts by violating the specific provisions noted in this Complaint, among others.

328.

Fluor's breaches of the contracts proximately caused the deaths of five innocent people and the injuries to seventeen innocent people, including Hencely.

329.

Fluor's breaches of the contracts proximately caused Hencely's injuries.

330.

But for Fluor's breaches of the contracts, Hencely would not have been injured.

## VII.  DAMAGES

### 331.

Plaintiff incorporates herein the preceding paragraphs 1 through 330.

### 332.

Hencely seeks to recover all damages to which he is legally entitled.

### 333.

The damages claimed by Hencely were proximately caused by the breaches of contracts and the negligent and tortious acts and omissions of Fluor, for which Fluor is liable.

## Compensatory Damages

### 334.

As a direct result of Fluor's misconduct, Hencely has suffered, and continues to suffer from, injuries to his body and mind.  These injuries are permanent.

### 335.

Hencely seeks to recover general and compensatory damages for all components of mental and physical pain and suffering, past, present, and future, as allowed by South Carolina law.

336.

Hencely seeks to recover special damages for the reasonable value of his past and future medical and rehabilitative treatment.

337.

Hencely seeks to recover special damages for the reasonable value of his past and future lost wages and income, as well as his lost or diminished capacity to earn.

**Punitive Damages**

338.

Fluor's misconduct described in this Complaint was so wanton and reckless it warrants *and demands* the imposition of substantial punitive damages against Fluor pursuant to S.C. Code Ann. § 15-32-530.

339.

Fluor's failure to properly supervise the bomber was intentional and was motivated primarily by financial gain.

340.

Fluor could have hired and trained supervisors capable of fulfilling its legal and contractual duties. Fluor could have executed reasonable supervision of the bomber. Fluor did not commit additional resources to meet its legal and contractual duties to properly supervise its operations at Bagram Airfield and to

properly supervise the bomber because doing so would have lessened Fluor's profits from the LOGCAP IV program.

341.

Fluor's decision to allow the bomber to wander freely about Bagram Airfield was unreasonably dangerous.

342.

Fluor's entrustment of unnecessary tools to the bomber was unreasonably dangerous.

343.

Fluor's entrustment of a multimeter to the bomber was unreasonably dangerous.

344.

Fluor's failure to supervise the escorting of Fluor local national employees, including the bomber, off the Base was unreasonably dangerous.

345.

In the setting of a military base in the Islamic Republic of Afghanistan, failing to supervise a former member of the Taliban was unreasonably dangerous.

346.

Failing to supervise a former member of the Taliban on a military base in the Islamic Republic of Afghanistan created a high likelihood of injury.

347.

Fluor's decision to retain and promote the bomber after known poor performance was unreasonably dangerous.

348.

Fluor's decision not to take disciplinary action against the bomber, including termination, for his poor job performance was unreasonably dangerous.

349.

The unreasonably dangerous decisions regarding supervision and staffing of the Non-Tactical Vehicle Yard were made, known, and approved by the persons responsible for making such policy decisions on behalf of Fluor.

350.

The bomber had an intent to harm U.S. soldiers by detonating the vest bomb and did in fact harm Hencely by detonating the vest bomb.

351.

Fluor contractually agreed to control the bomber's actions and ensure the bomber complied "with the standards of conduct, and all terms/conditions set forth in" the LOGCAP Materials.  The intentional acts of the bomber are imputable to Fluor.

352.

South Carolina's caps on punitive damages under S.C. Code Ann. § 15-32-530 violate the U.S. constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

(a) That the Court award Plaintiff damages on all counts in an amount (greater than $75,0000, 28 U.S.C. § 1332) to be proven at trial together with interest and costs and such further relief as is just and proper; and

(b) That Plaintiff recovers punitive damages.

PLAINTIFF DEMANDS A TRIAL BY JURY.

Respectfully submitted, this 20th day of February, 2019.


/s/ Beattie B. Ashmore
BEATTIE B. ASHMORE, #5215
Beattie@BeattieAshmore.com


JAMES E. BUTLER, JR. (Pro Hac Vice to be filed)
Georgia Bar No. 099625
Jim@ButlerWooten.com
JONATHAN S. TONGE (Pro Hac Vice to be filed)
Georgia Bar No. 303999
Jon@ButlerWooten.com
BUTLER WOOTEN & PEAK LLP

2719 Buford Highway
Atlanta, Georgia 30324
T:  (404) 321-1800    F:  (404) 321-2962


W. ANDREW BOWEN, #10510
Andrew@BowenPainter.com
PAUL PAINTER, III (Pro Hac Vice to be filed)
Georgia Bar No. 520965
BOWEN PAINTER, LLC
215 W. York Street
P.O. Box 8966 (31412)
Savannah, GA 31401
T:  (912)335-1909    F:   (912)335-3537

BEATTIE B. ASHMORE, P.A.
650 E. Washington Street
Greenville, S.C. 29601
T:  (864) 467-1001    F:  (864) 672-1406


ATTORNEYS FOR PLAINTIFF