UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Winston Tyler Hencely,           )
                                        )
                   Plaintiff,   )   Civil Action No. 6:19-cv-00489-BHH
vs.                  )
                                         )
Fluor Corporation, Inc.; Fluor Enterprises,   )   **OPINION AND ORDER**
Inc.; Fluor Intercontinental, Inc.; Fluor   )
Government Group International, Inc.,   )
                                         )
                   Defendants.   )
_____

This matter is before the Court on Defendants Fluor Corporation, Inc., Fluor Enterprises, Inc., Fluor Intercontinental, Inc., and Fluor Government Group International, Inc.'s (collectively "Defendants" or "Fluor") Federal Rule of Civil Procedure 12(b)(1) motion to dismiss for lack of subject matter jurisdiction under the political question doctrine. (ECF No. 10.) For the reasons set forth in this Order, the motion is denied.

## BACKGROUND

This suit arises from a suicide bombing on November 12, 2016 at Bagram Air Field ("BAF" or "the Base"), a United States Military installation in Bagram, Afghanistan. Plaintiff Tyler Hencely ("Plaintiff"), a Specialist (E-4) in the United States Army, asserts claims for grievous injuries he suffered when Ahmed Nayeb ("Nayeb"), an Afghan national working in Fluor's Non-Tactical Vehicle Yard at BAF, detonated a suicide vest bomb in a crowd gathered for a Veterans Day event. Plaintiff asserts claims for negligent supervision (Count 1), negligent entrustment (Count 2), negligent retention (Count 3), vicarious liability (Count 4), negligent control (Count 5), and breach of contract (Count 6). (ECF No. 1 at 66–77.) In essence, Plaintiff alleges that Defendants' negligence and breach of

contractual duties allowed Nayeb to commit his suicide attack at BAF and proximately caused Plaintiff's injuries. Defendants contend that the United States Military, not Fluor, was responsible for force protection at BAF and that adjudication of Plaintiff's suit would inevitably require the Court to scrutinize military judgment, decision making, and intelligence gathering, thus implicating nonjusticiable political questions and requiring dismissal. (*See* ECF No. 10.)

Defendants filed their Rule 12(b)(1) motion to dismiss on March 18, 2019. (ECF No. 10.) Plaintiff responded on April 1, 2019 (ECF No. 20), and Defendants replied on April 8, 2019 (ECF No. 30). On May 23, 2019, Plaintiff filed a short supplemental brief in opposition to Defendants' motion, providing the Court with an U.S. Army show cause notice decision letter that Fluor had not previously disclosed and about which Plaintiff's counsel learned subsequent to filing Plaintiff's initial response brief. (*See* ECF Nos. 40 & 40-1.) The matter is ripe for consideration.

## STANDARD OF REVIEW

"When a Rule 12(b)(1) motion challenge is raised to the factual basis for subject matter jurisdiction, the burden of proving subject matter jurisdiction is on the plaintiff." *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). In deciding such a motion, "'the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014) ("*Burn Pit*") (quoting *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004)). When determining whether subject matter jurisdiction is present, the Court applies the standard

applicable to motions for summary judgment where the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Richmond*, 945 F.2d at 768 (citing *Trentacosta v. Frontier Pacific Aircraft Indus.*, 813 F.2d 1553, 1559 (9th Cir. 1987)). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

## DISCUSSION

Defendants move to dismiss Plaintiff's complaint on grounds that the Court lacks subject matter jurisdiction over Plaintiff's claims because those claims are nonjusticiable under the political question doctrine. As set forth below, the undersigned finds that the substance of Plaintiff's claims, as embodied in the specific acts and omissions that form the basis of those claims, lie within the proper subject matter jurisdiction of the Court. Plaintiff has carried his burden of proving subject matter jurisdiction by showing that his claims are justiciable. Thus, the motion to dismiss will be denied.

### A. The Political Question Doctrine

"The political question doctrine had its genesis in the Supreme Court's decision of *Marbury v. Madison*, where Chief Justice Marshall explained that '[q]uestions, in their nature political, of which are, by the constitution and laws, submitted to the executive, can never be made in this court.'" *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 408 (4th Cir. 2011) (quoting *Marbury v. Madison*, 5 U.S. 137 (1803)). "Pursuant to the political question doctrine, the judiciary is deprived of jurisdiction to assess decisions exclusively committed to a separate branch of government. For example, most military decisions lie solely within the purview of the executive branch." *Id.* at 407 n.9 (citing *Baker*

*v. Carr*, 369 U.S. 186 (1962)). However, the fact that a government contractor "was acting under orders of the military does not, in and of itself, insulate the claim from judicial review." *Id.* at 411. "Therefore, although cases involving military decision making often fall in the political question box, we cannot categorize such a case as nonjusticiable without delving into the circumstances at issue." *Burn Pit*, 744 F.3d at 334.

The U.S. Supreme Court, in *Baker v. Carr*, set forth a test establishing six factors a court should consider when deciding whether a case presents a political question, including whether the case evinces:

> (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department," (2) "a lack of judicially discoverable and manageable standards for resolving" the issue, (3) "the impossibility of deciding [the issue] without an initial policy determination of a kind clearly for nonjudicial discretion," (4) "the impossibility of a court's undertaking independent resolution [of the issue] without expressing lack of the respect due coordinate branches of government," (5) an "unusual need for unquestioning adherence to a political decision already made," or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)) (modifications in original). In cases involving the civil liability of military contractors for alleged negligence, the Fourth Circuit Court of Appeals has distilled the *Baker* factors into two questions for determining whether a court has subject matter jurisdiction:

> [F]irst . . . "whether the government contractor was under the 'plenary' or 'direct' control of the military" (direct control). Second, . . . whether "national defense interests were 'closely intertwined' with military decisions governing the contractor's conduct, such that a decision on the merits of the claim 'would require the judiciary to question actual, sensitive judgments made by the military.'" An affirmative response to either of the two [questions], namely, the fact of direct control or the need to question sensitive military judgments, generally triggers application of the political question doctrine.

*Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 155 (4th Cir. 2016) (quoting *Taylor*,

658 F.3d at 411) (internal citations omitted). This test has been applied by the Fourth Circuit numerous times beginning with *Taylor v. Kellogg Brown & Root Servs., Inc.*, and the two questions posed above have come to be known as the "*Taylor* factors."

In *Taylor*, the Fourth Circuit determined that the political question doctrine barred a U.S. Marine's negligence suit against military contractor, KBR. The Marine—Peter Taylor—was electrocuted and suffered severe injuries when a KBR employee turned on the power to an electric generator at Camp Fallujah, Iraq, after having been specifically instructed by Marine Corps personnel not to do so. 658 F.3d at 404. The generator powered Camp Fallujah's tank ramp and had malfunctioned. There had been several such power outages, and a group of Marines, including Taylor, decided to install a wiring box at the tank ramp and hook up their own generator. As such, the main generator had been turned off. Taylor was working on the wiring box when the generator was turned on, resulting in his injuries. Importantly, jurisdictional discovery in the case established that the use of secondary or backup generator sources to power individual Camp facilities, such as the truck ramp, in the event of primary power failure had to be authorized by the "Mayor's Cell," commanded by Marine Major Omar Randall, and the truck ramp had not been authorized for backup power. *Id.* at 406.

The *Taylor* court disagreed with the underlying district court opinion and found that the direct control factor did not implicate the political question doctrine under the facts of the case because the explicit terms of the contract made KBR responsible for the physical safety of workers and servicemembers that might come into contact with the hazards presented by its electrical work. Specifically, the court quoted a section of the contract entitled "Statement of Work," which provided: "[KBR] shall be responsible for safety of

employees and base camp residents during all [KBR] operations conducted in accordance with this Statement of Work and [applicable Army safety regulations]." 658 F.3d at 406. Accordingly, the court found that where KBR was "solely responsible for the safety of all 'camp residents during all contractor operations,'" KBR could not be deemed to be under the plenary control of the military. *Id.* at 411 (quoting the underlying contract). In so finding, the *Taylor* court distinguished the factual scenario from the situation at issue in *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, where the Eleventh Circuit held that military authorities exercised plenary control over KBR's involvement in convoy operations. 572 F.3d 1271, 1276-77 (11th Cir. 2009) (holding the direct control factor counseled toward nonjusticiability in a suit for damages arising from a convoy crash because "it is the military, not civilian contractors, that decides when convoys are to be arranged, the routes to be traveled, the amount of fuel or other supplies to transported, the speed at which the vehicles are to travel, the number of vehicles to be included in the convoy, the spacing to be maintained between vehicles, and the security measures to be employed, and other details of the mission").

Nonetheless, the *Taylor* court held that the district court correctly concluded that Taylor's negligence claims were nonjusticiable under the political question doctrine by application of the "sensitive military judgments" factor. Specifically, the Fourth Circuit held that an analysis of KBR's contributory negligence defense would require the judiciary to question "actual, sensitive judgments made by the military," including whether Taylor and other Marines made a reasonable decision in seeking to install the wiring box to add another electric generator at the tank ramp, and "especially" the issue of the Mayor's Cell decision not to provide a backup generator for the tank ramp in the first place. *Id.* at 411-

12. Thus, the *Taylor* court found the case nonjusticiable based on the second factor alone. *See Burn Pit*, 744 F.3d at 335 (noting the *Taylor* court's sole reliance on the sensitive military judgments factor in making a nonjusticiability finding).

In *In re KBR, Inc., Burn Pit Litigation*, the Fourth Circuit vacated the district court's decision to dismiss military servicemembers' tort claims (including negligence) based upon their putative nonjusticiability under the political question doctrine. 744 F.3d 326, 341. The *Burn Pit* court held that neither the first nor the second *Taylor* factor indicated that the servicemembers' claims were nonjusticiable when considered in light of the factual context before the court. *Id.* The Judicial Panel on Multidistrict Litigation had consolidated fifty-eight separate complaints—the majority prosecuted by U.S. military personnel—alleging various tort and contract claims stemming from injuries suffered by servicemembers as a result of KBR's waste disposal and water treatment practices. *Id.* at 332. KBR moved to dismiss the servicemembers claims pursuant to, *inter alia*, the political question doctrine; the district court granted KBR's motion holding that both *Taylor* factors counseled toward nonjusticiability of the servicemembers' claims. *Id.* at 333. The Fourth Circuit noted that although some evidence demonstrated that the military exercised control over KBR's burn pit activities—e.g., a letter from General David Petraeus stating the need for burn pits during contingency operations, and declarations from various military officials and civilians indicating that the military decided what method of waste disposal to use on bases in Iraq and Afghanistan—other evidence presented by the servicemembers contradicted this picture—e.g., a U.S. Army manual indicating that the military does not tell logistics contractors how to perform the mission but only what the end result must be, and declarations from KBR managers stating that KBR was

exclusively responsible for operating the burn pits in performance of the relevant contract. *Id*. at 336-37. The Fourth Circuit also determined that the military exercised some degree of oversight regarding KBR's water treatment functions, though the relevant task orders delegated potable and non-potable water production, distribution, and disposal to KBR. *Id*. at 337-38. The *Burn Pit* court, considering the evidence available at that stage of the litigation, concluded that the military's control over KBR's burn pit and water treatment tasks did "not appear" to arise to the level of control over convoy operations present in *Carmichael* (*see id.* at 338), and likened the then-existent factual landscape in the *Burn Pit* case to *Harris v. Kellogg Brown & Root Services, Inc.*, in which the Third Circuit stated, "where the military does not exercise control but merely provides the contractor with *general guidelines* that can be satisfied at the contractor's discretion, contractor actions taken within that discretion do not necessarily implicate unreviewable military decisions." 724 F.3d 458, 467 (emphasis added). Ultimately, the *Burn Pit* court stated that it could not "determine whether the military control factor renders [the] case nonjusticiable at this time" because "we simply need more evidence to determine whether KBR or the military chose *how* to carry out [burn pit and water treatment operations]." 744 F.3d at 339 (emphasis added).

Respecting the second *Taylor* factor, the *Burn Pit* court concluded that KBR's "proximate causation" defense would not necessarily require the district court to evaluate the propriety of military judgments. *Id*. at 340. KBR's defense boiled down to its assertion that the servicemembers' "alleged injuries were caused by military decisions and conduct, not by KBR." *Id*. The Fourth Circuit distinguished this defense from the contributory negligence defense at issue in *Taylor*, the resolution of which would have "invariably

require[d] the Court to decide whether . . . the [military] made a *reasonable* decision." *See Taylor*, 658 F.3d at 411 (emphasis added). In contrast, KBR's proximate causation defense would simply require the district court "to decide if the military made decisions regarding (1) whether to use, how to use, and where to locate burn pits and (2) how to conduct water treatment," without extending to the *reasonableness* of those decisions. 744 F.3d at 340. Again, the Fourth Circuit likened the *Burn Pit* case to the decision in *Harris*, where the Third Circuit held that a contractor's proximate causation defense— asserted against a claim that the contractor negligently performed maintenance duties thereby causing a soldier's death—would require evaluation of strategic military decisions *only if* the governing law used a proportional-liability system that assigned liability based on fault. *Id.* Accordingly, KBR's proximate causation defense in *Burn Pit* would not require a court to evaluate military decision making unless (1) the military caused the plaintiffs' injuries, at least in part, and (2) the plaintiffs invoked a proportional-liability system that allocated liability based on fault. *Id.* at 340-41. The *Burn Pit* court deemed this potentiality too remote to find that the second *Taylor* factor weighed toward nonjusticiability and remanded the case for further proceedings.

In *Al Shimari v. CACI Premier Tech., Inc.*, four Iraqi nationals alleged that they were abused while detained in the custody of the U.S. Army at Abu Ghraib prison, and alleged various tort claims against the military contractor, CACI, that participated in interrogation operations, including assault and battery, sexual assault and battery, and intentional infliction of emotional distress. 840 F.3d 147, 151 (4th Cir. 2016). The case came before the Fourth Circuit for the fourth time after limited jurisdictional discovery and a finding by the district court that the plaintiffs' claims were nonjusticiable under the

political question doctrine. The Fourth Circuit vacated the district court's judgment and remanded for reexamination of subject matter jurisdiction in light of two holdings: (1) "conduct by CACI employees that was unlawful when committed is justiciable, irrespective whether that conduct occurred under the actual control of the military," and (2) "acts committed by CACI employees are shielded from judicial review under the political question doctrine if they were not unlawful when committed and occurred under the actual control of the military or involved sensitive military judgments." *Id*.

With regard to the first *Taylor* factor, the *Al Shimari* court found that the evidence regarding the military's control over CACI interrogators demonstrated both the presence of *formal* control—e.g., the military functioned as the official command structure at Abu Ghraib and instituted formal procedures to govern the interrogation process, including the submission of interrogation plans to the military chain of command for advance approval—and a lack of *actual* control over contractor interrogators—e.g., the military leaders at Abu Ghraib failed to properly supervise subordinates or provide direct oversight of the mission, and failed to demonstrate an adequate command presence, which resulted in a "command vacuum." *Id*. at 156-57. The court stated:

> The first Taylor factor is not satisfied by merely examining the directives issued by the military for conducting interrogation sessions, or by reviewing any particular interrogation plans that the military command approved in advance. Instead, *the concept of direct control encompasses not only the requirements that were set in place in advance of the interrogations, but also what actually occurred in practice* during those interrogations and related activities.

*Id*. at 157 (emphasis added). In vacating the lower court's finding of nonjusticiability, the Fourth Circuit noted that the district court "began and ended its analysis by drawing conclusions based on the evidence of *formal* control" without ever truly "addressing the

issue of *actual* control." *Id.* (emphasis added).

Regarding the second *Taylor* factor, the Fourth Circuit concluded that the district court's analysis was incomplete when it "explained that it was unequipped to evaluate whether the use of certain 'extreme interrogation measures in the theatre of war' was appropriate or justified." *Id.* at 158. The *Al Shimari* court found that the district court erred by "failing to draw a distinction between unlawful conduct and discretionary acts that were not unlawful when committed." *Id.* Accordingly, "to the extent that the plaintiffs' claims rest[ed] on allegations of unlawful conduct in violation of settled international law or criminal law . . . those claims [fell] outside the protection of the political question doctrine." *Id.* On remand, the Fourth Circuit directed the district court to segregate such justiciable claims before proceeding to determine whether CACI's other, not-unlawful conduct implicated qualitative assessment of sensitive military judgments under *Taylor*'s second prong. *Id.*

The *Al Shimari* court stated, "[W]e hold that any conduct of the CACI employees that occurred under the *actual* control of the military or involved sensitive military judgments, and was not unlawful when committed, constituted a protected exercise of discretion under the political question doctrine." *Id.* at 159 (emphasis added). Moreover, the court cautioned that the distinction between justiciable claims that clearly alleged unlawful conduct (e.g., sexual assault) and "grey area" conduct that was committed under the actual control of the military or involved sensitive military judgments and was therefore nonjusticiable (e.g., "enhanced interrogation tactics" the lawfulness of which was not settled at the time they occurred), would involve a "'discriminating analysis,'" and would "require the district court to examine the evidence *regarding the specific conduct to which*

*the plaintiffs were subjected* and *the source of any direction under which the acts took place.*" *Id.* at 160 (quoting *Baker*, 369 U.S. at 211) (emphasis added). Finally, the court instructed that, "If disputed facts are 'inextricably intertwined' with the facts underlying the merits of the plaintiffs' claims, the district court should resolve these disputed jurisdictional facts along with the intertwined merits issues." *Id.* at 160-61 (citing *Kerns*, 585 F.3d at 193).

In *Norat v. Fluor Intercontinental, Inc.*, No. 6:14-CV-04902-BHH, 2018 WL 1382666 (D.S.C. Mar. 19, 2018), this Court distilled the following lessons from the Fourth Circuit's above-described holdings regarding the justiciability of military contractors' civil liability for conduct performed in connection with in-theatre military operations:

> (1) the type of "direct control" that implicates nonjusticiability results from the military's *actual* control over the specific acts or omissions that form the basis of the plaintiff's claim, and it is not invoked by mere *formal* control or general oversight by military authorities respecting the contractor's activities (*see Taylor*, 658 F.3d at 411; *Burn Pit*, 744 F.3d at 337-39; *Al Shamiri*, 840 F.3d at 156-57); (2) the type of questioning, by courts, of "sensitive military judgments" that the political question doctrine abjures is that analysis which purports to assess the *reasonableness* or prudence of specific military decisions, and nonjusticiability is not implicated by the mere fact of military personnel's general involvement with integrated contractor operations (*see Taylor*, 658 F.3d at 411-12; *Burn Pit*, 744 F.3d at 340-41; *Al Shamiri*, 840 F.3d at 158-60; *see also Baker*, 369 U.S. at 217 (delineating, in factors three and four, policy determinations of a kind clearly for nonjudicial discretion and the necessity for the judiciary's respect of coordinate branches' decisions as reasons for invocation of the political question doctrine)).

*Norat*, 2018 WL 1382666, at *6.

In *In re: KBR, Inc.*, 893 F.3d 241 (4th Cir. 2018) ("*Burn Pit 2*"), *cert. denied sub nom. Metzgar v. KBR, Inc.*, 139 S. Ct. 916, 202 L. Ed. 2d 645 (2019),[1] servicemembers' consolidated tort claims premised on injuries allegedly caused by KBR's waste

---

[1] *Burn Pit 2* was decided on June 20, 2018, approximately two months after the undersigned made the above-referenced ruling in *Norat*, on March 19, 2018.

management and water services returned to the Fourth Circuit "after the district court created an extensive factual record through a herculean discovery process and once again concluded that the [s]ervicemembers' suit implicate[d] a political question that federal courts cannot adjudicate." *Burn Pit 2*, 893 F.3d at 253. The *Burn Pit 2* court affirmed, concluding that "the military's control over KBR was *plenary* and *actual*." *Id.* at 261 (emphasis added). The court stated, "First, the military's control was plenary as it not only directed to KBR 'what' must be done but also prescribed 'how' KBR must accomplish those tasks." *Id.* (citing *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 534 (4th Cir. 2014); *Burn Pit*, 744 F.3d at 338–39.) The court determined that the facts at issue plainly showed KBR had little to no discretion in choosing *how* to manage waste and *how* to provide potable water. *Id.* ("The military mandated the use of burn pits as a matter of military judgment. KBR could not unilaterally choose to use landfills, recycling, or incinerators instead. Additionally, the military exercised plenary control over where to construct the burn pits, what could or could not be burned, when KBR could operate the burn pits, how high the flames should be, and how large each burn should be.")

> Next, the military's control over KBR was actual. *See* [*Al Shimari*], 840 F.3d at 156–57. Unlike [*Al Shimari*], this was not a case involving merely on-paper military control that was plagued by a lack of actual command presence. Although, KBR did not officially fall within the military chain of command, the military exercised extensive control and oversight over KBR's burn pit operations and water services. Operationally, the commanders and their staff officers interfaced with KBR contractors on a regular basis. The operational command determined the methods of waste management and water services that KBR was to use, dictated their requirements for support, and directed KBR to provide the necessary services through the contracting arm. The military also retained the ultimate responsibility for testing water quality. Furthermore, the military continuously and meticulously evaluated whether KBR was meeting the commanders' intent. Accordingly, we conclude that the military's control over KBR's waste management and water services was actual and plenary.

13

*Id.* at 261–62. After determining that the district court did not err by finding that the first *Taylor* factor required dismissal, the *Burn Pit 2* court stated that it need not discuss the second *Taylor* factor and declined to do so. *Id.* at 264.

### B. Whether Fluor Was Under Direct Military Control

The Court will proceed to an analysis of *Taylor*'s direct control factor as applied to the factual context alleged in Plaintiff's complaint.

> To determine whether the military's control is plenary, "a court must inquire whether the military clearly chose *how* to carry out [the contractor's activities], rather than giving the contractor discretion to determine the manner in which the contractual duties would be performed." [*Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 534 (4th Cir. 2014)] (internal quotation marks omitted). The military's control over the government contractor must rise "to the level of the military's control over the convoy in *Carmichael*."

*Burn Pit 2*, 893 F.3d at 260 (emphasis in original). In *Carmichael*, a military convoy was on a fuel resupply mission when one of KBR's trucks rolled over and threw Sergeant Carmichael out of the truck, pinning him down and leaving him in a permanent vegetative state. 572 F.3d at 1278. The Eleventh Circuit held that the military's control over KBR's participation in the convoy was plenary because

> the military decided the particular date and time for the convoy's departure; the speed at which the convoy was to travel; the decision to travel along a particular route . . .; how much fuel was to be transported; the number of trucks necessary for the task; the speed at which the vehicles would travel; the distance to be maintained between vehicles; and the security measures that were to be taken.

*Id.* at 1281. Under this standard, the Court finds that the military *did not* exercise plenary control over Fluor's alleged conduct in the instant case, and *Taylor*'s first factor counsels against a finding of nonjusticiability.

In their motion to dismiss, Defendants make the following arguments in support of

their assertion that the military's plenary control raises nonjusticiable political questions in this case: (1) the military had plenary control over BAF force protection and security under the Army's Logistics Civil Augmentation Program IV Basic Contract with Fluor ("LOGCAP IV" or "Basic Contract") and Task Order ("TO") 0005 (*see* ECF No 10 at 20–30); (2) the military exercised actual, plenary control over Fluor's alleged conduct (a) by requiring and controlling Local National ("LN") hiring for LOGCAP work pursuant to the military's Afghan First Program ("Afghan First"), part of its broader counterinsurgency ("COIN") strategy in the asymmetric Afghan theater, (b) by controlling Nayeb's hiring and retention pursuant to Afghan First and COIN, (c) by controlling the means, methods, and details of LN Security screenings and BAF access for LNs, (d) by controlling physical security inspections of personnel and vehicles at BAF entry control points ("ECPs"), and (e) by controlling escort and supervision of LNs through its badge access policy (*see id.* at 30–47); (3) the military's plenary control over force protection is dispositive of "the very force protection/security issues that Plaintiff challenges in the case *sub judice*" (*see id.* at 47–50). The Court notes that although Defendants cast their motion as a "factual" challenge to the Court's subject matter jurisdiction under Rule 12(b)(1) (*see id.* at 9), they largely do not dispute Plaintiff's jurisdictional allegations. (*See generally id.*) Indeed, the only relevant factual allegation that Defendants clearly contest is that Fluor had knowledge that Nayeb was a former member of the Taliban. (*See id.* at 15, 39, 43, 54.)

Defendants begin by baldly asserting, "At its heart, Plaintiff's suit challenges the reasonableness of force protection and security at a United States military base," and proceed through the remainder of their briefing to show—quite convincingly—that "[t]he United States Military—not Fluor—was responsible for force protection at BAF." (*Id.* at 7.)

Thus, if it was true that Plaintiff's claims were premised on the alleged unreasonableness of military force protection measures, then assuredly the Court would agree that such claims were nonjusticiable because they implicate a category of decision-making that the Constitution assigns to the Executive Branch and which the judiciary is ill equipped to assess. *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1287 (11th Cir. 2009) ("[O]nly the military could accurately assess the risks presented by the mission; only the military was in a position to meaningfully balance those risks in light of its broader strategies and objectives; and only the military possessed the competence to make the many critical tactical decisions concerning the safest and most efficacious way to conduct the convoy."); *see also Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 1992) ("[J]udicial review of military decisions would stray from the traditional subjects of judicial competence."). With respect, however, Defendants' assertion that Plaintiff's complaint challenges force protection measures at BAF depends upon a not-so-subtle re-writing of the complaint. In fact, Defendants' motion barely mentions the actual substance of Plaintiff's causes of action except as a jumping off point from which to assert that the "true" nature of those claims is to challenge BAF force protection measures—"Though Plaintiff artfully pleads his claims as negligence against an alleged employer, they in fact assert inadequate 'force protection' to prevent a suicide bombing at a military base" (ECF No. 10 at 23)—and as a reference from which to argue that Fluor's proposed defenses inexorably raise nonjusticiable political questions (*see id.* at 53–57).

At the outset, the Court notes that Defendants' reliance on *Smith v. Halliburton Co.* to support the putative nonjusticiability of the instant claims is misplaced. Defendants assert that *Smith* is "imminently [sic] instructive on these facts" and that the "underlying

facts in *Smith* concerning responsibility for force protection at FOB Marez are indistinguishable from those before the Court in this case." (*Id.* at 51.) However, in that case a suicide bomber, who was not employed by or otherwise connected to Halliburton, detonated a bomb inside a dining hall ("DFAC") where Halliburton provided food services under contract with the U.S. Department of Defense, thereby killing numerous U.S. servicemembers. *Smith v. Halliburton Co.*, No. H-06-0462, 2006 WL 2521326, at *1, *3–*4 (S.D. Tex. Aug. 30, 2006). The plaintiffs sued Halliburton alleging negligent security claims. *See id.* at *1 ("Plaintiffs allege that defendants were negligent in (1) failing to properly secure the DFAC, (2) failing to properly monitor the DFAC, (3) allowing a large number of people to gather at the mess tent at the same time, (4) not providing a search of the people who entered into the DFAC, (5) failing to have a secure perimeter around the DFAC, (6) failing to warn people that came into the DFAC that defendants had provided no security, and (7) failing to take reasonable precautions to make the DFAC safe from attacks and explosions of the type that killed Smith.") The district court dismissed the plaintiffs' complaint under the political question doctrine because the evidence demonstrated that Halliburton "had no responsibility for force protection," the contract "provide[d] that the Service Theater Commander w[ould] provide force protection to defendants and their employees," and "as a practical matter the military, not defendants, actually provided security at the DFAC." *Id.* at *3–*4.

Two distinguishing points render *Smith* of no consequence to the current analysis: (1) the suicide bomber in *Smith* was not a Halliburton employee and Halliburton had no contractual duties of supervision pertaining to the suicide bomber; (2) the plaintiffs' claims in *Smith* were all premised on a negligent security theory. Plaintiff's claims in the instant

case make no negligent security allegation. Rather, Plaintiff's complaint is replete with explicit references to its underlying negligent supervision and breach of contract theories. For example, in direct refutation of an anticipated justiciability challenge, paragraph 244 of the complaint states:

> The Army did not "direct" Fluor to
> (a) *So fail to supervise* the bomber that he was able to construct the bomb vest while on the job for Fluor, at Fluor's facility, using Fluor's tools and materials;
> (b) *So fail to supervise* the bomber that he worked alone at Fluor's facility and wandered about the Base unsupervised;
> (c) *So fail to supervise* the bomber that he used Fluor's tools, including a multimeter for which he had no need except to build a bomb, to construct a bomb intended to kill American servicemen and women;
> (d) *So fail to supervise* the bomber that he was not escorted off the [B]ase when *Fluor's contractual obligations* and duty to preserve Base security both required that he be escorted off the [B]ase;
> (e) Completely fail to ensure that Fluor's escorts remained "in close proximity and remain in constant view" of the bomber, as required by *Fluor's contractual obligations* and security duties;
> (f) *So fail to supervise* the bomber that he was able to attack the U.S. Army on November 12, 2016.

(ECF No. 1 ¶ 244 (emphasis added).) Defendants' rely on a few cherry-picked uses of the phrase "Base security" to characterize Plaintiff's complaint as a veiled challenge to force protection measures that were indeed under plenary military control. (*See* ECF No. 10 at 26 ("Plaintiff bases his claims on an erroneous assumption that Fluor had an obligation to provide 'Base security' to prevent a suicide bombing.").) But this reading of the complaint takes Plaintiff's use of that phrase out of context, misses the forest for the trees, and completely ignores Plaintiff's causes of action as pled.

The U.S. Army conducted an investigation of Nayeb's suicide bombing pursuant to Army Regulation 15-6. (ECF No. 1 ¶ 33.) The factual findings and conclusions of the Army Investigation were reported in a memorandum report dated December 31, 2016,

issued by Major General Thomas James, Jr., U.S. Army ("AR 15-6 Report"), which report—redacted to remove classified information—is attached to Plaintiff's complaint as Exhibit 1. (*Id.*; ECF No. 1-1.) The AR 15-6 Report makes, among myriad others, the following relevant findings: (a) Nayeb was hired by Alliance Project Services, Inc. a subcontractor of Fluor; (b) Nayeb's work performance was supervised by Fluor while he was employed at the BAF NTV Yard; (c) Fluor did not reasonably supervise Nayeb at the work facility, nor reasonably supervise the transport of Nayeb or other employees between the ECP and the work facility; (d) as the prime contractor for LOGCAP IV (Task Order 0005), which encompassed services and base life support for the eastern and northern portions of Afghanistan, Fluor was responsible for all of its employees, subcontractors, and subcontractor employees' actions pursuant to the Task Order 0005 Performance Work Statement ("PWS"); (e) interviews with employees of the NTV Yard conducted by counterintelligence agents following the suicide blast illustrate that Fluor employees were responsible for the supervision of LN employees; (f) Fluor's lack of reasonable supervision included but was not limited to: (i) lack of direct supervision over the HAZMAT area, (ii) lack of supervising employee performance, and (iii) failure to supervise use of tools by employees; (g) as the only HAZMAT employee on night shift, Nayeb worked at the HAZMAT work center alone and with sporadic supervision; (h) statements of Fluor employees obtained by counterintelligence agents, coupled with statements provided by Fluor, reveal confusion among Fluor supervisors as to who was responsible for Nayeb's supervision and the HAZMAT work center; (i) this ambiguity on supervisory responsibility demonstrates an unreasonable complacency by Fluor to ensure LN employees were properly supervised at all times, as required by Fluor's

contractual and non-contractual, generally recognized supervisory obligations; (j) the lack of reasonable supervision facilitated Nayeb's ability to freely acquire most of the components for the construction of the suicide vest and the freedom of movement to complete its construction during his working hours; (k) despite Nayeb being caught sleeping in the HAZMAT area in a sleeping bag and regular, unexplained absences from his work area, no formal counseling or disciplinary action could be found for Nayeb; (l) the failure to enforce a work-related standard of performance and unjustified retention of Nayeb amounts to a lack of reasonable supervision by Fluor; (m) tool room logs from the NTV Yard obtained by counterintelligence agents revealed that in the months immediately prior to the suicide bombing Nayeb checked out multiple tools not associated with his duty as the HAZMAT employee, including a multimeter—a tool used to measure voltage, current, and resistance—which Nayeb checked out nine times for up to six hours at a time; (n) interviews with Fluor employees, including an individual who ran the NTV Yard tool room at night and asked Nayeb why he needed the multimeter, demonstrate that there was general knowledge of who was properly able to check out tools associated with job performance, but that the standard was poorly enforced; (o) Fluor was deficient in properly executing and supervising its escort during the transportation of LN employees who required escorts, including Nayeb, between the ECP and the NTV Yard, which lack of reasonable supervision was evidenced by, but not limited to: (i) lack of accountability over employees getting on the bus at the end of each shift, and (ii) lack of positive control while escorting LN employees to and from the ECP; (p) the BAF Badging and Screening Policy required that escorts remain in close proximity and remain in constant view of the individuals they were escorting; (q) the mechanism Fluor used to ensure that LN

employees were on the bus at the end of each shift consisted of a sign in/sign out sheet filled out by the night shift LN Team Lead, who, in lieu of a physical or visual inspection to ensure every LN employee was on the bus, would attest to the same by observing that all LN employees had signed out on the sheet, at which point the bus would move to the ECP without additional supervisory accountability; (r) Fluor supervisors relied on LNs to ensure all LN employees were accounted for and actually on the bus at the end of each shift; (s) on November 11, 2016, Nayeb informed an LN coworker that he would miss the bus on November 12, 2016 because of a HAZMAT class requirement, despite having taken the class on October 2, 2016 and not requiring the class for another year, and evidence supports that Nayeb never got on the bus; (t) evidence demonstrates that Fluor's NTV Yard designated escorts often did not know who they were responsible for escorting or their names, that if a night shift worker missed a ride to the ECP at the end of shift a day shift escort would take them at a later time after the shift change, and that Fluor changed out the designated escorts every week; (u) the preponderance of evidence shows a lack of reasonable supervision by Fluor while escorting LNs to and from the NTV Yard, and this systematic failing enabled Nayeb to go undetected from 0445 until 0538 hours on November 12, 2016, which coincides with the average walking time of 53 minutes from the NTV Yard to the blast site. (ECF No. 1-1 at 12–17.)[2] The Investigating Officer supported these findings with meticulous citations to evidence gathered in the course of the investigation and attached to the AR 15-6 Report as exhibits. (*See id.*)

The Investigating Officer routinely cited to the Task Order 0005 Performance Work Statement as one contractual source of Fluor's duty to supervise Nayeb. The PWS states

---

[2] The Court's lettering of the above-referenced findings from the AR 15-6 Report is its own and does not match the lettered paragraphs delineated by the Investigating Officer.

in relevant part:

> **01.07. Personnel.** The Contractor [Fluor] shall provide the necessary personnel with appropriate skills, certificates and licensing required to perform services identified in this TO and the Basic Contract.
>> **a.** The Contractor is responsible for ensuring all personnel supporting this TO comply with the standards of conduct, and all terms/conditions set forth in this PWS and the Basic Contract. *The Contractor shall provide the necessary supervision for personnel required to perform this contract.*
>> **b.** The Contractor shall hire HN[3] personnel and Subcontractors to the maximum extent possible in performance of this contract when such recruitment practices meet legal requirements. *The Contractor is responsible for oversight of such personnel or Subcontractors to ensure compliance with all terms of the Basic Contract and this PWS.*

> . . . .

> **03.03. Contractor Furnished Items and Services.**
>> **a.** The Contractor shall provide all necessary personnel, *supervision*, management, equipment, materials, communications, *transportation*, facilities, supplies, and cost estimates required in support of this TO . . . .

> . . . .

> **05.00. Base Life Support (BLS).** The Contractor shall plan for and provide all personnel, equipment, maintenance, tools, materials, *transportation*, *supervision* and other items and services necessary to accomplish the requirements of the TO. . . .

(Task Order 0005 PWS, ECF No. 10-3 at 5, 10 (emphasis added).)

Based on the AR 15-6 Report and Fluor's contractual obligations documented therein, Plaintiff has alleged six causes of action. In Count 1, Plaintiff avers that Fluor's negligent supervision of Nayeb allowed him to construct and detonate the vest bomb even though Flour knew or had reason to know it had the ability to control Nayeb, knew or had reason to know of the necessity of and opportunity to control Nayeb given his former

---

[3] "HN personnel" stands for "Host Nation personnel," which term is synonymous with "LN," the term used to designate Afghanis hired by military contractors pursuant to Afghan First and COIN.

association with the Taliban, and understood the importance and necessity of controlling Nayeb as part of its work in Afghanistan under LOGCAP IV. (ECF No. 1 ¶¶ 270–81.) In Count 2, Plaintiff alleges that Fluor negligently entrusted Nayeb with a multimeter—a tool that created an unreasonable risk of harm—even though Fluor knew Nayeb did not require any tools to perform his job at the HAZMAT work center, knew that hiring a former member of the Taliban carried a greater risk of harm precisely because of the increased risk that Nayeb would re-radicalize and attack the military, and knew Fluor's government projects had "strict compliance regulations" that required even greater supervision and oversight than its other engineering and construction work. (*Id.* ¶¶ 282–93.) In Count 3, Plaintiff alleges that Fluor negligently retained Nayeb, knowing he was a former member of the Taliban, even though Fluor knew Nayeb slept on the job, knew he read the Quran on the job, knew he frequently wandered away from his designated job site without any supervision by Fluor, knew he checked out tools he did not need—including the multimeter—from the Fluor tool room, and knew he was not present to be escorted off the Base on the morning of November 12, 2016. (*Id.* ¶¶ 294–303.) In Count 4, Plaintiff alleges that Fluor assumed a nondelegable duty to supervise Nayeb regardless of whether he or other LOGCAP personnel were direct employees of Fluor or of a Fluor subcontractor, and contractually obligated itself to ensure that all personnel supporting LOGCAP IV complied with the standards of conduct, terms, and conditions set forth in the LOGCAP IV Statements of Work, Performance Work Statements, Task Orders, and Letters of Technical Direction, as well as the Bagram Airfield Base Policies (collectively "LOGCAP Materials"), thereby rendering Fluor vicariously liable for Plaintiff's injuries even if Fluor's subcontractors' direct employees were immediately responsible for the failures of

supervision, entrustment, and retention already alleged. (*Id.* ¶¶ 304–10.) In Count 5, Plaintiff alleges that Fluor supervised the NTV Yard and all its subcontractors' employees on the Base, that Fluor failed in its duty to prevent its employees or its subcontractors' employees from doing their jobs in an unreasonably dangerous way, and that after having the opportunity to prevent a widespread and dangerous lack of supervision, entrustment, escort, and retention by exercising the power of control as obligated to do by the LOGCAP Materials, Fluor nonetheless negligently controlled its employees or subcontractors' employees thereby proximately causing Plaintiff's injuries. (*Id.* ¶¶ 311–19.) In Count 6, Plaintiff alleges that Fluor had a duty under contracts it entered with the U.S. Government—to wit, the LOGCAP Materials—to supervise Fluor employees and Fluor subcontractors' employees in order to ensure all Fluor personnel complied with the standards of conduct, terms, and conditions of the contracts, that U.S. soldiers—including Plaintiff—were intended to directly benefit and were the intended third party beneficiaries of these contracts, and that Fluor breached these contracts proximately causing Plaintiff's injuries. (*Id.* ¶¶ 320–30.)

The Court finds that, contrary to Defendants' assertions, Plaintiff's complaint simply does not allege that Fluor caused Plaintiff's injury by the breach of any supposed obligation to provide security or force protection at BAF or by Fluor's conduct in hiring Nayeb in the first instance. Rather, the ultimate question raised by the complaint and its factual underpinnings is whether Fluor was negligent in its legal and contractual duties to supervise and exercise control over Nayeb once he had already been hired. Thus, the "direct control" analysis in this case is similar to the context presented in *Norat*, where the undersigned found a lack of direct military control when the terms of Fluor's own contracts

made Fluor responsible for the alleged conduct forming the basis of the liability theories invoked by the complaint. *See Norat*, 2018 WL 1382666, at *7 ("[S]imilar to the contract at issue in *Taylor*, the Task Orders in the instant case made Fluor responsible for establishing and maintaining the safety of appurtenant worksites . . . ."); *see also Taylor*, 658 F.3d at 406 (holding the direct control factor did not implicate the political question doctrine because the explicit terms of the LOGCAP Statement of Work made KBR responsible for the physical safety of workers and servicemembers that might come into contact with the hazards presented by its electrical work). The AR 15-6 Report and relevant Task Order 0005 PWS clearly demonstrate that Fluor, not the military, was responsible for and maintained direct control over the supervision of its job site and its employees, including Nayeb.

In *Norat*, this Court held that although the Army's Contracting Officer Representative provided general oversight of Fluor's specific job site, such general oversight did not establish the level of military control that implicates the political question doctrine. *See Norat*, 2018 WL 1382666, at *9. Here, there is no evidence to suggest even "general" military oversight as to Fluor's operation of the NTV Yard, supervision of NTV Yard personnel, entrustment of NTV Yard tools and materials to employees, or escort of LN employees to and from the NTV Yard. Thus, the military's "control" over Fluor's alleged actions and omissions in the instant case cannot be deemed *plenary* because it does not even begin to approach the level of the military's control over the convoy in *Carmichael*. *See Burn Pit 2*, 893 F.3d at 260.

Neither can the military be deemed to have exercised *actual* control over Fluor's alleged conduct under the facts as pled. *See Al Shimari*, 840 F.3d 147, 157 (4th Cir. 2016)

("The first *Taylor* factor is not satisfied by merely examining the directives issued by the military . . . . but also [by reviewing] what actually occurred in practice . . . ."). Indeed, it is doubtful the military exercised even *formal* control over the specific actions and omissions that form the basis of Plaintiff's claims. Unlike *Al Shimari*, where the contractor employees conducted interrogation sessions at the Abu Ghraib prison pursuant to military directives and interrogation plans approved by the military command in advance, *see id.* at 156–57, there were no formal directives issued to Fluor about how to operate the NTV Yard, how to supervise Fluor's personnel there, how to control the entrustment of tools, or how to escort personnel to and from the NTV Yard.[4]

As to Defendants' repeated assertions that the military alone strategically placed Nayeb at BAF despite his Taliban ties, screened and granted Nayeb access to BAF, and conducted physical searches of LNs entering BAF (*see* ECF No. 10 at 13–17), these points merely serve to highlight the fact that Plaintiff's allegations relate to Fluor's conduct *after* Nayeb was admitted to BAF on any particular day (e.g., failing to designate any of three available Fluor supervisors to actually supervise Nayeb; checking out unnecessary and suspicious tools from Fluor's tool room to Nayeb though his work at the NTV Yard required no tools and though he offered no legitimate justification; allowing Nayeb to

---

[4] The Bagram Airfield Badge, Screening, and Access Policy (Dec. 5, 2015), attached as Exhibit 4 to the AR 15-6 Report (ECF No. 10-4), perhaps comes closest to a source of *formal* control by the military over Fluor's escort responsibilities. The relevant portion of the "Escort Procedures" provision within that policy states: "Escorts are responsible for the conduct and safety of the personnel they are escorting. Escorts must remain in close proximity and remain in constant view of the individuals they are escorting. Escorts will continuously monitor all escorted personnel and direct them during any Base security operations." (*Id.* at 17.) The mere existence of such a policy and generalized instructions regarding the standards expected of escort procedures do not exemplify *actual* control over Fluor's escort operations. Moreover, the policy puts the specific onus on Fluor to ensure its employees' adherence to the policy terms: "**Contractor Compliance.** The Contractor will ensure all employees adhere to all rules and regulations, security and badging regulations, and updates immediately upon arrival and through their departure from Bagram Airfield. Ignorance of polices is not an excuse for contracted employee transgressions. A contractor's status will be reviewed by [Bagram Support Group] Commander and [Force Protection Screening Cell] in the event that contracted employee misconduct is determined to be a systemic problem." (*Id.* at 21.)

acquire most of the components and projectiles necessary for the construction of the suicide vest from his worksite and granting him the freedom of movement to complete its construction while at the Base; failing to ensure that Fluor employees complied with escort policies that were universally applicable at BAF, etc.) and *after* his work performance warranted disciplinary action or termination (e.g., failing to implement discipline and retaining Nayeb, even promoting him to a higher pay grade, after he was caught sleeping at his worksite during working hours and with the knowledge that he was often inexplicably absent from his worksite without permission). This is another distinction between the instant case and *Carmichael*, where that accident that formed the basis of Sergeant Carmichael's claims was nonjusticiable because it occured *while the government contractors were literally operating under the direct and contemporaneous command* of U.S. Military leaders. *See Carmichael*, 572 F.3d at 1277–78 (describing KBR's participation in the military convoy itself).

Further, when examining a situation in which the global factual context involves both justiciable and nonjusticiable issues, *Al Shamiri* counsels toward employing a "discriminating analysis" to examine the evidence regarding the "specific conduct" that forms the basis of the plaintiff's claims. 840 F.3d at 160. As explained above, *supra* at 22–27, none of the specific conduct that forms the basis of Plaintiff's causes of action implicates the type or degree of military control that would invoke nonjusticiability under the political question doctrine, and a discriminating analysis easily identifies Defendants' motion as an effort to rewrite the complaint in order to pose nonjusticiable questions that would require dismissal.

Finally, Fluor's contention that it did not know of and could not have known of

Nayeb's previous Taliban affiliation because the military alone vetted and approved Nayeb for LOGCAP IV employment and never shared that information with Fluor (*see* ECF No. 10 at 15, 39, 43, 54, 56), even if true, is irrelevant to the justiciability *vel non* of Plaintiff's claims. Whether Fluor could have known of Nayeb's history might affect the outcome of some of Plaintiff's claims on the merits, but it has nothing to do with the level of military control over Fluor's alleged conduct or with the reasonableness of any military decision, and therefore does not impact the justiciability analysis.

In summary, the evidence of record does not establish the type and degree of control that implicates nonjusticiability under *Taylor*'s first factor. The military's control, if any, over the specific conduct that is alleged to constitute negligent supervision and breach of contract by Fluor, amounts to no more than *formal* control by any standard. Fluor operated with wide latitude and considerable discretion in the ways it supervised NTV Yard employees, entrusted NTV Yard employees with tools, evaluated LN employee performance and chose to retain Nayeb, implemented the LN escort process to and from the NTV Yard, and exercised control over LN employees during said escort process. Accordingly, Defendants' motion to dismiss on this basis is denied.

### C. Whether Plaintiff's Claims and Fluor's Defenses Would Require the Court to Question the Propriety of Sensitive Military Judgments

Defendants assert that adjudication of Plaintiff's claims would require the Court to improperly evaluate sensitive military judgments because "national defense interests were closely intertwined with the Military's decisions regarding Fluor's conduct." (ECF No. 10 at 50 (citing *Burn Pit 2*, 893 F.3d at 259–60)); *see Taylor*, 658 F.3d at 411 (establishing second prong of political question analysis pertaining to military contractors' civil liability as "whether national defense interests were closely intertwined with the military's

decisions governing [the contractor's] conduct"). In analyzing the "national defense interests" prong, a reviewing court must consider "whether the [plaintiff's] claims or [the contractor's] defenses require [the court] to question the military's judgments." *Burn Pit*, 744 F.3d at 339. Any call to question the propriety of judgments traditionally entrusted to the military raises a nonjusticiable political question because courts lack manageable standards to review the reasonableness of such matters. *See Taylor*, 658 F.3d at 408–09, 411–12; *Carmichael*, 572 F.3d at 1291; *Baker*, 369 U.S. at 217.

Defendants' arguments that Plaintiff's claims question military judgments rely on the same rewriting of the complaint as their arguments regarding the direct control factor described above. Again, Defendants baldly assert:

> Plaintiff's claim alleges inadequate force protection and security at a United States military base, in an active conflict zone. It is difficult to conceive of a situation in which there could be more "national defense interest" intertwinement than in the context of a tort claim asserting security deficiencies at a military base, particularly in an active conflict zone. The extensive evidence that establishes myriad Military and national security judgments and decisions in direct furtherance of BAF security and U.S. Government [n]ational security interests prove that this is true.

(ECF No. 10 at 44 (internal citations omitted).) Again, Defendants cite *Smith v. Halliburton* as illustrative of why Plaintiff's claims raise nonjusticiable political questions (*see id.* at 45–47), and again that case is inapposite to the substance of Plaintiff's claims as actually pled. Despite Fluor's repetitive insistence to the contrary, Plaintiff does not "allege[] inadequate force protection and security" claims. Defendants make no arguments regarding national defense interests related to Plaintiff's actual claims. The Court declines to reconfigure Defendants' arguments to address the real complaint and declines to rehash its prior explanation as to why the specific acts and omissions alleged therein were independent of the military decisions Fluor seeks to invoke as a nonjusticiability shield

(e.g., general force protection measures at the Base; Afghan First/COIN LN hiring policy; generally applicable security screening/badging policies and protocols, as well as the specific decision to grant access to BAF to someone with Nayeb's past; operational security measures at ECPs, etc.). Suffice it to say, Fluor's alleged conduct was not "governed" by military decisions, *see Taylor*, 658 F.3d at 411, and Defendants have not shown that Plaintiff's complaint implicates nonjusticiable questions under *Taylor*'s second factor because the adjudication of Plaintiff's claims will not require the Court to evaluate sensitive military judgments for which it has no sound rubric of decision.

Finally, Defendants assert that their causation defenses will require the Court to assess the reasonableness of military decisions, thereby rendering Plaintiff's claims nonjusticiable because they are intertwined with sensitive military judgments. (*See id.* at 53–57.) Defendants argue that Nayeb would have had no opportunity to act in any capacity with the LOGCAP IV Project, harmful or otherwise, but for the military granting him clearance pursuant to Afghan First/COIN policy and the military's own counterintelligence screening process. (ECF No. 10 at 54.) Defendants further contend that "the most critical element of a suicide-bombing incident is the explosive device, as without any explosive device there can be no bombing," and that "[t]he military controlled the *who*, the *what*, the *when*, the *where*, and the *how* with respect to physical searches at ECPs, and yet it still somehow failed to prevent *the* critical aspect of this entire incident through measures that it alone controlled and directed." (*Id.* at 55 (emphasis in original).) Defendants argue,

> On these facts, there is ample evidence with which Fluor can and will assert that the military's negligence was the sole proximate cause of the alleged incident and injury claimed by the Plaintiff. . . . There is also ample evidence with which Fluor can and will assert that the military's negligence was a

superseding cause; new and independent cause; and/or intervening cause of Plaintiff's incident and injury.

(*Id.* at 57 (internal citations omitted).)

Plaintiff argues in response that Fluor's causation arguments are irrelevant because they have nothing to do with the specific acts and omissions that form the basis of Plaintiff's claims, and "Plaintiff has not sued the Army or Fluor because Nayeb was initially given access to work on the Base or because Nayeb successfully smuggled explosives on to the Base." (ECF No. 20 at 22.) Plaintiff contends that Fluor cannot manufacture a political question by deflecting all proximate cause onto the Army, and that Fluor's "but for" arguments do not require the Court to examine the *reasonableness* of anything. (*Id.*)

The things for which Fluor blames the Army were either the sole cause of Plaintiff's injuries, as Fluor contends, or not. . . . Fluor can argue its "empty chair" defense . . . and try to convince a jury that Plaintiff has failed to prove causation *against Fluor*, but Fluor cannot hang proximate, *legal* cause on the Army in South Carolina as a matter of law.

(*Id.* at 22–23 (emphasis in original, internal citations omitted).)

The Court finds that Fluor's defenses do not implicate a political question for two reasons: (1) the United States is immune from suit and as a matter of South Carolina law cannot be found to be the proximate cause of Plaintiff's injuries, so no evaluation of military decisions by the Court is required; (2) even if the United States were not immune, as a matter of South Carolina law fault cannot be apportioned to the United States as a nonparty, so no evaluation of the reasonableness of military decisions is required. (*See* ECF No. 20 at 17.) Under South Carolina law:

If . . . a defendant asserts a defense that assigns fault for the plaintiff's injuries to [an immune nonparty], the defendant shall, under the well-established "empty chair" defense, have the right to present such evidence

> and require the fact-finder to consider whether the [immune nonparty's] actions were the cause of the plaintiff's injuries. *Of course, the [immune nonparty] cannot be found to be the proximate, or legal, cause of the plaintiff's injuries because the [nonparty] is immune from tort liability* . . . .

*Machin v. Carus Corp.*, 799 S.E.2d 468, 476 (S.C. 2017) (emphasis added) (stating, where an employee sought recovery from parties other than his employer for an injury sustained on the job, that the defendants could assert a defense assigning fault to the nonparty employer, but the employer could not be found to be the legal cause of plaintiff's injuries because the employer was immune from tort liability under the South Carolina Workers' Compensation Act). It is undisputed that the United States possesses immunity in this case. Thus, under South Carolina law, Fluor can assert its empty chair defense in the attempt to show that Plaintiff has not proven Fluor caused his injuries, but the U.S. Army cannot be found to be the proximate legal cause because it retains immunity in this matter. The factfinder, after the presentation of Fluor's causation defenses, could find that the actions and decisions for which Fluor blames the Army—and not Fluor's alleged conduct—caused Plaintiff's injuries, but this factual determination would not require the factfinder to evaluate the reasonableness of the Army's decisions.

In *Burn Pit*, the Fourth Circuit held that a military contractor's causation defense "does not require evaluation of the military's decision making unless (1) the military caused the [plaintiff's] injuries, at least in part, **and** (2) the [plaintiff] invoke[s] a proportional liability system that allocates liability based on fault." 744 F.3d 340–41. The *Burn Pit* court relied on the Third Circuit's reasoning in *Harris*, where the court stated:

> [T]he submission of evidence related to strategic military decisions that are necessary background facts for resolving a case involving a defense contractor is not sufficient to conclude that a case involves an issue textually committed to the executive. Instead, the case must require *evaluation* of those decisions such that the fact finder is asked to reexamine their wisdom.

. . . . KBR's defense that the military was the sole cause of Staff Sergeant Maseth's death does not require such an evaluation because the disputes are entirely factual: KBR did or did not install or maintain the pump, did or did not have authority under the contract to fix the showers, and did or did not receive a work order that would have required it to fix the pump. The District Court thus erred when it concluded that resolving this defense would require determining whether the military was negligent.

The other variation of KBR's proximate-cause defense—that the military was a proximate cause of Staff Sergeant Maseth's death—is another matter. It may require evaluation of strategic military decisions, and those questions turn on state law. If a jurisdiction uses a proportional-liability system which assigns liability by the degree of fault, then a proximate-cause defense introduces a nonjusticiable issue. In such a system, there is simply no way to determine damages without evaluating military decisions. The fact finder cannot decide the respective degrees of fault as between a military contractor like KBR and the military without evaluating the decisions made by each—particularly, the military's decisions to house troops in unsafe barracks that would not be repaired.

*Harris*, 724 F.3d at 473–74 (emphasis in original, internal citations omitted). Therefore, Plaintiff argues and the Court agrees, under the reasoning applied in *Burn Pit*, even where the military caused part of a plaintiff's injury, "If the military cannot be apportioned a percentage of fault in the case . . . resolving a factual causation question does not create a political question or require the evaluation of the *reasonableness* of any military decision." (ECF No. 20 at 23 (citing *Burn Pit*, 744 F.3d at 340–41).) South Carolina law dictates that fault cannot be apportioned to a nonparty. *See* S.C. Code § 15-38-15; *Machin*, 799 S.E.2d at 477–78 (holding the plain language and legislative intent of § 15-38-15(C) allows allocation of fault only among the parties to a lawsuit—not against nonparties—and that an immune nonparty cannot be deemed a "potential tortfeasor" under § 15-38-15(D)). Accordingly, fault *cannot* be apportioned to the military in this case, Plaintiff *can* obtain all of his relief—if any—from Fluor, and Fluor's defenses alleging the military caused Plaintiff's injuries do not implicate the political question doctrine or

justiciability. *See Burn Pit*, 744 F.3d at 340 (stating "under a pure joint-and-several liability system, the plaintiffs could obtain all of their relief from the military contractor, preventing the need to evaluate the military's decisions").

## **CONCLUSION**

For the reasons set forth above, Defendants' Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction under the political question doctrine (ECF No. 10) is DENIED. The Court retains subject matter jurisdiction over Plaintiff's claims and the stay of discovery imposed by the Court's May 22, 2019 Order (ECF No. 36) is hereby LIFTED.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

June 1, 2020
Greenville, South Carolina