**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

Winston Tyler Hencely,

                Plaintiff,

      v.

Fluor Corporation; Fluor Enterprises,
Inc.; Fluor Intercontinental, Inc.; Fluor
Government Group International, Inc.,

                Defendants.

Civil Action No. 6:19-00489-BHH


**OPINION AND ORDER**

      This matter is before the Court on Defendants Fluor Corporation, Fluor Enterprises, Inc., Fluor Intercontinental, Inc., and Fluor Government Group International, Inc.'s (collectively "Defendants" or "Fluor") motion for summary judgment based on the Federal Tort Claims Act's "combatant activities" exception. (ECF No. 128.) For the reasons set forth in this Order, the motion is granted.

      This is an extraordinary lawsuit that arises out of an attack by a foreign enemy— a Taliban operative—on a U.S. Military ("Military") base at Bagram Airfield ("BAF") in the Parwan Province of Afghanistan. The attack occurred during Operation Freedom's Sentinel ("OFS"), which began on January 1, 2015 and is part of the NATO-led Resolute Support Mission.[1] On November 12, 2016, Ahmad Nayeb ("Nayeb") deliberately detonated a suicide bomb inside BAF's secure perimeter. The attack killed five Americans and wounded 17 others. At the time, Plaintiff Winston Tyler Hencely was serving as an active duty soldier in the U.S. Army ("Army") at BAF. Plaintiff contends he

---

[1] *See, e.g.*, https://www.army.mil/article/156517/operation_freedoms_sentinel_and_our_continued_secur-ity_investment_in_afghanistan.

was wounded after he physically confronted Nayeb shortly before the bomb exploded. The Taliban attack was both an unquestionable tragedy and an unfortunate reality of asymmetric warfare. As Plaintiff emphasizes: "This was a war zone." (ECF No. 20 at 11.)

In light of the war zone context in which this suit arises, Plaintiff correctly notes that he has asserted "uniquely federal claims." (*See* ECF No. 65 at 19.)[2] Yet Plaintiff seeks to pursue his "uniquely federal claims" under *state* law. Prior to reaching the merits of the claims, the Court is asked through the present motion to first resolve a separate—and necessarily antecedent—issue: Under the "combatant activities" exception to the Federal Tort Claims Act ("FTCA"), can *state* tort law be used to regulate the Army's and Fluor's performance of mission-critical services inside an active overseas war zone, or would application of state-law duties conflict with paramount and uniquely *federal* interests?

This is the fundamental question embedded in the Fourth Circuit's combatant activities preemption test, which states: "'During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted.'" *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 349 (4th Cir. 2014) ("*Burn Pit III*")[3] (quoting *Saleh v. Titan Corp.*, 580 F.3d 1, 9 (D.C. Cir. 2009)).

---

[2] Plaintiff describes his claims as "uniquely federal" because "Plaintiff's claims involve the civil liability *of a federal government contractor* arising out of the performance *of a federal government contract* that resulted in serious and permanent injuries *to a federal government employee*—Mr. Hencely." (ECF No. 65 at 19 (emphasis in original).)

[3] For ease of reference, the Court uses the case name abbreviations employed by the Fourth Circuit to distinguish between the various district court and appellate court opinions in the history of the *In re KBR, Inc., Burn Pit Litigation*.

Plaintiff alleges that Fluor's escorting, supervision, and retention of Nayeb were negligent. As explained herein, the Military retained authority over those challenged activities and the activities stemmed from Military directives. Among other things, the Military decided to bring Nayeb onto the base for employment in the first instance, despite the Military's exclusive awareness of Nayeb's Taliban ties, and the Military did so as part of a calculated risk in furtherance of a larger political objective. The Military conducted seven security screening interviews of Nayeb during his employment and repeatedly decided not to terminate his access to BAF based on the Military's assessment of Nayeb's security risk. (*See* Wilson Decl. ¶¶ 58–59, ECF No. 128-7.) The Military also established the requirements and parameters for the oversight of Local Nationals ("LNs") at BAF, including decisions regarding *who* needed to be escorted; *when* they needed to be escorted and *not* escorted; who was authorized to be an escort; and the details of the escorting protocols, such as how many LNs could be escorted at a given time. Further, the Military had in place a surveillance system to ensure Military protocols were followed each time there was movement of LNs at the base.

As a result, allowing state tort law to regulate Fluor's conduct would necessarily "touch" numerous Military decisions, and thus inevitably conflict with the uniquely federal interests underlying the FTCA's combatant activities exception.[4] For reasons set forth below, the Court concludes that undisputed facts trigger combatant activities preemption and Fluor is entitled to summary judgment.

---

[4] *See Burn Pit III*, 744 F.3d at 349 (4th Cir. 2014) ("[W]hen state tort law touches the military's battlefield conduct and decisions, it inevitably conflicts with the combatant activity exception's goal of eliminating such regulation of the military during wartime.").

## BACKGROUND

In its motion, Fluor set forth facts establishing two overarching points: (1) Fluor was integrated into the Military's operations at BAF; and (2) the Military exercised and maintained command authority over Fluor's challenged conduct. (*See* ECF No. 128-1 at 9–26.) Plaintiff submitted his own statement of facts along with his opposition. (*See* ECF No. 138-1.) Although Plaintiff purports to dispute some facts mentioned in Fluor's motion, Plaintiff does not cite facts in his opposition, nor in his list of facts, that create a genuine dispute regarding the following material facts.

### A.     This Case Arises Out of "Combatant Activities"

Plaintiff alleges injuries resulting from an enemy attack on the U.S. Military that occurred inside the perimeter of BAF, a secure military installation inside the Afghanistan theater of war. (*See, e.g.*, Am. Compl. ¶ 234, ECF No. 83 ("[T]he bomber[] **attacked the Army** on November 12, 2016." (emphasis in original)).) At the time, Fluor was providing essential support services for the Army. (*See, e.g.*, Weindruch Decl. ¶ 3, ECF No. 128-2; Wilson Decl. ¶ 5; *see also* Riley Decl. ¶ 28, ECF No. 128-5.) Thus, as Plaintiff concedes, this case arises out of Fluor's performance of combatant activities. (*See* ECF No. 138 at 20 n.36.)

### B.     The Supervision and Escorting of Nayeb Stemmed From Military Decisions

The Military alone established and decided the protocols and requirements for the oversight of Local Nationals at BAF. (*See, e.g.*, Jones Decl. ¶ 18, ECF No. 128-3; BAF Badge, Screening, and Access Policy ("BAF Access Policy"), ECF No. 10-4;[5]

---

[5] The BAF Access Policy was issued by the Bagram Support Group Commander. (*See* ECF No. 10-4 at 22.) The authority over such base access matters, and base force protection measures in general, is (continued…)

Wilson Decl. ¶ 33.) Fluor did not have sole discretion to decide how to carry out such oversight. For example, the Military alone decided whether and when LNs needed to be escorted. (*See* Wilson Decl. ¶ 34; Jones Decl. ¶ 19; Jones Dep. 69:19–70:22, ECF No. 157-1 ("[T]he military makes the decision over whether or not that individual passed or failed that particular screening requirement; and then if everything was good, then the military would tell the contractor issue that badge in that particular color."); Weindruch Dep. 34:9–35:14, ECF No. 158-1 ("Is this interaction . . . whereby the Army vetted and decided to approve the issuance of badges and then gave direction to Fluor to issue the badges, is that an example of Fluor being integrated within the military's operations? A. Yes.").)

In addition to establishing the requirements for escorting LNs, the Military also established a surveillance system for ensuring that Fluor and others at the base complied with the Military's requirements. In fact, "[t]he Army had a surveillance system for every [Performance Work Statement ("PWS")] requirement" under the LOGCAP IV Contract, including the requirement to escort certain LNs from their work site to the entry control point ("ECP") for a "hand off to the military," after which the Military was responsible for getting them "off the base." (Jones Dep. 80:22–81:21; *see also* Bednarek Dep. 114:8–115:21, ECF No. 165 ("the military takes [LNs] and takes responsibility at that dismount point location very close to the [ECP], where they are then escorted . . . to that pedestrian turnstile for exit off of [BAF]").) The Military assigned a government quality assurance representative to "mak[e] sure that any time

---

vested within the Executive Branch and ultimately derives from Article II, Section 2 of the U.S. Constitution. *See* U.S. Const. art. II, § 2 ("The President shall be commander in chief of the Army . . . when called into the actual Service of the United States . . . .").

there was a movement of LN personnel," the Military's escorting requirements were followed. (*See* Jones Dep. 61:6–62:24.)[6]

Fluor did not have discretion to alter the Military's protocols or policies, nor to provide enhanced oversight of LNs above and beyond that which was dictated by the Military. Record evidence demonstrates that prior to the November 2016 Taliban attack, Fluor proposed to expand the amount of oversight of LNs at BAF—including a proposal to provide constant 24/7 escorting of all LNs—but the Military, in its discretion, declined to authorize this work. (*See* Jones Decl. ¶¶ 18–20; Jones Dep. 66:13–21 ("The contract . . . did not require[] 24-7, eyes-on surveillance once the LN employee got to the workplace. There were a couple of . . . occasions where Fluor had approached our [Army] office with this 24-7 concept for every LN employee, but the price tag was going to be excessive. And we presented it to the garrison, and it was never funded. Therefore, never implemented."), 63:16–64:3 ("There were many more times where Fluor had approached the . . . Government with a . . . potential mod to the PWS, the requirement to expand the escort services . . . .").) Because the Army did not authorize Fluor to provide expanded escort services, Fluor could not expand its services to include that work. (Jones Dep. 67:20–68:18 ("So unless and until the Army gives a direction to Fluor to do that work, Fluor is prohibited from doing that additional work; is that fair? A. Correct."); *see also* BAF Access Policy § 11.a(1) ("Red badge personnel

---

[6] Plaintiff asserts that Fluor has not "produced any evidence that the Army conducted audits or monitoring of any kind of Fluor's supervision and escort of Local Nationals." (ECF No. 138 at 15.) And Plaintiff argues: "Nor is there any evidence that the Army did anything more than direct Fluor to supervise and escort its Local National workers and then leave it up to Fluor to accomplish those tasks." (*Id.* at 10.) The assertions are conclusory. Unrebutted testimony established that the Army monitored all movements of LNs from worksites to ECPs where they were handed off to the Military. (*See* Jones Dep. 80:22–81:21; Bednarek Dep. 114:8–115:21.)

require an escort in all areas except work facility."); Wilson Decl. ¶ 33 (describing restrictions on the duty to monitor or "escort" LNs for security purposes imposed by the Military through its BAF Access Policy).)

### C.    The Retention of Nayeb Stemmed From Military Decisions

Prior to November 2016, consistent with the NATO "Afghan First Program," the Military required that Fluor maximize hiring of LNs. (*See* PWS § 01.07.b., ECF No. 128-19 ("The Contractor shall hire [Host Nation] personnel and Subcontractors to the maximum extent possible in performance of this contract when such recruitment practices meet legal requirements.").)[7] The Military identified Nayeb and sponsored him for employment. (*See* ECF No. 128-20.) The Military vetted and approved Nayeb for employment. (*See* ECF No. 128-16; Jones Dep. 72:12–25 ("[I]s it true that the Government was solely responsible for vetting Nayeb to ensure he did not have Taliban connections? A. . . . That was the Government's bailiwick. . . . Q. In other words, . . . the Government was responsible for vetting Nayeb. Fluor was not responsible for vetting Nayeb; is that true? A. Correct.").)

The Military decided to grant Nayeb access to the base despite its knowledge of Nayeb's Taliban history;[8] prior to the attack, the Military never warned Fluor of Nayeb's Taliban ties. (*See, e.g.*, ECF No. 128-16; Wilson Decl. ¶¶ 49-57.)

---

[7] The "Afghan First Program" was part of the Counterinsurgency ("COIN") strategy, under which the Military embarked on a long-term mission to win the hearts and minds of the Afghan people through socio-economic development, while recognizing the risks and inefficiencies in the short term. (*See* ECF No. 128-1 at 19.) In furtherance of the policy, at the time of the attack the Military had authorized over 1,000 LNs to be on BAF. The number of LNs at the base went from around 1,547 prior to November 2016 down to about one hundred afterward. (Jones Dep. 82:5–83:8.) The decision to drastically reduce LN presence at the base was made "by somebody with authority"—*i.e.*, by a senior Military commander, and "[a]bsolutely not" by Fluor. (*Id.*)

[8] The details regarding Nayeb's Taliban ties are classified, as are other core facts that would be central to litigating this suit. In a separate motion for judgment on the pleadings (ECF No. 101), Fluor sought a (continued...)

Throughout Nayeb's employment, the Military conducted at least seven security screening interviews. The purpose of the security interviews was for the Military to decide whether Nayeb should continue to retain base access privileges or whether those privileges should be revoked due to security concerns; and, each time, the Military decided Nayeb should retain his access to the base. (*See* Wilson Decl. ¶¶ 58-59; Fluor Ans. to 15-6 Questions, ECF 11-3 at 4.) During a March 2016 interview, just months before the bombing, the Military observed that Nayeb provided "trained and coached" answers to security screening questions, but the Military did not terminate Nayeb's base access and again did not warn Fluor. (*See* Wilson Decl. ¶ 59.)

## **STANDARD OF REVIEW**

To prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The facts and any inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Although the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), once the movant has made this threshold demonstration, the non-moving party, to

---

ruling that this suit cannot be fairly litigated because the United States has refused to release classified information that is central to the parties' dispute, and in particular central to Fluor's proximate cause defense. The Court's instant Order regarding "combatant activities" preemption renders the motion for judgment on the pleadings for lack of access to classified information moot. However, suffice it to say that, were this case to continue in the absence of preemption, the withholding of classified information central to material questions of causation would present a major hurdle, if not a prohibitive event, to the resolution of this matter on the merits. (*See* ECF No. 162 (denying without prejudice Plaintiff's motion in limine to admit the redacted Army Regulation 15-6 Report and declining to speculate about the contents and import of information removed from the Report and its exhibits due its classified nature).)

survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. To survive at the summary judgment stage, a non-movant must offer more than a mere "scintilla of evidence" in support of his position; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. "[C]onclusory allegations, mere speculation, [or] the building of one inference upon another," without more, do not suffice to satisfy the non-moving party's burden of proof. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013); *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997). Rather, a party opposing summary judgment must demonstrate that specific, material facts exist which give rise to a genuine issue. *Celotex Corp.*, 477 U.S. at 324; *Dash*, 731 F.3d at 311; *see, e.g.*, *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 324 (4th Cir. 2017) (affirming partial summary judgment award where plaintiff "woefully failed to meet her burden of production in opposition to summary judgment" where she cited "*zero* evidence" to establish a triable issue of fact (emphasis in original)).

## DISCUSSION

The undisputed facts establish that Fluor was integrated into combatant activities at BAF, and any attempt to litigate and try this case—including the presentation of Plaintiff's claims and Fluor's defenses—would result in state-tort law impermissibly "touching" military judgments. *See Burn Pit III*, 744 F.3d at 349. As explained below, the elements of the Fourth Circuit's broad preemption test are met.

### A.    The Fourth Circuit's Broad Combatant Activities Preemption Test

In *Boyle v. United Technologies Corp.*, the Supreme Court established the federal common law principle that state tort claims against government contractors are impliedly preempted when they would create a significant conflict with uniquely federal

interests or policies. *See* 487 U.S. 500, 504–08 (1988). Because *Boyle* was a product liability suit involving an alleged design defect in a U.S. Marine Corps helicopter escape hatch built according to government specifications, the Court pointed to the FTCA's discretionary function exception, 28 U.S.C. § 2680(a), as the "statutory provision that demonstrates the potential for, and suggests the outlines of, 'significant conflict' between federal interests and state law in the context of Government procurement." *Id.* at 511.

In *Saleh v. Titan Corp.*, the D.C. Circuit adapted and applied *Boyle*'s conflict preemption principle to state tort claims against war zone logistical support contractors. The *Saleh* contractors had been hired by the Military to provide translation and interrogation services at Abu Ghraib prison in Iraq. The *Saleh* court held that the uniquely federal interests and policies underlying the FTCA's combatant activities exception preempted state tort claims brought by Iraqi nationals who alleged that they had been abused by the contractors. 580 F.3d at 5–11. In reaching this conclusion, the court articulated the following "battle-field preemption" formulation:

> During wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted.

*Id.* at 9. The court explained that "the federal government occupies the field when it comes to warfare, and its interest in combat is always 'precisely contrary' to the imposition of a non-federal tort duty." *Id.* at 7 (quoting *Boyle*, 487 U.S. at 500); *see also Aiello v. Kellogg, Brown & Root Servs., Inc.*, 751 F. Supp. 2d 698, 710 (S.D.N.Y. 2011) ("[T]he combatant activities exception demonstrates the potential for, and suggests the outlines of, significant conflict between federal interests and state law in the context of

military activity.").

In *Burn Pit III*, the Fourth Circuit adopted the *Saleh* combatant activities preemption test. *See Norat v. Fluor Intercontinental, Inc.*, No. 6:14-CV-04902-BHH, 2018 WL 1382666, at *12–*13 (D.S.C. Mar. 19, 2018) (citing *Burn Pit III*, 744 F.3d at 349–51). Under that test, combatant activities preemption is a broad "field" preemption doctrine. As the Fourth Circuit has explained, "in the combatant activities exception realm, the conflict between federal and state interests is much broader" than the discrete conflict presented in *Boyle*, because "when state tort law touches the military's battlefield conduct and decisions, it inevitably conflicts with the combatant activity exception's goal of eliminating such regulation of the military during wartime." *Burn Pit III*, 744 F.3d at 349–50; *see also Saleh*, 580 F.3d at 7 ("[T]he instant case presents us with a more general conflict preemption, to coin a term, 'battle-field preemption' . . . ."). Thus, state tort law is preempted "when it affects activities stemming from military commands." *Burn Pit III*, 744 F.3d at 351. "[T]he military need not maintain exclusive operational control over the contractor for [combatant activities] preemption to apply; rather, the government's interest in immunizing a military operation from suit is present when the military retained command authority, even if the contractor exerted some limited influence over an operation." *Norat*, 2018 WL 1382666, at *6, 12 (citing *Burn Pit III*, 744 F.3d at 349; quotations omitted).

This Court previously denied Fluor's motion to dismiss based on the political question doctrine. (*See* ECF No. 52.) However, the Fourth Circuit's preemption rule "creates a type of field preemption, broader than the political question doctrine." *Aiello*, 751 F. Supp. 2d at 711. As a result, it is entirely possible for a plaintiff's state tort claims

challenging a military contractor's war zone conduct to present a justiciable controversy, which is nonetheless preempted. *See id.* at 706, 715 (holding claims were justiciable, but barred by combatant activities preemption); *see also In re KBR, Inc., Burn Pit Litig.*, 268 F. Supp. 3d 778, 820 (D. Md. 2017) ("*Burn Pit IV*") (stating "[p]laintiffs' claims are preempted, even if they are not nonjusticiable political questions"), *vacated in part as moot*, 893 F.3d 241, 264 (4th Cir. 2018) ("*Burn Pit V*") (affirming district court's ruling that the controversy was justiciable and vacating as moot accompanying ruling that plaintiffs' claims were preempted under combatant activities exception).

## B.    Plaintiff's Claims Arise Out of Combatant Activities

Plaintiff concedes that this suit arises out of "combatant activities" (*see* ECF No. 138 at 20 n.36.), and for good reason. The Fourth Circuit's preemption rule incorporates the broad definition of "combatant activities" set forth in *Johnson v. United States*, 170 F.2d 767, 769–70 (9th Cir. 1948), under which combatant activities "include not only physical violence, but [also] activities both necessary to and in direct connection with actual hostilities." *Burn Pit III*, 744 F.3d at 351 ("It therefore makes sense for combatant activities to extend beyond engagement in physical force."). Applying this definition, the activities at issue here are a quintessential example of "combatant activities."

Here, Plaintiff alleges injuries that resulted from *actual combat* with an enemy combatant. According to the Amended Complaint, "the bomber[] **attacked the Army** on November 12, 2016." (Am. Compl. ¶ 234 (emphasis in original).) That core allegation of "physical violence"—an enemy attack inside the perimeter of a base inside a war zone— establishes that Plaintiff's claims arise out of "combatant activities" under the Fourth Circuit's broad definition. *See Taylor v. Kellogg Brown & Root Servs., Inc.*, No. 2:09-CV-341, 2010 WL 1707530, at *10 (E.D. Va. Apr. 16, 2010) ("If shelling and

receiving shelling is not combat, then combat has no meaning."), *vacated in part as moot*, 658 F.3d 402, 412 (4th Cir. 2011) (affirming ruling that negligence claim was nonjusticiable under the political question doctrine and vacating as moot accompanying ruling that claim was preempted by the FTCA combatant activities exception).[9]

Furthermore, the undisputed facts also show that Fluor performed "essential sustainment support services for the U.S. Army" at BAF. (*See* Weindruch Decl. ¶ 3; *see also* Bednarek Decl. ¶ 18, ECF No. 128-4 ("[T]he military cannot successfully carry out its responsibilities, including its force protection responsibilities, without the support provided by contractors such as Fluor.").) Thus, while "physical violence" alone is sufficient to meet the definition, the challenged conduct at issue included *both* "physical violence" *and* activities "necessary to and in direct connection with actual hostilities." *See Johnson*, 170 F.2d at 768–70.

Moreover, numerous courts have held that support services provided by contractors inside war zones "undoubtedly" constitute "combatant activities" for purposes of the defense, even in the absence of direct violence and where the allegations centered on relatively mundane, though essential, support functions. *See, e.g.*, *Burn Pit III*, 744 F.3d at 351 (stating "waste management and water treatment functions" were "undoubtedly" combatant activities); *Norat*, 2018 WL 1382666, at *13 ("There is little doubt that Fluor's installation and maintenance of electrical systems at

---

[9] Beyond Plaintiff's concession that this was a war zone, and his allegation that the suit arises out of an enemy attack, soldiers involved in the attack—and many others who served in Afghanistan over the past two decades—were awarded Bronze Star Medals and other decorations specifically for their heroic actions in a "combat" zone. *See, e.g.*, Army Reg. 600-8-22 (Mar. 2019) at 3-16.e. ("the [Bronze Star Medal] is a combat related award and service or achievement under combat conditions is inherent to the medal"). Several soldiers injured in Nayeb's attack received Purple Hearts, which they were rightly entitled to, because they were wounded in "any action against an enemy of the United States." *See id*. at 2-8.b.(1).

Bagram Airfield qualifies as engaging in combatant activities."); *Aiello*, 751 F. Supp. 2d at 713–14 ("indoor latrine maintenance" constituted combatant activities); *Harris v. Kellogg Brown & Root Srvs., Inc.*, 724 F.3d 458, 481 (3d Cir. 2013) (maintenance of electrical systems constituted combatant activities).

### C. Plaintiff Challenges Supervision and Escorting Activities Stemming From Military Decisions

Plaintiff alleges that Fluor's performance of supervision and escorting was negligent. (*See, e.g.*, Am. Compl. ¶ 110.) Plaintiff does not dispute that the Military, not Fluor, established the requirements for supervising and escorting LNs through Fluor's contract and the BAF Access Policy. (*See* ECF No. 128-1 at 19–21; Jones Decl. ¶ 18 ("[T]he military also established protocols and requirements for the escorting and supervision of the many Local Nationals who were authorized by the military to work on the base.").) Among other things, the Military, not Fluor, made the following decisions: (1) the Military decided who was permitted on base, including which LNs could gain access and which were barred; (2) the Military decided which LNs required escorts once on the base; (3) the Military decided when LNs required escorts, and when no escorts were required (such as at the work place); (4) the Military decided who was qualified to serve as an escort; (5) the Military decided how many LNs could be escorted at one time. (*See* BAF Access Policy, ECF No. 10-4.)

Having established these requirements for oversight of LNs on the base, the Military also established a surveillance system to monitor Fluor's performance and to ensure the escorting policy was followed. In particular, Army personnel were "assigned to mak[e] sure that any time there was a movement of LN personnel," the Military's escorting requirements were followed. (*See* Jones Dep. 61:6–62:24.)

Based on these undisputed facts, it is clear that this lawsuit challenges "activities stemming from military commands." (*See Burn Pit III*, 744 F.3d at 349–51.) Rather than dispute these facts, Plaintiff instead argues that Fluor should have done a better job supervising and escorting the Taliban bomber. Such arguments concern the merits of the claims, and do not alter the preemption analysis. For purposes of preemption, it is apparent that whether, when, and how to supervise and escort Nayeb—an individual who the Military alone knew had Taliban ties—was ***not*** left to Fluor's "sole discretion," and thus the claims are preempted. *See Saleh*, 580 F.3d at 9; *Burn Pit III*, 744 F.3d at 349; *see also Norat*, 2018 WL 1382666, at *12 (stating contractor may exert "*some* limited influence over an operation" and "[t]he military need not maintain exclusive operational control over the contractor for preemption to apply" (emphasis in original; quotation marks and citations omitted)); *Burn Pit IV*, 268 F. Supp. 3d at 823 (stating "[t]he evidence does not support the notion that KBR was operating in such a discrete manner that Plaintiffs are challenging its sole discretion" (quotation marks and citations omitted)).[10]

### D.     Plaintiff Challenges Retention Activities Stemming From Military Decisions

Plaintiff alleges that Fluor's retention of Nayeb was negligent. (*See*, *e.g.*, Am. Compl. ¶ 199.) Plaintiff does not dispute that the Military: (1) sponsored Nayeb for

---

[10] Plaintiff argues: "Fluor bases nearly its entire argument on the false claim that the Army ***prohibited*** Fluor from supervising Local Nationals while they were at their workplace." (ECF No. 138 at 5 (emphasis in original); *see also id.* at 7 ("Jones' testimony proves that Fluor's entire motion hinges on a deliberate misrepresentation to the Court.").) But Fluor's preemption defense does not hinge on a showing that the Army prohibited Fluor from supervising LNs while they were at their workplace. As explained *supra*, preemption would apply even if the Army had not rejected Fluor's request to provide enhanced oversight because it is undisputed that the Army prescribed the level of oversight that Fluor was directed to perform; thus, the challenged conduct stemmed from military directives and was not left to Fluor's sole discretion.

employment in furtherance of the Afghan First Program; (2) vetted Nayeb prior to employment; and (3) conducted security screening interviews of Nayeb throughout his employment to decide whether to terminate him for security reasons. (*See* ECF No. 128-1 at 34–35.) Plaintiff does not dispute that the Military alone knew of the threat posed by Nayeb, including that he was a Taliban associate and acted suspiciously during a security screening interview. (*See id.*) Plaintiff does not dispute that the Military could have terminated Nayeb by barring him from the base, but chose not to. (*See id.*) Plaintiff does not dispute that the Military did not warn Fluor of the extraordinary risks posed by Nayeb. (*See id.*; *see also* ECF No. 120 at 6 n.14 (indicating Plaintiff's view that these facts irrelevant because "Fluor, and only Fluor, enabled Nayeb to build the bomb and to be there to explode it").)

Again, based on these undisputed facts, it is clear that this lawsuit seeks to impose state tort law on "activities stemming from military commands." *See Burn Pit III*, 744 F.3d at 349–51. In particular, the Military made the critical decision that Nayeb should be employed at BAF in the first instance. The Military's decision to bring Nayeb, a known Taliban associate, onto the base was a quintessential military judgment; it was a calculated risk taken in furtherance of a long-term political goal. *See supra* at n.7. There is no evidence that the Military ever warned Fluor of the unique risks posed by Nayeb. Fluor's subsequent decision to retain Nayeb was inexorably linked to these Military decisions. As a result, whether to retain Nayeb was plainly not left to Fluor's "sole discretion," and the claims are preempted. *See Saleh*, 580 F.3d at 9; *Burn Pit III*, 744 F.3d at 349; *see also Norat*, 2018 WL 1382666, at *12; *Burn Pit IV*, 268 F. Supp. 3d at 823. There can be no question that injecting state tort law into this arena would

"touch" Military decisions, and preemption is invoked.

This case is distinguishable from *Norat*, where the undersigned found that the plaintiffs' negligence claims, as to injuries they suffered when they drove an all-terrain vehicle into an uncovered excavation ditch associated with the installation and maintenance of electrical systems at BAF, were not preempted by the combatant activities exception. *See* 2018 WL 1382666, at *12–*13. The Military's involvement in, and authority over, the activities at issue here extended far beyond "general oversight of Fluor's project and periodic compliance inspections." *See id.* at *1, *13. Among other reasons, as noted *supra*, this case arises out of an attack on the Army carried out by an enemy operative who the Military allowed to work on the base, without warning Fluor, to further a political objective—namely, to win the hearts and minds of the Afghan population as part of the COIN strategy. The Military made judgments regarding the requisite level of oversight for LNs, balancing security risks with scarcity of resources. The Military had a surveillance system to ensure its escort policies were followed any time there was a movement of LN personnel. The federal interests involved in *Norat* pale in comparison to the profound federal interests implicated in this extraordinary suit.

### E.    Plaintiff's Arguments Against Preemption Are Unavailing

Plaintiff repeatedly argues that "Fluor's employees were not within the Army's chain of command." (*See* ECF No. 138 at 22; *see also id.* at 8 ("Fluor also failed to tell this Court this crucial fact: *contractors are expressly excluded from the Army's chain of command by Federal Regulations.*" (emphasis in original)); *id.* at 14 ("Fluor has never presented any evidence that any Army personnel was in the chain of command over Fluor employees and subcontractors at the NTV Yard."); *id.* at 21 ("The official views of the Department of Defense also make it clear that contractors are not in the chain of

command."); *id.* ("Army Regulations about contractors also establish that contractor personnel are not part of the Army chain of command and are not supervised by the Army."); *id.* ("Fluor's supervision and escort duties were not within the military's chain of command."); *id.* at 22 (citing deposition testimony that "contractor personnel are not part of the operational chain of command"); *id.* at 23 ("Fluor has never produced any evidence of any Army personnel in the chain of command over Fluor employees and subcontractors working as escorts in the NTV Yard."); *id.* at 26 ("Fluor employees did not report to the Army chain of command and the Army was expressly precluded from supervising Fluor's personnel.").)

These facts are legally irrelevant. As Plaintiff rightly notes, no private services contractor is *ever* a part of the military operational chain of command. (ECF No. 138 at 8.) But that did not stop the Fourth Circuit from creating a preemption test for claims against "private service[s] contractor[s]." *See Burn Pit III*, 744 F.3d at 349. The Fourth Circuit explained: "the *Saleh* test does not require private actors to be combatants; it simply requires them to be 'integrated into combatant activities.'" *Id.* at 350 (quoting *Saleh*, 580 F.3d at 9)). Thus, the same argument raised by Plaintiff here was addressed and rejected in *Burn Pit IV*: "Plaintiffs' argument that [the contractor] was not part of the formal military chain of command is irrelevant to the *Saleh* preemption analysis, as military contractors are never part of the military chain of command." *Burn Pit IV*, 268 F. Supp. 3d at 822; *see also Saleh*, 580 F.3d at 7 (noting contractors "were subject to military direction, even if not subject to normal military discipline").[11]

---

[11] To be clear, the Military has direct authority over contractors—and can issue binding directives—particularly in matters of safety and security. The regulation that Plaintiff cites confirms this, as it states: "Commanders have direct authority over [contractor personnel] working on military facilities for matters of (continued...)

Plaintiff also argues that "the very nature of Fluor's contract with the military directs that Plaintiff's suit cannot be preempted" because the LOGCAP contract includes a "performance-based statement of work." (*See* ECF No. 138 at 23.) This argument too has been rejected by the Fourth Circuit, as the *Burn Pit III* court adopted a broad preemption rule in a case involving a LOGCAP contract. *See Burn Pit III*, 744 F.3d at 332, 351 (remanding for discovery in order to determine whether the military retained command authority of contractor's waste management and water treatment activities and "the extent to which [the contractor] was integrated into the military chain of command"[12]).

Plaintiff devotes much of his brief to allegations that Fluor was negligent. (*See, e.g.*, ECF No. 138 at 13 ("Fluor has never even sought to offer any explanation for its failure to notice that its employee Nayeb had left his work station on the morning of the bombing and was wandering freely around the base wearing a bomb vest intended to kill American soldiers.").) These assertions, however, put the cart before the horse. The Court cannot address whether conduct was negligent under state tort law in order to decide whether state tort law can be applied to the conduct.

For example, in *Saleh*, the plaintiffs alleged that contractors providing interrogation and interpretation services committed serious abuse of prisoners. *See* 580 F.3d at 2. The *Saleh* court assumed the allegations of tortious conduct were true, but

_____

administrative procedures and requirements, force protection, and safety of the force." (*See* Army Reg. 715-9 at § 4-1.d., ECF No. 138-16 at 15)); *accord* Army Reg. 700-137 at § 6-4.e. (Mar. 23, 2017) ("Commanders have authority over contractor personnel working on military facilities in matters of safety, security, environmental, health, and welfare.").

[12] The lesson that emerges from the case law surrounding combatant activities preemption, and the Fourth Circuit's treatment of this subject, is that private service contractors can be "integrated" into the military chain of command for purposes of the preemption rule, without ever being part of the chain of command as a formal matter.

held the claims were preempted under the "battle-field preemption" rule later adopted by the Fourth Circuit. *See id.* at 3, 7 ("for purpose of this appeal, we must credit plaintiffs' allegations of detainee abuse"); *id.* at 11 ("plaintiffs rely on general claims of abuse which include assault and battery, negligence, and the intentional infliction of emotional distress"). The D.C. Circuit even noted "the executive branch ha[d] broadly condemned the shameful behavior" at issue, but the court stated that such a "disavowal does not . . . bear upon the issue presented." *Id.* at 10.

The same rationale applies here. In assessing the preemption defense, whether Fluor acted negligently with respect to supervision, escorting, or retention of Nayeb is irrelevant because merits issues are not part of the Fourth Circuit's test.[13] In fact, allowing "battle-field preemption" to rise and fall based on whether a defendant acted "appropriately" or "reasonably" would undermine the Fourth Circuit's broad preemption rule, which is designed to ensure "the federal government occupies the field when it comes to warfare." *Burn Pit III*, 744 F.3d at 349–50.

Finally, as Plaintiff has repeatedly emphasized, the Court is well aware that the Army conducted an investigation into the attack and issued a report stating "the primary contributing factor to the 12 November 2016 attack was Fluor's complacency and its lack of reasonable supervision of its personnel." (*See* ECF No. 1-1 at 4.) The statements in the Army's unclassified report do not alter the preemption analysis, nor do they affect the material facts triggering preemption. Under the Fourth Circuit's

---

[13] For example, Plaintiff argues: "Building a bomb vest to kill American soldiers while on the job for Fluor is clearly not an appropriate work activity." (*See* ECF No. 138 at 18.) The same argument could have been made in *Saleh*, as no one would claim that serious abuse of prisoners is an "appropriate work activity" for an interrogator/interpreter. However, the credibility of the allegations in that case were collateral to the preemption rationale and did not undermine the reasoning supporting application of the combatant activities exception.

preemption test, it is clear that the Military retained authority over Fluor's conduct; Fluor did not have sole discretion over the challenged activities; and, the injection of state tort law into this setting to regulate Fluor's conduct would "touch" numerous Military decisions.

### F.     Allowing This Suit to Proceed Would Cause Other Significant Harms to Federal Interests

Beyond meeting the Fourth Circuit's preemption test, which alone warrants dismissal, the Court concludes that this litigation should be dismissed because it would cause additional harms to federal interests if it were to proceed through any further discovery and trial.

Allowing this litigation to proceed would create perverse incentives for contractors to interfere with Military investigations into attacks by foreign enemies on overseas military bases. Here, the Army conducted a classified investigation into Nayeb's attack and has deemed the vast majority of its investigation and report classified and thus unavailable to the litigants. Fluor was plainly not allowed to conduct its own parallel investigation, as any attempt by a contractor to carry out an investigation of an enemy attack inside a war zone "would pose a significant risk of interfering with the military's combat mission." *Aiello*, 751 F. Supp. 2d at 711. That the Military precluded Fluor from carrying out a post-accident investigation is perfectly understandable. However, "if claims against a contractor arising out of combatant activities were not preempted, then there would be a legitimate need for the contractor's lawyers, engineers and/or investigators to inspect the condition of the scene of the allegedly tortuous act and interview witnesses, including military personnel." *Id.* Such a result would hamper military investigations, disrupt military operations, and increase

costs that will ultimately be passed on, whether directly or indirectly, to the government.

Allowing this litigation to proceed would also undermine military discipline, as soldiers would inevitably be haled into court proceedings to testify and to implicate and critique the conduct of other soldiers and senior officers. The recent depositions of Army personnel offer a preview of such "military versus military" testimony. For example, Lieutenant General (Ret.) Mick Bednarek testified that Lieutenant General Thomas James, the Investigating Officer in charge of the Army's 15-6 investigation, "just got it wrong." (*See* ECF No. 153 at 10 (citing Bednarek Dep. 43:19–24).) Such proceedings, in which Military commanders, officers, and their subordinates are pointing the finger at one another, cause great harm to military discipline and offend separation-of-powers principles. The inevitability of such testimony provides further reason why this suit should be dismissed. *See Tozer v. LTV Corp.*, 792 F.2d 403, 406 (4th Cir. 1986) (dismissing case against contractor where trial of the case would "'require members of the Armed Services to testify in court as to each other's decisions and actions'" (quoting *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 673 (1977))); *Saleh*, 580 F.3d at 8 (noting "the prospect of military personnel being haled into lengthy and distracting court or deposition proceedings" that "will as often as not devolve into an exercise in finger-pointing between the defendant contractor and the military, requiring extensive judicial probing of the government's wartime policies," which "will surely hamper military flexibility and cost-effectiveness").

Finally, allowing this suit to proceed would impose significant litigation burdens on the armed forces, as both parties would seek access to a large number of witnesses and documents to obtain testimony and information that are central to core issues, such

as proximate cause. The United States has argued, as amicus curiae, that such litigation burdens are further reason why suits like this should be dismissed. *See*, *e.g.*, Br. for the United States as Amicus Curiae, *KBR, Inc. v. Metzgar*, No. 13-1241, 2014 WL 7185601, at *21-22 (U.S. Dec. 16, 2014) (explaining that "allowing state-law claims against battlefield contractors can impose enormous litigation burdens on the armed forces," and advocating for broad preemption rule).

## **CONCLUSION**

For the reasons set forth above, Plaintiff's state law tort claims are preempted and Fluor's motion for summary judgment based on the FTCA's combatant activities exception (ECF No. 128) is GRANTED.

**IT IS SO ORDERED**.

<u>/s/ Bruce Howe Hendricks</u>
United States District Judge

August 11, 2021
Greenville, South Carolina