**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| Winston Tyler Hencely,<br><br>Plaintiff,<br><br>v.<br><br>Fluor Corporation; Fluor Enterprises, Inc.; Fluor Intercontinental, Inc.; Fluor Government Group International, Inc.<br><br>Defendants. | Civil Action No. 6:19-cv-00489-BHH |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' RENEWED MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

INTRODUCTION .......... 1

BACKGROUND .......... 5

I. The Government and NATO Classified Significant Amounts of Information at the Heart of this Litigation Related to the November 2016 Bagram Airfield Attack. .......... 5

II. The Army Has Repeatedly Denied Formal Requests for Classified Materials and Information Related to the Taliban Attack. .......... 7

STANDARD OF REVIEW .......... 11

ARGUMENT .......... 12

I. THIS SUIT SHOULD BE DISMISSED BECAUSE SENSITIVE MILITARY SECRETS ARE CENTRAL TO THE SUBJECT MATTER OF THE LITIGATION. .......... 12

A. Dismissal Is the Proper Remedy When Lack of Access to Classified Information Precludes Plaintiff's Establishment of a *Prime Facie* Case or Defendant's Development and Presentation of Defenses. .......... 13

B. Dismissal Is Necessary Because the United States Refuses to Allow Use of Classified Information Essential to Resolving This Litigation. .......... 17

1. Plaintiff Cannot Establish a *Prima Facie* Case Without Classified Information, and Any Attempt by Plaintiff to Establish Claims Would Risk Divulging Classified Information. .......... 18

2. Fluor Cannot Fairly Develop and Present Its Main Avenues of Defense Without Classified Information. .......... 22

3. Evidence in the Record Already Indicates There Is Classified Information That Contradicts Plaintiff's Core Allegations. .......... 24

4. The Army Has Made Clear It Will Prevent the Parties from Exploring Factual Areas Related to the Essential Classified Investigation. .......... 26

CONCLUSION .......... 28

Defendants Fluor Corporation, Fluor Enterprises, Inc., Fluor Intercontinental, Inc., and Fluor Government Group International, Inc. (collectively, "Fluor"), respectfully submit this Memorandum of Law in Support of their Renewed Motion for Judgment on the Pleadings ("Motion"). For reasons set forth below, the Court should dismiss Plaintiff's Amended Complaint.[1]

**INTRODUCTION**

In 2021, this Court considered several dispositive motions. The Court granted summary judgment based on preemption, but in so doing recognized a separate fundamental problem with this case were it to proceed: This case cannot be fairly litigated without critical classified information that the United States refused to disclose based on the risk of damage to national security and foreign policy interests. As the Court aptly summarized during argument in June 2021: "[I]f everything is classified, I don't know how the Court ever gets to where it needs to get to have a fair trial." ECF 170, June 4, 2021 Hr'g Tr. 73:9-11. And in the Court's August 2021 opinion, the Court noted: "[W]ere this case to continue in the absence of preemption, the withholding of classified information central to material questions of causation would present a major hurdle, if not a prohibitive event, to the resolution of this matter on the merits." ECF 176 at 7-8 n.8.

Since the Court considered this issue, several developments have amplified and clarified that there is no path forward to fair litigation of this suit without key classified information.

*First*, in 2021 the Court denied Plaintiff's motion in limine to admit into evidence the heavily-redacted Army Regulation ("AR") 15-6 Report ("Partial Report"). ECF 162. The Court explained that it "cannot possibly pass on the admissibility of a government report that neither it,

[1] On April 22, 2026, the Supreme Court vacated the Fourth Circuit's decision, which had affirmed this Court's holding that Plaintiff's claims are preempted. *See Hencely v. Fluor Corp.*, 146 S. Ct. 1086, 1099 (2026). The Supreme Court only addressed the issue of preemption and did not consider the separate legal issues raised in this Motion. *See also id.* at 1106 (Alito, J., dissenting) (noting "[t]he parties may seek discovery of sensitive documents about security threats at Bagram," and "the Government has not yet ruled [] out" invocation of state-secrets privilege).

nor the parties have seen in a form that is even close to complete." *Id.* at 6-7. The Court rejected Plaintiff's inappropriate attempt to establish his claims, and to try the entire case, based on patently *incomplete* and *unclassified* information in the Partial Report. Most salient here, that ruling confirmed that gaining access to *classified* information is essential to fairly litigating this case.

*Second*, despite indications that the Government *might* declassify some information surrounding the attack, *nothing* was declassified or released. In February 2026, after Fluor sought the same classified information related to the Bagram bombing in a separate case (a *qui tam* suit before Judge Dawson), the Army confirmed it has not declassified any information, remains opposed to its release, and lacks authority to declassify most of the information.[2] The Government submitted a declaration by Col. Darren W. Pohlmann, who explained that "[a]pproximately 60% of the documents in the Investigation File—which comprises several thousand pages" remains classified, and "approximately 90% are classified according to provisions outside [the Army]'s declassification authority," including numerous Department of War components, the Department of Homeland Security, and the North Atlantic Treaty Organization ("NATO")—an entity whose "declassification process is wholly outside of the U.S. government control." Ex. 1 at 30.

*Third*, the post-remand proceedings before this Court immediately reiterated the criticality of classified information and the impossibility of proceeding without it. On August 13, 2026, despite the Court's holding that it "cannot possibly pass on the admissibility" of the Partial Report without seeing the entirety of it, ECF 162 at 6-7, Plaintiff filed a "renewed" motion, again seeking to admit into evidence the Partial Report, which Plaintiff labeled "a central piece of evidence."

---

[2] The United States made these assertions in *United States ex rel. Shepherd v. Fluor Corp.*, No. 6:13-cv-02428 (D.S.C. Sept. 9, 2013), in response to Fluor's *Touhy* request for the full classified report and supporting documents. *See* Ex. 1 at 8-9 (Government's motion to quash) *id*. at 14-16 (Fluor's *Touhy* request); *id*. at 26-28 (Army's response to *Touhy* request); *id*. at 29-31 (Decl. of Col. Darren W. Pohlmann attached in support of motion to quash).

ECF 204 at 1. At the August 19 Status Hearing, the Court again noted it "has to see the unredacted report before it can rule on the plaintiff's motion." Ex. 2, Aug. 19, 2026 Hr'g Tr. at 6. Plaintiff agreed "the Court needs to see the unredacted Army report," and Plaintiff indicated he would file a motion seeking an order to obtain the classified materials for *in camera* review. *Id.* at 7.[3]

*Finally*, despite Plaintiff's specious claim that "the case can be fairly litigated whether classified information in the Army Report is available to Fluor or not," ECF 205 at 12, Plaintiff's own admissions and arguments illustrate the futility of proceeding in the absence of the inaccessible classified information. For one thing, Plaintiff agrees "the Court needs to see the unredacted Army report." Ex. 2, Aug. 19, 2026 Hr'g Tr. at 7. Beyond that, Plaintiff's theories on how the case could be litigated are superficial and conclusory. The Court need look no further than the "central questions" posed by Plaintiff in his recent "Status Report." *See* ECF 205 at 6. According to Plaintiff, these questions "*will not be answered by any state secrets information*," and Fluor will *not* be "deprived of the opportunity to mount a meaningful defense in the absence of [classified] information." *Id.* Under cursory examination, Plaintiff's claims fall apart. While the record is incomplete due to the massive volume of information being withheld, the current record establishes that Plaintiff's "central questions" *cannot* be answered *without* classified information:

- Plaintiff asks how Nayeb was allowed "to wander around the base the morning of the bombing," *Id.*, but there is inaccessible classified information showing *Fluor properly escorted Ahmad Nayeb into military custody* on the morning of the attack. Ex. 3, Bednarek Dep. at 74:14-75:1 ("[A.] Sir, there is clear evidence in the report, again, the version we are not able to discuss in this forum, that provides information that this escort, to your question, sir, was, in fact, accomplished on the bus after departure of his work location for transport to the entry or exit control point. Q. . . . Are you saying, sir, that there's something in the classified portion of the Army report that says Fluor's employee Nayeb was properly escorted that morning? Is that your testimony? A. Yeah.").

[3] At the August 19 hearing, Plaintiff indicated he had a motion "ready to file" that "spells out the procedure" for obtaining the classified information. Ex. 2, Aug. 19, 2026 Hr'g Tr. at 7-8. That motion has not yet been filed.

- Plaintiff asks how Nayeb "was able to build a bomb" on base, ECF 205 at 6, but any attempt to resolve whether and how a bomb was constructed on base will require inquiry into how *the Military failed to prevent Taliban operatives from smuggling deadly explosives onto the base*. For example: Did the Military's Entry Control Points fail to stop the smuggling of explosives onto the base over the course of months preceding the attack? Did the Military fail to interdict co-conspirators involved in the construction and detonation of the bomb? There is inaccessible classified information showing Military failures relevant to these questions. *See*, *e.g.*, Ex. 4, AR 15-6 Ex. 4P at 4-5.

- Plaintiff asks how Nayeb was allowed "to roam Bagram Airfield for nearly an hour," ECF 205 at 6, but there is inaccessible classified information showing *the Military had custody of Nayeb and should have escorted him off the base* before the attack, and showing *Nayeb was assisted by co-conspirators*. *See* Ex. 3, Bednarek Dep. at 118:18-23 ("My belief and understanding is that the individual, Nayeb, got on the bus to that entry control point location, that shuttle that I explained a moment ago; and at that point, was met by [a military] escort for guide off of the installation through that pedestrian turnstile."); Ex. 5, AR 15-6 Ex. 2A at 1 ("classified exhibits…produced from other military agencies…identified co-conspirators to the suicide bomber"); *see also* Ex. 6, Wilson Dep. at 57:5-13 ("No one knows how Nayeb got to where he got to when he detonated the bomb, to include military and military investigations. One of the working theories that military had at the time was that Nayeb was taken off base and allowed back through the ECP by the local national guard force the military had in place that was performing the ECP functions and searching all the local nationals as they entered the base.").

Beyond the above, classified information bearing on other core issues remains inaccessible, including information regarding: (i) the Military's decision to deliberately place a Taliban associate on the base without warning Fluor; (ii) failures by the Military's force protection and intelligence functions; and (iii) conduct of co-conspirators. The United States has repeatedly refused to grant access to this essential information, and it is clear that the United States will continue to preclude attempts by the parties to develop evidence surrounding these issues. Without this information, the Court and the parties cannot fairly address core questions, including: Was the attack unforeseeable to Fluor as a matter of law? Was the Military's conduct the sole proximate cause of the attack? Was the conduct of co-conspirators a supervening or intervening cause?

As a result, the Court is faced with an unusual but not unprecedented conundrum. Where unavailable classified information either prevents a plaintiff from establishing a *prima facie* case or prevents a defendant from mounting a viable defense, courts have repeatedly recognized the

obligation to dismiss the suit. *See*, *e.g.*, *El-Masri v. United States*, 479 F.3d 296, 313 (4th Cir. 2007) (recognizing dismissal was necessary because a plaintiff's "personal interest in pursuing his civil claim is subordinated to the collective interest in national security"); *see also Sterling v. Tenet*, 416 F.3d 338, 348 (4th Cir. 2005) ("Yet there can be no doubt that, in limited circumstances like these, the fundamental principle of access to court must bow to the fact that a nation without sound intelligence is a nation at risk."). As the Supreme Court has confirmed, a formal invocation of the state secrets privilege is not a prerequisite for dismissal. *See, e.g.*, *Tenet v. Doe*, 544 U.S. 1, 10-11 (2005) (upholding dismissal of case over breached espionage agreement between CIA and an alleged Soviet defector without an assertion of state secrets). Here, dismissal is appropriate because the United States' repeated refusal to release critical classified information has the same effect that necessitated dismissal in prior suits: Plaintiff lacks admissible evidence sufficient to establish a *prima facie* case; Fluor cannot fairly pursue and present its main avenues of defense; and given the state of the record—both the limited available evidence and the massive universe that is *unavailable* yet plainly relevant to core issues—further litigation would be futile.[4]

## BACKGROUND

### I. The Government and NATO Classified Significant Amounts of Information at the Heart of this Litigation Related to the November 2016 Bagram Airfield Attack.

On November 12, 2016, during the Afghanistan War, Ahmad Nayeb and co-conspirators carried out an enemy attack on U.S. forces by detonating a suicide bomb inside the secure perimeter of Bagram Airfield. Unbeknownst to Fluor, Nayeb was a covert Taliban operative, and

[4] In an *amicus* brief submitted to the Supreme Court, the Solicitor General ("SG") noted that further discovery in this case was "likely" to include requests "to interview, depose, or subpoena military commanders, enlisted men and women, contracting officers, or even senior policymakers, and to demand discovery of military records." Br. for the U.S. as Amicus Curiae, *Hencely*, 2025 WL 2771777, at *21 (Sep. 22, 2025). The SG's brief confirmed: "The United States has not yet determined whether to invoke the state-secrets privilege in this case. . . . Should the case continue, the United States will assess whether invocation of the privilege is warranted." *Id.* at *21 n.1.

the U.S. Military had unilaterally and deliberately placed him on the base despite his Taliban past.

After the attack, the Army launched multiple investigations. Ultimately, the Army, along with numerous other federal entities and NATO, classified much of those proceedings, releasing publicly only a heavily redacted, unclassified Partial Report and keeping much of the supporting materials and separate Army reports classified. *See* ECF 212 at 10-17 (Background § 3).[5]

The full scope of classified information being withheld is unknown. It is clear, however, that the Partial Report excludes critical information regarding the attack, including the role of the U.S. Military and Taliban co-conspirators in the events leading up to the attack. For example:

- The Partial Report omits information regarding Nayeb's history as a Taliban fighter, the Military's knowledge of that history, and the Military's deliberate decision to place a Taliban associate on a secure military base without warning Fluor. ECF 212 at 11-12; 22-23.

- The Partial Report omits Military intelligence revealing the extent of the Military's awareness of potential attacks in the days and months leading up to the bombing. For example, the Partial Report includes a question: "Did U.S. or Coalition Forces have any intelligence of value or indicators regarding the planning and execution of this incident before it occurred?" This question is followed by ten pages of redacted text. *See* ECF 1-1 at 19-28. As another example, the Partial Report indicates that Nayeb gave "trained and coached" answers during Miliary counterintelligence screening months before the attack, which were a "missed indicator" and a "lost opportunity to mitigate the threat posed by Nayeb"—but, all information related to the Military's "lost opportunity" to stop the attack is redacted or entirely withheld. *See id*. at 33.

- The Partial Report omits evidence showing Fluor properly escorted Nayeb into Military custody on the morning of the attack. Ex. 3, Bednarek Dep. at 74:14-75:1 ("[Q] Are you saying, sir, that there's something in the classified portion of the Army report that says Fluor's employee Nayeb was properly escorted that morning? Is that your testimony? A. Yeah.").

- The Partial Report omits Military intelligence regarding Taliban co-conspirators who provided unknown support in the execution of the enemy attack. Ex. 5, AR 15-6 Ex. 2A at 1 ("I have

[5] The Department of Defense's National Industrial Security Program Operating Manual ("NISPOM") "prescribes requirements, restrictions, and other safeguards to prevent unauthorized disclosure of classified information." 32 C.F.R. § 117.1(b)(1). The federal government generally restricts access to classified information to individuals who undergo an extensive background check, sign a nondisclosure agreement, and need to know the information. Exec. Order No. 13,526 § 4.1(a); 32 C.F.R. § 117.3(b) (defining "Authorized person"); *see also* 32 C.F.R. § 117.10. As a result, the federal government controls who can access, store, or disclose classified information. *See* 32 C.F.R. §§ 117.9-117.10; *see also* ECF 101-1 at 11-13 (describing NISPOM regulations, including how they apply to Fluor as a government contractor under the LOGCAP contract).

classified exhibits in my investigation produced from other military agencies who identified co-conspirators to the suicide bomber. At this time, [the Army] does not plan on listing the co-conspirators as subjects in the unclassified [Report] due to the classified means in which they were identified as subjects/co-conspirators.").

- The Partial Report omits evidence and information that establishes, as a retired Lieutenant General testified, that the authors of the report "just flat got it wrong." Ex. 3, Bednarek Dep. at 40:11-14; *id.* at 43:19-24 ("the investigating officer just got it wrong"); *id.* at 97:9-13 ("he just got it wrong in this case; and sometimes that happens; and investigators get it wrong. He's not an investigator; but a combat arms officer; and in this particular situation, his findings in the 15-6 were just incorrect"); *id.* at 99:1-2 ("they simply just got the findings incorrect").

## II. The Army Has Repeatedly Denied Formal Requests for Classified Materials and Information Related to the Taliban Attack.

Both Plaintiff and Fluor have unsuccessfully sought a complete, unredacted version of the report from the Army for use in this litigation, as well as the entirety of the classified investigative files. The parties also sought relevant information during depositions. At all turns, the Army denied *all* requests for classified materials and shut down all questioning surrounding such materials. In addition, the Army recently reiterated that same position in a separate matter in early 2026.

Before filing his Complaint, Plaintiff requested the full AR 15-6 Report from the Army under the Freedom of Information Act ("FOIA"), but the Army rejected Plaintiff's request and provided only the heavily redacted, unclassified version, which Plaintiff relied on to draft his Complaint. *See* ECF 96 at 4 n.8 (noting Partial Report was "central" to Plaintiff's Complaint).

On August 7, 2020, Fluor formally requested that the Army release the full, classified AR 15-6 Report, including all attachments, exhibits, and references, in accordance with the pertinent "*Touhy*" regulations—procedures for litigants to obtain official information and testimony. *See* 32 C.F.R. Part 516; *see also United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). The Army rejected Fluor's request, confirming that "significant sections of the AR 15-6 remain classified and cannot be released in an unredacted state." Ex. 7 (Letter dated Sept. 14, 2020).[6]

---

[6] In 2020, the Army advised Fluor that the Army "requested a Mandatory Declassification Review

On October 20, 2020, Fluor again sought the classified AR 15-6 Report in a FOIA request. Ex. 8 (Letter dated Oct. 20, 2020). The Army again denied the request, explaining that the report and related materials contain classified information regarding, "military plans, weapons systems, or operations"; "intelligence activities (including special activities), intelligence sources, methods or cryptology"; and "foreign relations or foreign activities of the United States, including confidential sources." Ex. 9 (Letter dated Mar. 8, 2021) at 1.

In 2021, the parties attempted to obtain relevant information through depositions of three Army witnesses, but the Army repeatedly made clear its intent to deny access to classified information. Before each deposition, Army counsel sent an approval letter expressly prohibiting the witnesses from divulging classified information. Ex. 10 at 1-2 ("[The witness] is not authorized to discuss any aspect of classified information regarding the Bagram attack or the subsequent investigation."); Ex. 11 at 1-2 (same); Ex. 12 at 1-2 (same). Army counsel attended all three depositions and expressly warned each witness not to divulge classified information. Ex. 13, Jones Dep. at 6:12-8:11 ("[The witness] may not provide classified or privileged information or provide information that is otherwise protected from Public disclosure . . . ."); Ex. 3, Bednarek Dep. at 10:24-13:3 (same); Ex. 14, Weindruch Dep. at 6:13-8:14 (same).

Throughout the depositions, Army counsel prevented the witnesses from testifying about

---

IAW AR 380-5," noting that "[u]ntil that review has been conducted, the classified portions of the AR 15-6 [Report] shall remain classified." Ex. 7 (Letter dated Sept. 14, 2020). However, under Executive Order 13526, "Classified National Security Information," a Mandatory Declassification Review shall not be conducted if the information is "the subject of pending litigation." Exec. Order No. 13,526 § 3.5(a)(3). It is Fluor's understanding that the Army has not undertaken and does not intend to undertake a declassification review of the AR 15-6 Report and related materials. In addition, as set forth in the February 2026 Army sworn declaration referenced *infra*, "a significant portion" of the materials were classified by agencies outside the Army, which "does not possess the unilateral authority to declassify information classified by another agency." *See* Ex. 1 at 30. Further, "a number of documents fall under NATO declassification authority," and the "NATO declassification process is wholly outside of the US government control." *See* Ex. 1 at 30.

classified information. Army counsel interjected during the deposition of Lindsay Weindruch, the Army's contracting officer, to prevent her from answering questions about even "the general contents" of the classified report. Ex. 14, Weindruch Dep. at 36:25-37:19 (Army counsel: "I don't believe Miss Weindruch can properly testify even as to the -- the general contents of the classified version of the 15-6."). Army counsel interjected during the deposition of Lt. Gen. (Ret.) Mick Bednarek to prevent him from describing classified evidence that Fluor properly escorted Nayeb the morning of the attack. Ex. 3, Bednarek Dep. at 75:13-77:7 ("[Q.] You are saying that there's something in the classified portion of the Army report that is evidence that Nayeb was properly escorted that morning by Fluor. That's your testimony, correct? [Army counsel] Major Downie: Now this is Major Downie. The subject matter of the classified 15-6 is not authorized for discussion. . . . if that information is located in the classified report and not located in the publicly released version of the AR 15-6, you are not authorized to answer questions that are pertaining to the classified report"). Gordon Jones, senior Army contracting officer at Bagram, refused to discuss the contents of classified report. Ex. 13, Jones Dep. at 18:22-19:15 ("I am prohibited from disclosing any of the information that was within that 15-6."); *id.* at 46:22-48:7.

In early 2026, Fluor submitted a supplemental *Touhy* request for the classified AR 15-6 Report in connection with *United States ex rel. Shepherd v. Fluor Corp.*, No. 6:13-CV-02428, a non-intervened *qui tam* case initially filed under seal in 2013, which was tried to a jury earlier this year in Greenville before United States District Judge Joseph Dawson III.[7] *See* Ex. 1 at 14-16

[7] *Shepherd* centered on alleged deficiencies in Fluor's management of materials in connection with its LOGCAP IV contract in Afghanistan. While the Bagram bombing was not relevant to the allegations in that case, Relators nonetheless sought to admit the Partial Report referenced herein as evidence—thereby prompting Fluor's request for production of the full, classified AR 15-6 Report and investigative files. As noted above, the Government ultimately moved to quash Fluor's subpoenas in *Shepherd*—and while that motion was pending, Judge Dawson decided that he would not admit any evidence regarding (or even allow mention of) the bombing in the trial, mooting the Government's motion to quash. The classified report was not produced to either of the parties in

(Fluor *Touhy* request). Fluor also issued three trial subpoenas to Army personnel. *Id*. at 17-25 (trial subpoenas). The Army again refused to provide the classified report and related classified records. *Id*. at 26-28 (Army denial of *Touhy* request). Following the Army's 2026 denial, the United States moved to quash Fluor's subpoenas. *Id*. at 1-10 (motion to quash). Critically here, one of the attachments to the Government's motion was a supporting declaration signed by Col. Darren W. Pohlmann, Senior Legal Advisor to the U.S. Army Central ("ARCENT") Commander. *Id*. at 29-31 (Pohlmann declaration). Col. Pohlmann's sworn declaration explained that most of the report and investigative file remains classified, and ARCENT lacks the authority to declassify most of that information. According to Col. Pohlmann, "approximately 90% [of the classified documents in the investigation file] are classified according to provisions outside ARCENT's declassification authority," including NATO provisions outside U.S. control entirely:

> A significant portion of the documents originated with other three [sic] Army entities, five other Department of Defense components, and the Department of Homeland Security. ARCENT does not possess the unilateral authority to declassify information classified by another agency. In addition, a number of documents fall under NATO declassification authority. The NATO declassification process is wholly outside of the US government control. . . . ARCENT has no control over the timelines or outcomes of these external reviews.

*Id.* Col. Pohlmann's declaration explained that the classified file "contains information protected by multiple, well-established governmental privileges," including "[t]he State Secrets Privilege, as disclosure of certain information could cause serious damage to national security." *Id.*[8]

---

*Shepherd* nor was it ever produced to Judge Dawson for his review *in camera.*

[8] *See also* Ex. 1 at 8 (Government's Motion to Quash) (explaining requested "documents contain information concerning military operations, contractor performance in a theater of combat, and internal U.S. Army deliberations"; "[m]uch of this information is outside [the Army]'s classification authority, and the declassification process would entail enormous burden on a protracted timeline, with no guarantee that these efforts would ultimately result in declassification of the requested information"; and "much of the information Fluor requests may implicate

Based on the above history, it is clear that, if the parties were to seek to depose witnesses who possess any knowledge of the Military's force protection and security failures at Bagram, the Military's intelligence-gathering leading up to the attack, the actions of co-conspirators who facilitated the attack, and other relevant topics during merits discovery, the Army would continue to prevent witnesses from answering questions seeking such highly relevant, but classified, information (that is assuming the Army even permits such depositions).[9]

## STANDARD OF REVIEW

"A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standards as a motion to dismiss under Rule 12(b)(6)." *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013).[10] To survive, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). A court "need not accept the [plaintiff's] legal conclusions drawn from the facts, nor need it accept as true unwarranted inferences, unreasonable conclusions, or arguments."

---

governmental privileges, including state secrets").

[9] Many Military witnesses remain on active duty, some deployed overseas. If compelled to appear for depositions, this would pull service members away from duties in service of our Nation's defense and inflict a significant burden on the Military—a burden that, according to the United States, is one reason why this suit should be barred. *See, e.g.*, Br. for the U.S. as Amicus Curiae, *Hencely*, 146 S. Ct. 1086, 2025 WL 2771777, at *21-22 ("Discovery involving service members—such as, in this case, soldiers on active duty on the battlefield who may have witnessed the suicide attack—would also present significant burdens."); *Hencely*, 146 S. Ct. at 1106 (Alito, J., dissenting) ("Depositions and trial testimony by military officers responsible for setting and implementing base security policy and protocols may pose similar problems and may also interfere with those officers' current responsibilities regarding urgent national security challenges.").

[10] As the Fourth Circuit has explained, "where state secrets form the very subject matter of a court proceeding…dismissal *at the pleading stage*…is appropriate." *El-Masri v. United States*, 479 F.3d at 306 (citation and quotation omitted, emphasis added). That said, the Court should grant the Motion even if it were treated as one for summary judgment, and the Court need not allow further discovery to do so. *See*, *e.g.*, *Abilt v. CIA*, 2015 WL 566712, at *4 (E.D. Va. Feb. 10, 2015) ("The Court recognizes the dangers in allowing discovery to proceed in this action where Defendants contend that the very core of Plaintiff's claims implicate classified information. Therefore, the Court declined to allow any discovery in this action.").

*Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (cleaned up). Judgment "under Rule 12(c) is appropriate where the facts stated in the complaint [cannot] support recovery under an otherwise cognizable legal theory." *Bostic v. Bostic*, 2015 WL 5178163, at *1 (D.S.C. Sept. 3, 2015) (citing *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013)).

## ARGUMENT

### I. THIS SUIT SHOULD BE DISMISSED BECAUSE SENSITIVE MILITARY SECRETS ARE CENTRAL TO THE SUBJECT MATTER OF THE LITIGATION.

Regardless of which forum's tort law applies, this case cannot be fairly litigated or tried without risking damage to the national security and foreign policy interests of the United States by exposing classified information.[11] Plaintiff seeks to present sufficient evidence in open court to prove the elements of his claims, including the proximate cause of a deadly bombing attack orchestrated by the Taliban and carried out inside the secure perimeter of a U.S. Military base in an active war zone. Fluor intends to defend itself against Plaintiff's accusations and assert defenses showing, among other things, that the enemy attack was not foreseeable to Fluor and that the Military's deliberate decisions and wartime failures, as well as actions of Taliban co-conspirators, caused the attack and Plaintiff's resulting injuries. Without classified information, Plaintiff cannot establish his claims; Fluor cannot develop and present its main avenues of defense; and the Court

[11] At the August 19 Status Hearing, the Court noted it has not yet resolved the choice-of-law issue, including whether South Carolina, Afghan, or some other forum's law applies. As explained below, under South Carolina or Afghan law, litigating this suit without core classified information is neither practically feasible nor in accordance with fundamental principles of fairness. For example, the Court cannot resolve foreseeability and causation issues that would arise under either South Carolina or Afghan law. *See, e.g.*, *Sherman v. Scotts Co.*, 2026 WL 788925, at *7 (D.S.C. Mar. 20, 2026) (ruling in favor of defendant because superseding cause broke causal chain); *see also* Afghan Civil Code of 1977, Article 783 (providing there is no liability under Afghan tort law if there is an "external cause" responsible for harm). Nor can the Court assess the legal import of co-conspirators. *See Patel v. Truist Bank*, 2023 WL 12204763, at *3 (D.S.C. Aug. 25, 2023) (finding defendant was not proximate cause of injury "caused by the unforeseen, intervening criminal act of a third party"); *see also* Afghan Civil Code of 1977, Article 783 (noting there is no liability under Afghan tort law if a third party's fault is an external cause responsible for harm).

and the ultimate factfinder may reach an erroneous result. This reality necessitates dismissal.

### A. Dismissal Is the Proper Remedy When Lack of Access to Classified Information Precludes Plaintiff's Establishment of a *Prime Facie* Case or Defendant's Development and Presentation of Defenses.

In many civil cases involving classified information, courts are compelled to dismiss the case rather than risk a possible disclosure of sensitive information.[12] Dismissal is particularly appropriate when "the circumstances make clear that sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters." *See Sterling*, 416 F.3d at 348 (quoting *DTM Research, LLC v. AT&T Corp.*, 245 F.3d 327, 334 (4th Cir. 2001)); *Bowles v. United States*, 950 F.2d 154, 156 (4th Cir. 1991) ("If the case cannot be tried without compromising sensitive foreign policy secrets, the case must be dismissed."); *see also Totten v. United States*, 92 U.S. 105, 107 (1875) (recognizing that classified information so pervades some matters as to be incapable of judicial resolution once the government has refused to release the information).[13]

In some cases, under the "mosaic theory," it may be impossible to separate the subject matter of the case from the classified information, particularly because "the business of foreign intelligence gathering in this age of computer technology" allows "[t]housands of bits and pieces of seemingly innocuous information can be analyzed and fitted into place to reveal with startling

[12] The reason for such caution is based, in part, on the fact that even *in camera*, *ex parte* review poses a risk of disclosure of highly sensitive information. *See*, *e.g.*, *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1369 (4th Cir. 1975) ("It is not to slight judges, lawyers or anyone else to suggest that any such disclosure carries with it serious risk that highly sensitive information may be compromised. In our own chambers, we are ill equipped to provide the kind of security highly sensitive information should have.").

[13] Although *Totten* is best known for its application to suits involving secret spy contracts, the Fourth Circuit has recognized that it stands for a broader proposition and extends beyond that context—specifically, the "proposition that a cause cannot be maintained if its trial would inevitably lead to the disclosure of privileged information." *See El-Masri*, 479 F.3d at 306.

clarity how the unseen whole must operate." *Halkin v. Helms*, 598 F.2d 1, 8 (D.C. Cir. 1978); *see also Kasza v. Browner*, 133 F.3d 1159, 1166 (9th Cir. 1998) ("Accordingly, if seemingly innocuous information is part of a classified mosaic, the state secrets privilege may be invoked to bar its disclosure and the court cannot order the government to disentangle this information from other classified information."). The Supreme Court has recognized this reality, making clear that "where state secrets form the very subject matter of a court proceeding…dismissal at the pleading stage—'without ever reaching the question of evidence'—is appropriate." *El-Masri*, 479 F.3d at 306 (quoting *United States v. Reynolds*, 345 U.S. 1, 11 n.26 (1953)).

The need for dismissal applies equally when the sensitive military secrets are central to a plaintiff's claims as to a defendant's defenses. As the Supreme Court explained, "[i]t is claims *and* defenses *together* that establish the justification, or lack of justification, for judicial relief; and when public policy precludes judicial intervention for the one it should preclude judicial intervention for the other as well." *Gen. Dynamics v. United States*, 563 U.S. 478, 487 (2011) (emphasis in original). Accordingly, the Fourth Circuit has routinely affirmed dismissals when the government refuses to allow the parties to use classified information needed to support their respective claims *or* defenses. *Abilt v. CIA*, 848 F.3d 305, 316 (4th Cir. 2017); *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 281 (4th Cir. 1980) (en banc).[14]

---

[14] Other circuits have adopted a similar approach, affirming dismissals when the government refused to permit access to classified information necessary to prove either the plaintiff's claims or the defendant's defenses. *In re Sealed Case*, 494 F.3d 139, 149 (D.C. Cir. 2007); *Tenenbaum v. Simonini*, 372 F.3d 776, 777 (6th Cir. 2004) ("Defendants cannot defend their conduct with respect to [the plaintiff] without revealing the privileged information"); *Bareford v. Gen. Dynamics Corp.*, 973 F.2d 1138, 1143 (5th Cir. 1992) ("[A]ny further attempt by the plaintiffs to establish a prima facie case would threaten disclosure of important state secrets"); *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 547-48 (2d Cir. 1991) ("[T]here is no evidence available to the appellant to establish a prima facie case… Discovery would thus be a waste of time and resources."); *Molerio v. FBI*, 749 F.2d 815, 825 (D.C. Cir. 1984) (granting summary judgment where state secrets privilege precluded government from asserting valid defense); *see also White v. Raytheon Co.*, 2008 WL 5273290, at *5 (D. Mass. Dec. 17, 2008) (dismissing case because court could "see no

For example, in *Farnsworth*, the en banc Fourth Circuit affirmed dismissal of an action between a government contractor and an individual Navy employee, alleging tortious interference with four classified Navy contracts. *See Farnsworth*, 635 F.2d at 281. The Navy refused to allow the litigants to discuss the nature of the contracts, the organizational structure of the Navy component where the defendant worked, or the defendant's job responsibilities. *Id.* at 269. The Fourth Circuit explained that classified information was so central to the dispute that "[i]n an attempt to make out a prima facie case during an actual trial, the plaintiff and its lawyers would have every incentive to probe as close to the core secrets as the trial judge would permit." *Id.* at 281. Under the mosaic theory, "[s]uch probing in open court would inevitably be revealing," and dismissal was therefore necessary. *Id.*; *see also Kasza*, 133 F.3d at 1166.

In *Sterling*, the Fourth Circuit dismissed a covert employee's Title VII discrimination case against the Central Intelligence Agency. 416 F.3d at 341. It reasoned that, to succeed on her discrimination claim, the employee would need to show evidence about the treatment of other similarly situated covert operatives. *Id.* at 346. The CIA refused to let the parties use information about its operatives in the litigation because it was classified. *Id.* at 345-46. The court also dismissed the employee's claim that the CIA retaliated against her by subjecting her to early security re-investigations. *Id.* at 347. Those claims required proof of the CIA's internal security policies and procedures, which the CIA also refused to allow into the case. *Id.* On top of that, the court held that "[e]ven assuming [the employee] were somehow able to manage the impossible feat of making out all the elements of a Title VII claim without revealing state secrets, further issues would remain" because the government would still be "entitled to present, as a defense to

practical means by which Raytheon could be permitted to mount a fair defense without revealing state secrets"); *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1496 (C.D. Cal. 1993) ("[T]he state secrets privilege seriously prejudices Hughes' ability to defend against plaintiffs' case.").

[the employee's] prima facie case, legitimate nondiscriminatory reasons for its actions." *Id.* at 347.[15] But, again, those legitimate nondiscriminatory reasons for hiring and promoting the covert operatives were classified.[16]

Applying the same principles, the U.S. District Court for the District of Massachusetts dismissed a private tort suit against a contractor, arising out of Operation Iraqi Freedom, when the government refused to release classified information essential to the contractor's defenses. *See White*, 2008 WL 5273290, at *5. In *White*, the court dismissed a claim by a U.S. soldier tragically killed in a friendly fire incident involving the Raytheon-manufactured Patriot missile system. *Id.* at *1. The government would not release classified information about the Army's missile defense operations, including the Patriot system's rules of engagement. *Id.* In its defense, Raytheon asserted a proximate cause defense and the government contractor defense, which both required information the government refused to allow into the case. *Id.* at *3-4. The court had "no alternative but to order the case dismissed" after "see[ing] no practical means by which Raytheon could be permitted to mount a fair defense without revealing state secrets." *Id.* at *5.[17]

---

[15] More recently, the Fourth Circuit reached the same conclusion in *Abilt v. CIA*, where it held that even if plaintiff could clear the "extremely high hurdle given the facts," Fourth Circuit "precedent nonetheless requires dismissal because any defense to these claims that the government could offer would undoubtedly rely on privileged information." 848 F.3d at 316.

[16] In his August 2026 "Status Report," ECF 205, Plaintiff cited the Fourth Circuit's March 2026 decision in *Al Shimari v. CACI Premier Tech., Inc.*, 170 F.4th 162 (4th Cir. 2026), *opinion vacated on reh'g sub nom.*, 2026 WL 2547096 (4th Cir. Aug. 28, 2026). In *Shimari*, the Fourth Circuit reaffirmed the legal principle outlined herein—i.e., that a court assessing whether a suit can proceed in the absence of classified information should "determine[e] whether a party can establish the elements of a claim or defense without privileged information." *Shimari*, 170 F.4th at 200. In *Shimari*, the case had already been litigated and tried, and the classified information was peripheral to the core issues and had not prejudiced the defendant from presenting its "main avenues of defense." *Id.* at 197-98 (quoting *El Masri*, 479 F.3d at 309). Here, in contrast, the classified information is central to both Plaintiff's claims and Fluor's main avenues of defense.

[17] Although the Fourth Circuit cases in which courts have dismissed actions on national security grounds also involved the government's invocation of the state secrets privilege, that step is not a prerequisite. The Supreme Court has confirmed dismissal as the appropriate option even without

**B. Dismissal Is Necessary Because the United States Refuses to Allow Use of Classified Information Essential to Resolving This Litigation.**

For the same reasons the Fourth Circuit dismissed *Sterling* and *Farnsworth*, the Court should dismiss Plaintiff's claims, which cannot be fairly resolved without delving into sensitive military secrets. To allow those claims to proceed, the Court would need to invite a real risk of injury to national security and foreign policy concerns, and would introduce the risk of a verdict that is false or mistaken. Neither is an option under the law.

As this Court has acknowledged, "the withholding of classified information central to material questions of causation would present a major hurdle, if not a prohibitive event, to the resolution of this matter on the merits." ECF 176 at 8 n.8. At its core, this case concerns liability for the injuries of an active-duty U.S. Army soldier serving in a war zone at a U.S. Military-controlled operating base that was subjected to an orchestrated Taliban suicide bombing attack—an attack carried out by a Taliban operative who was at the time known as such to the Army and nonetheless permitted by the Army onto the base for years. Given that backdrop, along with the designation of substantial relevant information as classified, it is inevitable that zealous advocates representing both parties will "have every incentive to probe as close to the core secrets as the trial judge would permit." *Farnsworth*, 635 F.2d at 281; *see also Gen. Dynamics v. United States*, 563

a formal assertion of state secrets. *See*, *e.g.*, *Tenet*, 544 U.S. at 10-11 (upholding dismissal of case over breached espionage agreement between CIA and an alleged Soviet defector without an assertion of state secrets); *Weinberger v. Cath. Action of Haw./Peace Educ. Project*, 454 U.S. 139, 146-47 (1981) (affirming dismissal of suit challenging the Navy's failure to file a required environmental impact statement where, "[d]ue to national security reasons," the Navy could "neither admit nor deny" the fact that was central to the suit: "that it propose[d] to store nuclear weapons" at a facility). The formal assertion of state secrets signals to a court that a case touches on sensitive national security information, but the United States can send the same signal in other ways. It can file a statement of interest, intervene in the litigation, or—as it has done here—repeatedly refuse to grant the parties access to the classified information for use in the litigation. There is no functional difference in the outcome between the Army's repeated denials and a formal assertion of the state secrets privilege.

U.S. at 487 ("Every document request or question to a witness would risk further disclosure, since both sides have an incentive to probe up to the boundaries of state secrets."); *Hencely*, 146 S. Ct. at 1106 (Alito, J., dissenting) (noting the parties are likely to seek discovery of sensitive documents impacting national defense and foreign policy interests and depose Military personnel regarding security protocols and the accident investigation). This is especially true because, as detailed below, the classified information is central to the core issues, claims, and defenses in this case.

1. Plaintiff Cannot Establish a *Prima Facie* Case Without Classified Information, and Any Attempt by Plaintiff to Establish Claims Would Risk Divulging Classified Information.

Plaintiff has consistently stated that the Partial Report is central to his case. *See* ECF 204 at 1 ("The redacted Army Report (RAR) . . . has emerged as a central piece of evidence in this case. . . . Both parties rely on the RAR."); ECF 112 at 17 ("Plaintiff's complaint is based on the redacted Army Report and, as Plaintiff argued in his motion *in limine*, that report is admissible into evidence. Plaintiff needs no further information from the Army to make out a *prima facie* against Fluor.") (citation omitted); *see generally* ECF 1 (Complaint, citing repeatedly to Partial Report). This Court, however, has declined to admit the Partial Report into evidence. *See* ECF 162 at 6 ("[T]he Court cannot possibly pass on the admissibility of a government report that neither it, nor the parties have seen in a form that is even close to complete."). Without the Partial Report, Plaintiff by his own admission lacks admissible evidence to establish a *prima facie* case.

Even if the Court gained *in camera* access to the classified report, that would not solve Plaintiff's problem. Regardless, the heavily redacted, unclassified AR 15-6 Report (i.e., the Partial Report) would remain inadmissible. *See generally* ECF 212. Among other reasons, the Partial Report is incomplete, lacks reliability and trustworthiness, and fails to qualify under any hearsay exception. *Id.* at 21-30. The Partial Report contradicts exhibits and includes inaccurate references to material facts. *See*, *e.g.*, *id.* at 14-16 (discussing references in the investigative file to co-

conspirators that were deliberately excluded from the unclassified report; knowledge by the Military that Local Nationals were smuggling contraband onto the base and trading favors with security personnel; and analysis of the explosives found at bomb site that linked Nayeb to high-level Taliban leadership). Furthermore, the Army's rushed investigation was conducted without regard for the rules of evidence and led by combat soldiers lacking investigative experience—which independently casts doubt on its reliability. *Id.* at 27-30. And the Partial Report cites extensively to and relies almost exclusively on classified and unreleased exhibits, which further renders it impossible for Plaintiff to resolve obvious double or triple hearsay problems. *Id.* at 23-25. Thus, if Plaintiff hopes to establish an evidentiary basis for the Army's conclusions, at a bare minimum Plaintiff would need to introduce the classified information underlying these documents.

Even if the Court were to admit into evidence some or all of the Partial Report, *but see* ECF 162, Plaintiff's presentation of his case by way of such partial, unclassified information would jeopardize disclosure of classified information either directly or indirectly under the well-established "mosaic theory." The mosaic theory recognizes that it is often impossible to extricate classified information from unclassified information, and thus even unclassified information alone can reveal, indirectly, the contents of classified materials. Courts have recognized that foreign enemies can assemble "seemingly innocuous information [into] part of a classified mosaic." *Kasza*, 133 F.3d at 1166. Here, for example, according to Plaintiff, the "central questions" include how Nayeb was able "to wander around the base the morning of the bombing for nearly an hour without an escort," and how Nayeb was "able to build a bomb" on the base. ECF 205 at 6. Even assuming, *arguendo*, that Plaintiff had admissible evidence supporting his theory as to the answers to those questions, Plaintiff is not the only party in the case. During discovery and at trial, Fluor would be entitled to probe any such evidence by pursuing plainly relevant information regarding,

*inter alia*, the Military's knowledge of the extraordinary risk posed by Nayeb and related threat actors; the Military's force protection and security protocols; whether the Military's Entry Control Points failed to prevent smuggling of deadly explosives; whether the Military's intelligence failed to act on known threats; whether co-conspirators facilitated the building or detonation of the bomb; and whether the Military failed to interdict Taliban co-conspirators. Even if such probing could plausibly focus only on available *unclassified* information, the mere process of conducting discovery and delving into Plaintiff's allegations would allow enemy combatants to discern *classified* aspects of the facts surrounding the attack—for example, the Military's tactics and techniques employed at Entry Control Points. That sort of information would be of obvious value to enemy combatants. Likewise, the public probing of these issues could damage foreign policy interests, particularly given the known presence of information classified under NATO's authority.

Under the facts here, this Court cannot eliminate that risk through evidentiary rulings. As the Fourth Circuit has recognized, it may be difficult to identify "[i]nformation within the possession of the parties on the periphery of the suppression order." *Farnsworth*, 635 F.2d at 281. Beyond that, trying to balance the evidence presented—as between classified and unclassified—risks confusing the factfinder and allowing a slanted and incomplete picture to be presented as the whole truth. *See In re Sealed Case*, 494 F.3d 139, 151 (D.C. Cir. 2007) (dismissing case when "the truthful state of affairs would deny a defendant a valid defense that would likely cause a trier [of fact] to reach an erroneous result"). And forcing parties to litigate a case with significant gaps in the evidence can lead to a false or mistaken verdict. *See Farnsworth*, 635 F.2d at 281.

Moreover, regardless of any evidentiary rulings, Fluor would need to probe near and beyond the boundaries of a wealth of classified information. That is true regardless of the applicable law, as issues of foreseeability and proximate cause are relevant under any potentially-

applicable tort regime. For example, under South Carolina law, Plaintiff would need to show that his injuries were "the natural and probable consequences of the complained act." *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 638 S.E.2d 650, 662 (S.C. 2006). Similarly, under Afghan law, Plaintiff would need to establish that his injuries resulted from Fluor's conduct rather than "external" causes such as the Army and co-conspirators. *See* Afghan Civil Code of 1977 at Articles 777, 779, 783 (outlining principles of causation under Afghan tort law and explaining that a defendant is not liable where it is shown that an "external" cause was responsible for the harm). In response to whatever evidence Plaintiff presents in an attempt to establish causation, Fluor would be entitled to cross-examine Plaintiff's witnesses about, *inter alia*, missed counterintelligence indicators, the Army's knowledge of Nayeb's Taliban ties and failure to warn Fluor of these ties, the gaps and seams in Military security that the Taliban operatives exposed in carrying out the attack, and the unprecedented nature of an on-base attack.[18] But this information is classified, and probing the information creates a serious risk of disclosure. *See Farnsworth*, 635 F.2d at 281 ("Such probing in open court would inevitably be revealing.").

As a result, dismissal is the only appropriate and practical result because, as in *Farnsworth*, "any attempt on the part of [P]laintiff to establish a prima facie case" of Fluor's negligence being the proximate cause of the Taliban suicide bombing attack "would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation." *Farnsworth*, 635 F.2d at 281.

[18] Army personnel described the on-base Taliban attack as "unprecedented" and "unforeseeable," from the Army's perspective, *see* Ex. 15, AR 15-6 Ex. 4O at 7, because, among other things, "historically, there has never been a kinetic attack on the base from within, we just never really thought there would be," Ex. 16, AR 15-6 Ex. 3O at 7.

### 2. Fluor Cannot Fairly Develop and Present Its Main Avenues of Defense Without Classified Information.

Regardless of the impact of the missing classified information on Plaintiff's claims, Fluor needs the information that the Government refuses to disclose in order to defend itself. *See El-Masri*, 479 F.3d at 309 (stating that dismissal is appropriate if "the defendants could not properly defend themselves without using privileged evidence"); *Farnsworth*, 635 F.2d at 281. Fluor's inability to obtain classified information effectively dismantles its main avenues of defense. This is true under either South Carolina law or Afghan law.

If South Carolina law applies, the withheld classified information is critical to Fluor's ability to establish, for example: (i) the Military's actions leading up to the bombing were an unforeseeable superseding cause that broke the causal chain between Fluor's actions and the November 12, 2016 attack[19]; (ii) the Military's failures throughout the course of Fluor's alleged negligence were a superseding cause that broke the causal chain to Fluor[20]; (iii) Nayeb's co-conspirators' intervening acts were an unforeseeable superseding cause that broke the causal chain to Fluor[21]; (iv) Nayeb's intervening criminal acts were an unforeseeable superseding cause that broke the causal chain to Fluor[22]; and (v) the attack was not a foreseeable consequence of Fluor's

[19] *See Sherman*, 2026 WL 788925, at *8 ("A prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible, if there intervened between such prior or remote cause and the injury a distinct, successive, unrelated and efficient cause of the injury, even though such injury would not have happened but for such condition or occasion.") (quoting *Driggers v. City of Florence*, 2 S.E.2d 790, 791 (S.C. 1939)).

[20] *See Sherman*, 2026 WL 788925, at *1, *2, *8 (finding intervening act that occurred during defendant's alleged negligence, which spanned months, was superseding cause of injuries).

[21] *See Patel v. Truist Bank*, 2023 WL 12204763, at *3 (D.S.C. Aug. 25, 2023) (finding bank was not proximate cause of plaintiff's injury where injury "was caused by the unforeseen, intervening criminal act of a third party").

[22] *See Bass v. Gopal, Inc.*, 716 S.E.2d 910, 916-17 (S.C. 2011) (finding attempted robbery at defendant's motel was unforeseeable superseding cause, despite county's relatively high crime

alleged failures based on the information available to Fluor.[23]

Similar factual arguments would *also* defeat Plaintiff's claims if Afghan law applies. *See, e.g.*, Afghan Civil Code Articles 777, 779, 783 (explaining that a person is not liable for harm absent a direct causal link between the impugned act and the injury, and that "external" causes preclude liability, including unexpected events or a third party's fault).

To fairly develop and present these defenses, Fluor needs classified information regarding topics that, the United States has made clear, are off limits for discovery in this matter, including:

- the Military's decision to knowingly and deliberately place a Taliban associate on the base;
- the Military's repeated mis-assessments of Nayeb's threat level that resulted in the Military granting base access to Nayeb continuously for a period of years;
- the Military's years-long failure to inform Fluor that Nayeb had Taliban ties;
- the contents and results of the Military's numerous counterintelligence screenings in the years and months leading up to the attack;
- the Military's failure to act on Nayeb's suspicious behavior that the Military alone witnessed during counterintelligence screenings just months prior to the attack;
- the Military's failure to detect or prevent the smuggling of explosive materials into Bagram by Nayeb and/or co-conspirators, apparently over the course of at least months;
- the Military's decision to deny Fluor's request to increase surveillance of local nationals, which would have resulted in "24/7 eyes on" including at the worksite;
- the Military's intelligence that apparently indicated a likely attack in the days leading up to the bombing, including the Military's failure to act on that intelligence and failure to provide any warning to Fluor of the threat;
- the Military's force protection failures leading up to the attack;

---

rate, due to lack of evidence of prior criminal incidents at defendant's motel).

[23] *Shepard v. S.C. Dep't of Corr.*, 385 S.E.2d 35, 38 (S.C. Ct. App. 1989) ("Foreseeability is to be judged from the perspective of the actor at the time of the negligent act . . . ."); *see also* Ex. 15, AR 15-6 Ex. 4O at 7 (Army personnel viewed attack as "unprecedented" and "unforeseeable"); Ex. 16, AR 15-6 Ex. 3O at 7 ("historically, there has never been a kinetic attack on the base from within, we just never really thought there would be").

- the Military's intelligence regarding the existence, identity, and role of co-conspirators involved in the attack; and
- the Military's failure to act on its intelligence to interdict Taliban co-conspirators.

And it is not only defenses relating to foreseeability and causation that are disabled by virtue of inaccessible, highly relevant, classified information. The absence of this information also disables Fluor's ability to prove its government contractor defense.[24] In particular, Fluor will be prevented from establishing that the United States possessed superior knowledge of key information about Nayeb's association with the Taliban, intelligence suggesting an upcoming attack, and possible co-conspirators which it failed to share with Fluor prior to the attack. *See*, *e.g.*, *Harduvel v. Gen. Dynamics Corp.*, 878 F.2d 1311, 1322 (11th Cir. 1989) (finding contractor met knowledge prong of *Boyle* by showing government knew of potential defect); *see also Helene Curtis Indus., Inc. v. United States*, 312 F.2d 775, 778 (Ct. Cl. 1963) ("[T]he Government—where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word.").

3. Evidence in the Record Already Indicates There Is Classified Information That Contradicts Plaintiff's Core Allegations.

Fluor's need for the information outlined above is essential for basic fairness, but that need

[24] The government contractor defense shields contractors from liability under state tort law, when the contractor proves that (1) the government provided reasonably precise specifications governing the conduct; (2) the contractor's performance conformed to those specifications; and (3) the Military's actual knowledge of the risks at issue was equal to or greater than that of the contractor. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 501 (1988). Fluor recognizes that the Supreme Court found that *Boyle* did not compel dismissal based on the record before it. However, the Supreme Court's reasoning applied to a different defense and was based on assumed facts most favorable to Plaintiff under the standard of review for summary judgment: "Hencely sued Fluor for conduct that, we assume (as the Fourth Circuit did), was not authorized by, but was even contrary to, federal instructions." *Hencely*, 146 S. Ct. at 1095. If this case proceeds, Fluor would be entitled to pursue discovery to prove it *did* comply with federal instructions, and a more complete record may show that the government contractor defense applies to defeat Plaintiff's claims, consistent with the Supreme Court's discussion of *Boyle* in *Hencely*. However, without access to classified information, Fluor cannot fairly develop evidence to support this defense.

is even more compelling considering evidence in the record indicating that inaccessible classified information *contradicts core allegations in Plaintiff's Complaint*, including the allegation that Fluor failed to properly escort Nayeb on the morning of the attack. *See* Ex. 3, Bednarek Dep. at 74:14-75:1 ("[A.] Sir, there is clear evidence in the report, again, the version we are not able to discuss in this forum, that provides information that this escort, to your question, sir, was, in fact, accomplished on the bus after departure of his work location for transport to the entry or exit control point. Q. . . . Are you saying, sir, that there's something in the classified portion of the Army report that says Fluor's employee Nayeb was properly escorted that morning? Is that your testimony? A. Yeah."); *id.* at 118:18-23 ("My belief and understanding is that the individual, Nayeb, got on the bus to that entry control point location, that shuttle that I explained a moment ago; and at that point, was met by [a military] escort for guide off of the installation through that pedestrian turnstile."); *see also* Ex. 6, Wilson Dep. at 57:5-13 ("One of the working theories that military had at the time was that Nayeb was taken off base and allowed back through the ECP by the local national guard force the military had in place that was performing the ECP functions and searching all the local nationals as they entered the base."); *id.* at 56:7-10 ("[Q.] So is it your testimony that Fluor, in fact, fulfilled its duty and got Nayeb off the base that morning before the bombing? A. It is a strong possibility, yes, sir."); *id.* at 111:20-22 ("We know that reportedly he detonated, but we do not know that he did not leave the base and return.").

Plaintiff asserts, in conclusory fashion, that Fluor will not be deprived of "the opportunity to mount a meaningful defense" without classified information. ECF 205 at 6. But that claim rings hollow given not only the sheer volume of *missing* information bearing on core issues, but also the testimony of Lt. Gen. (Ret.) Bednarek, in particular, who repeatedly explained there is classified information establishing that the Army investigators "got it wrong" in their findings:

> After reading it, I completely disagree with the findings and -- But I cannot discuss that due to the classification nature of it[.] [P]ersonally with General James, Tom James. You know, he is a superb officer. Know him personally very, very well; and, unfortunately, sometimes investigators make mistakes; and he just flat got it wrong. He's a top officer, excellent superior Army leader. [interruption] Not an investigator. And, again, I've reviewed both class[ified] and unclass[ified] versions, so I'm very sensitive to discussing those versions.

Ex. 3, Bednarek Dep. at 40:7-22; *id.* at 41:20-42:4 ("Q. Now isn't it true that you just stated that you had reviewed the classified portions of the Army report? A. I have. Q. And isn't it true that you just stated that -- that in your opinion, Lieutenant General James and his team got it all wrong? A. There are clear areas in the report that were just incorrect, and that's why I disagree with the -- with the findings. Correct."); *id.* at 43:11-24 ("As I mentioned, sir, that sometimes investigators just make mistakes. I have done many of these 15-6 investigations, some in a combat zone in my prior experiences. Very short period of time where James had an opportunity to pull this -- pull a team together and -- and work through this very complex and detailed 15-6 investigation. But in -- in my assessment, after reading the classified version of the document -- and, again, I will not get into any details of that pursuant to Major Downie's discussion; but in this case, the officials -- the investigating officer just got it wrong."); *id.* at 97:6-13 ("Again, I know General James very, very well, a highly decorated combat commander and senior officer. Again, he just got it wrong in this case; and sometimes that happens; and investigators get it wrong. He's not a investigator; but a combat arms officer; and in this particular situation, his findings in the 15-6 were just incorrect.").

4. The Army Has Made Clear It Will Prevent the Parties from Exploring Factual Areas Related to the Essential Classified Investigation.

The parties' inability to access classified information is not hypothetical; it has been established repeatedly over the course of years of litigation. Beyond refusing to declassify or release a massive volume of information, the Army has made clear that it will not permit deposition

inquiry into any of the topics described above. That reality is evidenced by the Army's repeated admonitions to witnesses prior to and during depositions, and Army counsel's repeated interjections at depositions when questioning touched on topics related to the classified investigation. *See*, *e.g.*, Ex. 3, Bednarek Dep. at 75:13-23 ("[Q.] You are saying that there's something in the classified portion of the Army report that is evidence that Nayeb was properly escorted that morning by Fluor. That's your testimony, correct? [Army Counsel] Major Downie: Now this is Major Downie. The subject matter of the classified 15-6 is not authorized for discussion…This is not the appropriate forum to discuss what is inside the classified AR 15-6."); *id.* at 77:1-12 (Army counsel instructing witness: "if that information is located in the classified report and not located in the publicly released version of the AR 15-6, you are not authorized to answer questions that are pertaining to the classified report," and witness responding: "Based on that guidance, I cannot answer this question."). The Army acted to protect against divulgence of sensitive information that the United States has deemed must remain classified, but the Army's interjections forestalled any meaningful development of the record.

As explained *supra*, the Army recently reiterated its refusal to release this information. *See* Ex. 1 at 8-9, 31-32. Fluor supports the Court's efforts to obtain the entirety of the classified materials relating to the attack, as Fluor has repeatedly noted. But given the Government's repeated and unequivocal statements, there is no reason to believe the United States will permit use of key classified information in this litigation. Rather, for reasons the Government outlined, efforts to conduct highly relevant discovery would risk direct disclosure of classified information that "could cause serious damage to national security," *see* Ex. 1 at 31 (Pohlmann declaration), as well as indirect disclosure under the "mosaic theory." That threat of improper disclosure of classified information is inevitable and unavoidable given the nature of the information, which, as set forth

herein, is inextricably interwoven with the claims and defenses at issue.

For example, if discovery were to proceed, beyond witnesses who possess firsthand knowledge regarding the topics noted *supra* (most of whom are currently anonymous due to their names being redacted), Fluor would be compelled to seek to depose members of the Army AR 15-6 Investigation Team: Lt. Gen. Thomas S. James Jr.; Col. Russell N. Parson; Col. Carol M. Tschida; Maj. Keith W. Benedict; Cpt. Nathan D. Platz; and Sgt. First Class Elizabeth M. Weaver. Even assuming the Army allows such depositions, none of these witnesses will be permitted to answer any questions regarding the vast universe of classified information related to their investigation. Beyond that, by virtue of having worked on the classified report, those individuals possess *both* classified and unclassified information—a quintessential example of the "mosaic theory" problem, and one that would create yet another insurmountable practical hurdle to developing highly relevant evidence. Indeed, the "mosaic theory" problem already surfaced in this case and would inevitably arise again if the parties were to delve into core facts. *See* Ex. 13, Jones Dep. at 47:2-48:7 (Army contracting officer struggling to respond to Plaintiff's questioning without divulging classified information, testifying: "I'm considering it classified information, because I don't know what the unclassified information is. . . . Listen, I have a top secret security clearance. It has not been revoked. I am still under the nondisclosure statements. I will not violate the terms of that nondisclosure statements and jeopardize my security clearance.").

## CONCLUSION

As the litigation to date has demonstrated, Plaintiff's claims and Fluor's defenses cannot be fairly litigated, and further proceedings, including additional discovery, would be futile. Beyond being futile, attempting to proceed would be highly burdensome and disruptive on the U.S. Military as well as this Court, and would pose the very real risk of inadvertent disclosure of information that could harm national security and foreign policy interests. For these reasons, and

because the United States refuses to allow the use of classified information central to Plaintiff's claims and Defendants' defenses, the Court should grant Fluor's Motion and dismiss this case.

Respectfully submitted,

s/ *Andrew A. Mathias*
Andrew A. Mathias (Fed. Bar No. 10166)
Konstantine P. Diamaduros (Fed. Bar No. 12368)
MAYNARD NEXSEN PC
104 South Main Street, Suite 900 (29601)
P.O. Box 10648
Greenville, SC 29603-0648
Telephone: (864) 370-2211
AMathias@maynardnexsen.com
KDiamaduros@maynardnexsen.com

Mark C. Moore
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Telephone: 803.540.2146
MMoore@maynardnexsen.com

Harold Watson Gowdy, III (Fed Bar No. 5675)
Trey Gowdy Law Firm, LLC
PO Box 3324
Spartanburg, SC 29304
Telephone: (864) 373-2251
treygowdy89@gmail.com

Raymond B. Biagini (*admitted pro hac vice*)
Daniel L. Russell Jr. (*admitted pro hac vice*)
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
RBiagini@cov.com
DRussell@cov.com

*Counsel for Fluor*

September 4, 2026
Greenville, South Carolina